UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRACKMAN, INC., <br><br> Plaintiff, <br><br> v. <br><br> GSP GOLF AB d/b/a GSPRO, DAVOR BOGAVAC, SIMULATORGOLFTOUR LLC, and CHAD COOKE, <br><br> Defendants. | Case No. 1:23-cv-598-NRB |
| GSP GOLF AB d/b/a GSPRO and DAVOR BOGAVAC, <br><br> Counterclaim Plaintiffs, <br><br> v. <br><br> TRACKMAN, INC., <br><br> Counterclaim Defendant. | |

## FIRST AMENDED COMPLAINT

Plaintiff TrackMan, Inc. brings this complaint against Defendants GSP Golf AB, Davor Bogavac, SimulatorGolfTour LLC, and Chad Cooke (collectively, "Defendants").

## THE PARTIES

1.      TrackMan, Inc. ("TrackMan") is a technology company that offers hardware and software for tracking and simulating athletic performance.  TrackMan is a Delaware corporation with its headquarters and principal place of business at 16445 North 91st Street, Suite 104, Scottsdale, Arizona, 85260.

2.      GSP Golf AB ("GSP") is a provider of golf simulator software.  GSP is a Swedish corporation with an address at Älgvägen 16, 428 34 Kållered, Sweden.

3.      Davor Bogavac is the founder, co-owner, and Chief Executive Officer of GSP. Mr. Bogavac is responsible for the day-to-day management of GSP.  Mr. Bogavac resides at Älgvägen 16, 428 34 Kållered, Sweden.

4.      SimulatorGolfTour LLC is an Iowa limited liability company with an address at 2502 NW Maple Street, Arkeny, Iowa, 50023.  SimulatorGolfTour LLC provides a golf simulator platform, Simulator Golf Tour ("SGT").  SGT is an online platform, located at simulatorgolftour.com, where users can access and download simulator golf courses and play golf tournaments online.

5.      Chad Cooke is the owner, single member, and manager of SimulatorGolfTour LLC.  Mr. Cooke is responsible for the day-to-day management of SimulatorGolfTour LLC.  Mr. Cook also is the founder, developer, owner, and operator of SGT.  Mr. Cooke resides at 2502 NW Maple Street, Arkeny, Iowa, 50023.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338; diversity jurisdiction under 28 U.S.C. § 1332, as the matter in controversy exceeds the minimum required by the statute; and supplemental jurisdiction under 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Defendants under N.Y. C.P.L.R. § 302. Defendants' software infringes TrackMan's copyrights, and Defendants' conduct violates an end-user license agreement applicable to TrackMan's software.  On information and belief, Defendants offer their infringing software to residents of New York, and New York residents have purchased, downloaded, accessed, and used Defendants' infringing software.  Accordingly,

personal jurisdiction arises because Defendants have (a) transacted business within the State of New York; (b) committed tortious acts within the State of New York; (c) and committed tortious acts without the State of New York causing injury to TrackMan within the state, where Defendants expected and should reasonably expect the acts to have consequences in the State of New York and Defendants derive substantial revenue from interstate or international commerce. The exercise of personal jurisdiction comports with the Due Process Clause of the U.S. Constitution because Defendants have minimum contacts with the State of New York such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

8.      This Court also has personal jurisdiction over Defendants because Defendants are subject to an end-user license agreement for TrackMan's software which provides that Defendants agree to the exercise of personal jurisdiction in the federal and state courts of New York in connection with any dispute.

9.      This Court also has personal jurisdiction over GSP and Mr. Bogavac under Federal Rule of Civil Procedure 4(k)(2), as they are not subject to jurisdiction in any state's courts of general jurisdiction and exercising jurisdiction is consistent with the U.S. Constitution and laws.

10.     Venue arises in this District under 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events giving rise to TrackMan's claims occurred, and a substantial part of property that is the subject of the action is situated, in this District, or else there is no district in which an action may otherwise be brought as provided in 28 U.S.C. §1391.  Venue is also appropriate under 28 U.S.C. § 1400(a) because Defendants may be found in this District.

11.     Venue also arises in this District because Defendants are subject to contractual provisions in an end-user license agreement for TrackMan's software which provides for

exclusive jurisdiction in the federal and state courts located in the State of New York of any claim or dispute or relating in any way to use of the software.

**ALLEGATIONS**

**I.    TRACKMAN'S GOLF BALL TRACKING TECHNOLOGY**

12.    Two decades ago, the founders of TrackMan asked a simple question:  could we track a golf ball?  Since then, TrackMan's corporate parent, Denmark-based TrackMan A/S, has worked in collaboration with the world's best golfers, teachers, and equipment manufacturers to develop technology and manufacture devices that provide accurate, real-time data on ball collision, launch, flight, and landing.  Today, the technology developed by TrackMan A/S captures a wide range of data never before available – club speed, ball speed, curve, landing spin, launch angle, spin rate, spin axis, apex, carry, and more.

13.    TrackMan technology has numerous applications in the sport of golf, serving professional and amateur players, instructors, driving ranges, golf clubs, tournaments, and broadcasters.  TrackMan's offerings include launch monitors, simulators, and driving range solutions.

**A.    TrackMan Launch Monitors**

14.    TrackMan offers and sells launch monitors for golf ball tracking.

15.    The company's TrackMan 4 is a portable launch monitor that uses two radars and one camera to track the full trajectory of any golf shot, from short putts to 400-yard drives. Among its features, TrackMan 4 pinpoints the landing position of the ball and maps a shot's 3D trajectory in real-time.  Using the TrackMan Go app, players can control the TrackMan 4 unit directly from an iOS device and capture and analyze data on full swings and putting strokes.



16.     TrackMan launch monitors are the gold standard in ball tracking for golf professionals.  More than 1,000 tour players use TrackMan launch monitors, with more than 90 of the Top 100 players in the world using TrackMan for club delivery and ball flight analysis, shot testing, and optimizing their equipment.



17.     TrackMan launch monitors are available both to professionals and the wider golfing public.  Portable, simple to set up, and easy to use at any time of day and in any weather conditions, TrackMan launch monitors provide world-class ball tracking technology and data to players of all skill levels.

18.     TrackMan is continually innovating.  In 2023, TrackMan announced its release of TrackMan iO, a launch monitor purpose-built for indoor golf.  TrackMan iO features a compact, ceiling-mounted design that frees up space on the floor for a clean and elegant simulator setup, with no need for additional lighting.  Trackman iO combines radar, infrared, and high-speed imaging to provide data, including measured 3D spin and spin axis, in real-time.



**B.     TrackMan Simulator**

19.     TrackMan's industry-leading simulators provide an immersive golf experience away from the course, for year-round training, both indoors and outdoors.

20.     TrackMan Simulator incorporates, among other features, a TrackMan launch monitor, impact location lights that allow the monitor to see what is happening with the club and

the ball at the moment of impact, a video projector, and an impact screen that displays the simulation and keeps golf balls from rebounding.  TrackMan Simulator is powered by Virtual Golf 2, a computer program developed and updated over the course of the last decade.

21.    TrackMan designs and builds simulators tailored to the specifications of individuals and commercial establishments.  Below is an example of a TrackMan Simulator:



22.    TrackMan Simulator allows players to practice their golf game through features like Shot Analysis and the Test Center that give actionable feedback.  Players can apply those findings in simulated real-world conditions using On Course Practice and the Target Practice Range.

23.    TrackMan Simulator players can choose to play more than 260 courses from around the world, including the iconic St. Andrews, Pebble Beach, and PGA National.

TrackMan uses drone flyovers of golf courses to create 3D lidar maps to render bunkers, fairways, and greens in extraordinary detail with high-definition graphics.

24.    TrackMan has negotiated and entered into agreements with the owners and operators of established, branded golf courses.  These agreements authorize TrackMan to conduct drone flyovers and create digital course renderings.  The agreements also give TrackMan permission to offer simulations of courses for play with TrackMan Simulator using official course names and trademarks.

**C.    TrackMan Range**

25.    TrackMan Range is a "360" solution for commercial golf ranges, golf clubs, and entertainment ranges.



26.    TrackMan Range incorporates, among other technology, TrackMan launch monitors for ball tracking, instruction, and club fitting; flight tracking on the range using multiple radars to create an overlapping tracking-field array; and Virtual Golf 2 for a fully-

rendered version of golf courses on all TrackMan platforms, ensuring that every feature and target is replicated exactly so that players can see their shots illustrated in highly accurate graphics in the app or on an in-bay screen.

27.     Together, TrackMan's launch monitors, simulators, and range solutions are changing the experience of golf.  TrackMan technology is helping professionals, amateurs, and causal players to unleash their potential in the sport, advancing how golf is played, taught, and viewed.

**D.    Perfect Golf**

28.     TrackMan offers TrackMan Performance Studio, a golf swing and shot-analysis software tool with totally integrated video and data for use on TrackMan launch monitors.

29.     In addition, TrackMan offers "Virtual Golf 2."  Virtual Golf 2 is simulator software that allows users to play golf in realistic environments.  Virtual Golf 2 simulates play on more than 260 courses around the world and on golf courses and ranges replicated by TrackMan Range.  Virtual Golf 2 is seamlessly integrated into TrackMan Performance Studio.

30.     Virtual Golf 2 is the product of years of development.  That development began with Perfect Parallel, Inc. ("Perfect Parallel"), a software technology company.

31.     In November 2012, TrackMan A/S and Perfect Parallel announced an agreement to develop an integration of their respective products.  After years of development, on January 22, 2015, Perfect Parallel released Perfect Golf, a golf game that provides an immersive experience centered on high-resolution visuals, accurate ball flight physics developed using state-of-the-art launch monitors, and hyper-realistic gameplay.  Perfect Parallel provided, and continues to provide, Perfect Golf for download on Steam.

32.     Below is a screenshot from Perfect Golf:

33.    Perfect Parallel has described Perfect Golf as "the best simulation of golf released to date."[1]

34.    Perfect Golf includes "Course Forge" software which allows users to design golf courses that can be played in Perfect Golf.  Course Forge is included as a download with the purchase of Perfect Golf.  Since Perfect Golf was released, users have created hundreds of courses using Course Forge.

35.    Perfect Parallel also built and previously provided an API for external tournament sites to be able to fully integrate into Perfect Golf for online real-time scoring and tracking. Through third-party tournament sites, Perfect Golf users could play each other on courses designed in Course Forge.  One such tournament site was Online Golf Tour ("OGT").

36.    Effective January 1, 2018, TrackMan A/S acquired Perfect Parallel, including Perfect Golf and all of Perfect Parallel's software assets and intellectual property rights.

---

[1] Perfect Golf, https://store.steampowered.com/app/288140/Perfect_Golf.

37.     Since the acquisition, Perfect Parallel has helped to develop, and TrackMan A/S has released, golf simulation software "Virtual Golf" (released May 1, 2018) and "Virtual Golf 2" (released November 20, 2019) for use with TrackMan launch monitors.  TrackMan, Inc. has obtained exclusive United States rights in Perfect Golf, Virtual Golf, and Virtual Golf 2.

38.     In August 2019, TrackMan A/S announced it would suspend third-party simulator integration licenses for Perfect Golf in a year, effective August 31, 2020.  TrackMan A/S, which had acquired Perfect Parallel the year before, made the announcement in light of its planned release of Virtual Golf 2, which is playable with TrackMan launch monitors and offers tournament play as a feature.  TrackMan decided to suspend third-party simulator integration licenses to keep the company's focus on quality assurance and support for TrackMan's customers.

## II.     DEFENDANTS' UNLAWFUL CONDUCT

39.     Davor Bogavac was an avid user of Perfect Golf.  Mr. Bogavac regularly played Perfect Golf, both on his personal computer and in simulator golf tournaments on the OGT platform.  Mr. Bogavac recorded videos of himself playing Perfect Golf, and he posted them on YouTube.  Mr. Bogavac also regularly used Course Forge to design virtual golf courses which he played using Perfect Golf.  Mr. Bogavac has described Course Forge course design tool as "by far the best and easiest to use design tool that has ever existed."

40.     When TrackMan A/S announced in August 2019 that it would discontinue Perfect Golf simulator licenses the following year, Mr. Bogavac saw an opportunity.  If he could offer a product that allowed tournament play of golf courses created in Course Forge, he could build a business.  Mr. Bogavac could take the golf simulator ecosystem Perfect Parallel had built and make it his own.

41.     To succeed, Mr. Bogavac needed to do three things.

42.     First, Mr. Bogavac needed to make and distribute golf simulator software to replace Perfect Golf.  He undertook that project himself and with the support of others.  Mr. Bogavac ultimately called the golf simulator software he produced "GSPro."

43.     Second, Mr. Bogavac needed an online platform to host tournament play by GSPro users.  OGT would no longer be an option.  OGT had announced it would wind down its operations, and Mr. Bogavac needed a new platform.  Mr. Bogavac would coordinate closely with Chad Cooke in the development of a new tournament platform.  That platform, Simulator Golf Tour ("SGT") would replace OGT, and it would be designed to operate seamlessly with GSPro and courses created in Course Forge.

44.     Third, Mr. Bogavac needed courses.  Lots of courses for GSPro users to play on the SGT platform.  Fortunately for him, Mr. Bogavac had a ready supply – the dozens, if not hundreds, of courses Perfect Golf users had created with Course Forge.  Mr. Bogavac undertook, both himself and working together with others, to build GSPro to play Course Forge-created courses.  In addition, Mr. Bogavac undertook, both himself and working together with others, to make Course Forge-created courses playable on GSPro by creating tools to "convert" the courses into a form playable by GSPro.

45.     GSP, Mr. Bogavac, SimulatorGolfTour LLC, Mr. Cooke, and others carefully orchestrated and coordinated these efforts.  In doing so, they created a commercial product – one they built on top of and derived from Perfect Golf.

**A.     GSPro**

46.     Shortly after TrackMan announced it would discontinue simulator passes for Perfect Golf, Mr. Bogavac began to assess how to make a standalone game that would replace

Perfect Golf and allow users to play games designed in Course Forge. "[H]acking the damn thing" was "morally justifiable," he declared in a post on messaging platform Discord.

47.     Mr. Bogavac acknowledged that building such a game "for the masses" would be challenging. "Way too much work for someone like me that has very little time to spare," he admitted in one post. And Mr. Bogavac did not have much time. To produce a commercially viable product, he needed to complete his standalone replacement for Perfect Golf within a year, before Perfect Golf's simulator passes expired.

48.     Mr. Bogavac realized there was an easier way to get where he wanted. "Whenever you develop something it's always a good idea to look what is already there," he posted in Discord. "Copy and borrow as a starting point and then innovate on top of that." Copying and borrowing would become his guiding principle in developing GSPro. Or, as Mr. Bogavac put it more bluntly in another post in anticipation of the upcoming release of Virtual Golf 2: "Hope [TrackMan] came up with some new cool features so we can copy and steal them."

49.     Mr. Bogavac further described his approach to building GSPro in one Discord post: "I am all for innovating but if someone else does something good I have no issues to shamelessly 'borrow,'" he posted. And in another post: "we can thank [TrackMan] (and [Perfect Parallel] and all the course designers) for what we are about to embark on. It all builds on top of what was already done by them."

50.     In the late summer and early fall of 2019, Mr. Bogavac set out to produce his golf simulator software. TrackMan was not aware of these development efforts at that time.

51.     To develop GSPro, Mr. Bogavac, GSP, and their associates downloaded, accessed, and used Perfect Golf, including Course Forge. As part of their development efforts,

Mr. Bogavac, GSP, and their associates copied, adapted, and incorporated TrackMan's copyright-protected software into GSPro, without permission from TrackMan or Perfect Parallel.

52.    Defendants' copying has taken various forms.  As one example, Mr. Bogavac, GSP, and their associates copied Course Forge code directly into GSPro.  Defendants admit to this copying.

53.    As another example, Mr. Bogavac, GSP, and their associates copied Perfect Golf's "combine" feature.  A combine is a standardized test that enables golfers to identify strengths and weaknesses in their game, and to compare their performance to other golfers.  The copying went like this.  While developing GSPro, Mr. Bogavac received a request from a Perfect Golf user to make a TrackMan-like combine:  "A copy cat [TrackMan] one would be a good start, same as we had in [Perfect Golf]," the user requested.  Mr. Bogavac agreed.  He asked the user to "send me a summary on how the [TrackMan] combine works.  I might do a quick hack and implementet [sic] it using the driving range."  Later, having implemented the combine, Mr. Bogavac posted:  "GSP has a 'skill test' that is basically a copy of TrackMan's combine. . . . On top of that we plan to develop a significant amount of practice features. Basically copy what is already out there and develop some new ideas that we have."  GSPro's version of TrackMan's combine is emblematic of Mr. Bogavac's "copy and borrow" approach in developing GSPro.

54.    Copying and borrowing from Perfect Golf and Course Forge, Mr. Bogavac released various versions of GSPro in 2020.  Mr. Bogavac – and, later, GSP, a company Mr. Bogavac registered in Sweden on November 10, 2021 – would continue to release updated versions of GSPro, up to the present day.

55.    GSPro purports to offer "[a]mazing 4k graphics, ultra realistic ball physics, and a massive community who constantly contributes."  GSPro claims to have "[u]nrivaled game physics set GSPro apart from the competition."[2]

56.    GSPro officially supports a number of launch monitors, including Uneekor EyeXO, Uneekor EyeXO2, Uneekor EyeMini, Uneekor QED, Flightscope Mevo+, Flightscope Xi, Flightscope X2, Flightscope X3, Foresight GC3, Foresight GCQuad, Foresight GCHawk, and Bushnell Launch Pro.  GSPro also offers an open API and interface, allowing users to integrate and use GSPro with other launch monitors.  These launch monitors compete with TrackMan's launch monitors, including TrackMan 4.

57.    GSPro was a commercial enterprise from the start.  Shortly after TrackMan A/S's announcement to discontinue sim passes, Mr. Bogavac posted that while he had "not decided on the commercial" terms and conditions of the simulator software he was going to distribute, "[w]hat I know already now is that it will not be free, it will be lower cost than" Perfect Golf. From day one, Mr. Bogavac's development of GSPro was geared toward commercial release.

58.    Today, Mr. Bogavac and GSP commercially market and sell GSPro to the public by offering several purchase options:

    a.    "GSPro Subscription w/Simulator" where users pay an annual fee of $250 for access to GSPro and updates for the life of the subscription;

    b.    "Lifetime Add-On," which is an upgrade to an active subscription where users can continue using the software even after cancelling a subscription, for a one-time fee of $350; and

---

[2] GSPro, https://gsprogolf.com.

c.      "GSPro Subscription + Lifetime Add-On" where users purchase both a subscription (including all GSPro updates until the subscription is cancelled) and a "Lifetime Add-On," for $550 for the first year and $250 for each following year.

59.      Mr. Bogavac and GSP also have entered into commercial arrangements with launch monitor manufacturers.  For example, in January 2023, sports technology provider Foresight Sports ("Foresight") announced a partnership with GSP to provide an integration between Foresight's launch monitor devices and GSPro software.  The partnership enables Foresight users to subscribe to the GSPro simulation platform.  On information and belief, Foresight and other launch monitor companies have compensated Mr. Bogavac and GSP in connection with their commercial arrangements.

**B.      Simulator Golf Tour**

60.      At the same time Mr. Bogavac and his associates were developing GSPro, he was coordinating and participating in a parallel effort to develop a simulator golf tournament platform to replace OGT.  That platform is Simulator Golf Tour, or "SGT."  The owner and lead developer of SGT is Chad Cooke.

61.      SGT is a commercial enterprise, and it has been from the start.  SGT charges subscriptions for its service.  Currently, members pay $80 for one year of access to SGT.

62.      From the beginning, Mr. Bogavac, GSP, and their associates knew of, participated in, and assisted the development of SGT.  SGT is an essential part of GSPro's business.  For GSPro to be commercially successful, it needed to be interoperable with a simulator tournament platform.  As Brian Evans, co-owner and managing partner of GSP posted during the development process, "GSPro and Simulator Golf Tour (SGT) will continue to be working closely together.  SGT has played a critical role in the growth of GSPro and its community."

16

63.    SGT and GSPro are designed to be played together.  To play on SGT, a user must first purchase, download, and install GSPro.  SGT markets itself on its website as "powered by" GSPro.  Likewise, to play online tournaments on GSPro, a user must have an SGT membership.

64.    SGT was not built from scratch, however.  Like GSPro, SGT copies and borrows from TrackMan's copyright-protected software.

65.    For example, Perfect Parallel built and Perfect Golf provided copyright-protected API data structures for simulating golf competitions.  Without permission, Defendants downloaded, accessed, copied, and used these data structures, allowing SGT to provide online competitions for GSPro users.

66.    Copying and borrowing is not SGT's only violation of intellectual property rights. SGT also has made unlawful, misleading statements with respect to its course offerings.

67.    SGT offers dozens of virtual golf courses that members can access and play online using GSPro.  On behalf of SimulatorGolfTour LLC and himself, Mr. Cooke has promoted SGT's course selection as including iconic, branded courses like St. Andrew's in Scotland and various PGA Tour Tournament Players Club ("TPC") courses throughout the United States.  Mr. Cooke has promoted the ability of users to access these courses on SGT and to play them using SGT's platform.  Mr. Cooke's statements include, without limitation, the following:

a.    Listing St. Andrews and PGA Tour golf courses on the SGT website as available for tournament play.

b.    A post on Discord on January 26, 2021 promoting "Very early build pics of TPC Sawgrass on GSPro," which included images of the course under construction.

  c.  A post on Discord on March 5, 2021, stating: "Please download the new St. Andrews Course."

  d.  A post on Discord on October 12, 2021 promoting TPC Deere Run in response to a user inquiry about the best course to play on GSPro.

  e.  A post on Discord on October 28, 2021 promoting TPC Deere Run in response to a user inquiry about the best-looking courses on GSPro.

  f.  A post on Discord on November 3, 2021 promoting TPC Summerlin as a new course available on SGT.

  g.  A post on Discord on November 18, 2021 promoting TPC San Antonio as a new course available on SGT.

  h.  A post on Discord on December 9, 2021 promoting TPC Deere Run in response to a user inquiry about the nicest courses on SGT.

  i.  A post on Discord on March 11, 2022, stating: "@everyone – TPC Sawgrass is LIVE!!!!  Available IN GAME with Course Name : 'Home of the Players.'"

  j.  A post on Discord on June 1, 2022, stating in response to a question about what the best GSPro courses are:  "The Home of the Players" and "TPC Deere Run."

68.  SGT's offer of trademarked courses including St. Andrews and the PGA Tour's TPC courses drew a significant number of users to join SGT as members and to purchase GSPro, and to continue using SGT and GSPro.

69.  SGT, however, had a problem.  It, and its owners SimulatorGolfTour LLC and Mr. Cooke, did not have any licenses, including licenses of trademark rights, required to offer these and other branded courses to the public.

70.    SGT's conduct in offering unlicensed courses contrasts with TrackMan's approach to intellectual property rights.  Unlike SGT, TrackMan diligently sought and obtained permissions, including trademark licenses, from the owners of branded golf courses.  Having done so, TrackMan is authorized to offer established, branded courses for play with its golf simulator.  Today, TrackMan offers more than 260 courses, rendered in high quality and great detail, including St. Andrews and PGA Tour courses.

71.    SGT's lack of rights eventually caught up with it.  In 2023, the trademark owners of St. Andrews and PGA Tour courses sent cease-and-desist letters to SGT and GSP.  After receiving the letters, SGT and GSP removed, disabled access to, or renamed the St. Andrews and PGA Tour courses.  The courses included PGA National, TPC Deere Run, TPC San Antonio, TPC Sawgrass a/k/a "The Home of the Players," and TPC Summerlin.  The courses SGT and GSP removed no longer are available under those names.

72.    By the time SGT and GSP acted, however, the damage had been done.  By promoting SGT and GSPro allowing simulator golf play at some of the most coveted courses around the world, SimulatorGolfTour LLC and Mr. Cooke induced users to buy SGT subscriptions and pay for GSPro downloads.  Through their false statements, SimulatorGolfTour LLC and Mr. Cooke actually deceived customers who elected to purchase SGT subscriptions and GSPro downloads.  They benefitted financially from the misleading statements, at the expense of TrackMan, which lawfully obtained rights to offer courses to for simulator play.

**C.    Defendants' Exploitation of Course Forge Courses**

73.    The ability to play a large number of high-quality courses is essential to the commercial success of GSPro and SGT.  From the start, and continuing through the present,

Defendants knew of, permitted, and actively encouraged the use of Course Forge-created courses with GSPro and SGT, enabling Defendants to build and operate their businesses.

74.     The early versions of GSPro and SGT that Defendants developed and distributed allowed users to play courses created in Course Forge "as is."  By examining and studying Course Forge-created courses – without at first copying them – Defendants learned how to build golf simulator software GSPro and tournament platform SGT that would play these courses. Defendants did so for commercial gain, to build their businesses.

75.     As Mr. Bogavac and his associates developed newer versions of GSPro, they created and distributed – and encouraged and supported others in the player community to create and distribute – tools and methods to "convert" courses originally created in Course Forge so that the courses could be played with GSPro.  The development of GSPro, in fact, depended on converting courses.  As GSP's Brian Evans posted:  "There is a crew of people working hard to convert courses.  That is one of our largest dependencies to get [the next version of GSPro] released.  Every course needs to be converted and we don't want to release it with a small course library."  Without a large library of Course Forge-created courses, GSPro and SGT would not be successful.

76.     The result was a massive coordinated campaign – encouraged, supported, and orchestrated by Defendants – to convert Course Forge-designed courses for play in GSPro. GSPro's development proceeded in tandem with course conversions.  Mr. Bogavac described the progress in September 2020:  "As for course conversions.  It has been a slow process since I was the only one doing it.  We now have more people on the job.  Expect that is will be much faster now."  The following month, Mr. Cooke noted that SGT was hosting only converted courses. "Courses are being converted daily," he posted.  By the time Mr. Bogavac released a new

version of GSPro in January 18, 2021, more than two dozen converted courses were available. By mid-February 2021, Mr. Evans posted: "We currently have around 50 courses, with that number growing everyday."

77.     The conversion of courses, and the ability to play them, was crucial to the futher development and commercial succcess of GSPro and SGT.  By converting courses that Perfect Golf users had created using Course Forge, Defendants were able to divert Perfect Parallel's user base to them, allowing Defendants to grow their businesses.

78.     Mr. Bogavac did so without concern for the law.  For example, when one user wrote that "my only concern . . . is that [TrackMan] in some way could stop us from converting courses to your game that were initially created using [Course Forge] for [Perfect Golf] explicitly," Mr. Bogavac responded nonchalantly:  "how would they stop us.  They can't take everybody to court."

79.     Today, Defendants claim that only courses created with a program other than Course Forge are playable on GSPro and SGT.  But even today, users are playing converted courses on GSPro and SGT.  Defendants are fully aware that courses originally created in Course Forge and then converted are being played on GSPro and SGT.  Upon information and belief, users are continuing to employ the course conversion tools and methods that Defendants have created, distributed, and supported.  Upon information and belief, Defendants are aware of these ongoing course conversions and actively support it, or they are willfully blind to it.

### D.    Defendants' Unlawful Conduct

80.     Defendants have acted in concert, and as agents for each other, for their mutual benefit, with respect to all of Defendants' conduct alleged in this complaint.

81.    Each of the Defendants committed copyright infringement.  Mr. Bogavac, GSP, SimulatorGolfTour LLC, and Mr. Cooke downloaded, installed, accessed, and used TrackMan's Perfect Golf, Course Forge, and tournament API, which are protected by copyright.  Each of the Defendants copied, prepared derivative works based on, and distributed literal and structural aspects of TrackMan's copyright-protected software.  Defendants' conduct was not licensed, and it is unlawful.

82.    In addition to being directly liable, Mr. Bogavac also is secondarily liable for copyright infringement.  Mr. Bogavac knew of and materially contributed to the direct infringements of GSP, his associates, and SGT.  Mr. Bogavac had control over, and earned financial benefits from, the direct infringements of GSP, his associates, and SGT.

83.    Mr. Cooke also is secondarily liable for copyright infringement.  Mr. Cooke knew of and materially contributed to the direct infringements of GSP, Mr. Bogavac, and SimulatorGolfTour LLC.  Mr. Cooke had control over, and earned financial benefits from, their direct infringements.

84.    In addition to their copyright law violations, Defendants violated the Perfect Parallel End User License Agreement ("EULA").[3]  Persons who purchase Perfect Golf (including Course Forge and the API data structures) agree and are subject to the EULA.  The EULA prohibits various activities which do not constitute copying, and which are outside the subject matter of copyright and not equivalent to an exclusive right under the Copyright Act. Relevant here:

---

[3] Perfect Parallel End User License Agreement, https://store.steampowered.com/eula/288140_eula_0.

    a.    The EULA grants a personal, limited, non-exclusive license to install and use Perfect Golf (including Course Forge and the API data structures) on a single computer for "personal, non-commercial use."

    b.    The EULA prohibits the use, "in any way, directly or indirectly," to generate revenue or in exchange for any consideration or value, of any part of Perfect Golf, Course Forge, the API data structures, or any "User-Generated Content." User-Generated Content includes courses created using Course Forge. The EULA provides that while Perfect Golf users are permitted to use their User-Generated Content, they may do so for only personal and non-commercial uses.

    c.    The EULA prohibits users from decompiling, disassembling, reverse engineering, or otherwise attempting to derive the source code, underlying ideas, or algorithms of Perfect Golf, Course Forge, and the API data structures, and to assist any third party to do so.

85.    Defendants engaged in activities, which do not constitute copying or any other violation of copyright law, in violation of the Perfect Parallel EULA. Defendants' unlawful conduct included reverse engineering – namely, studying and analyzing TrackMan's software and the courses created in Course Forge in order to learn details of design, construction, and operation – to allow Defendants to develop, produce, and distribute GSPro, SGT, and simulator golf courses.

86.    SimulatorGolfTour and Mr. Cooke also engaged in false advertising in violation of the Lanham Act. These Defendants made various statements promoting the availability on SGT of iconic, trademarked golf courses for simulator play, including St. Andrews and PGA Tour courses. The statements were false and misleading, as they suggested, falsely, that SGT

was authorized to offer such genuine, trademarked courses.  SGT lacked the rights to offer these branded courses, and SGT and GSP removed and disabled access to the courses after receiving cease-and-desist letters from St. Andrews and PGA Tour.  A significant number of SGT and GSPro users relied on, and were deceived by, the false and misleading statements to join SGT and to download and use GSPro for tournament play.  The statements were material, as the availability on SGT of genuine, iconic courses was a significant draw for its members.  SimulatorGolfTour LLC's and Mr. Cooke's conduct caused injury to TrackMan, which has undertaken efforts to obtain licenses from courses.  Users who otherwise would have purchased TrackMan launch monitors and used TrackMan software for simulator play were diverted to buy SGT memberships and purchase GSPro as a consequence of these false and misleading statements.

87.    TrackMan has acquired and owns all accrued causes of action with respect to Perfect Golf, Course Forge, the API data structures, and courses created by users of Course Forge, including all accrued actions for copyright infringement, breach of contract, and false advertising.  TrackMan was not aware of Defendants' unlawful acts at the time they first occurred.

88.    Defendants' conduct is intentional and willful.  Between February and March 2021, TrackMan corresponded with Mr. Bogavac concerning Defendants' unlawful activities.  Mr. Bogavac and GSP nevertheless continued their unlawful conduct.

## FIRST CAUSE OF ACTION

### (Direct Copyright Infringement – All Defendants)

89.     TrackMan repeats and realleges paragraphs 1 through 88.

90.     Perfect Golf, Course Forge, and the API data structures are original works of authorship fixed in a tangible medium of expression and are protected by copyright.  *See* 17 U.S.C. § 102(a); *see also* 17 U.S.C. § 101 ("A 'computer program' is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.").  Copyright protection in TrackMan's software includes both literal code and structural elements – the original structure, sequence, and organization – of the code.  The copyrights in the TrackMan software are valid and subsisting.

91.     TrackMan owns exclusive U.S. rights in Perfect Golf, including in Course Forge and the API data structures.

92.     TrackMan owns U.S. Copyright Registration No. TX 9-168-826 for Perfect Golf, including Course Forge and the API data structures.

93.     Defendants had access to TrackMan's software, which they purchased, downloaded, and used.  Defendants copied, modified, and distributed TrackMan's copyright-protected code and structures as part of GSPro and SGT, which contain expression that is substantially similar to TrackMan's software.  For example, Mr. Bogavac, GSP, and their associates copied Course Forge code directly into GSPro, which Defendants admit.  As another example, Defendants downloaded, accessed, copied, and used TrackMan's copyright-protected API data structures for simulating golf competitions.  On information and belief, Defendants committed additional acts of infringement, including by reproducing code and structural elements of TrackMan's Perfect Golf and Course Forge, preparing derivative works based on

TrackMan's copyright-protected software, and distributing GSPro and offering SGT which contain infringing material.

94.    Defendants' copying of Perfect Golf, Course Forge, and the API data structures was unauthorized and unlicensed.  Defendants' uses were not permitted by the Perfect Parallel EULA and, moreover, the Perfect Parallel EULA terminated as Defendants failed to comply with its terms.

95.    Defendants' use of TrackMan's software violated TrackMan's exclusive rights under 17 U.S.C. § 106, including the rights of reproduction, distribution, and preparation of derivative works.  Accordingly, Defendants' conduct is an infringement of copyright in violation of 17 U.S.C. § 501.

96.    Mr. Bogavac is directly liable for copyright infringement.  Mr. Bogavac personally engaged in the conduct alleged in this complaint, including by downloading, accessing, copying, and using Perfect Golf, Course Forge, and the API structures, without authorization.  After GSP was formed on November 10, 2021, Mr. Bogavac continued to directly engage in the infringing activities alleged in this complaint, and he personally directed GSP's conduct.  Mr. Bogavac is the founder and CEO of GSP, and he manages and operates the company on a day-to-day basis.  Mr. Bogavac has the right and ability to supervise GSP's infringing activity, he personally engaged in the infringing activity, and he has a financial interest in that activity.

97.    Mr. Cooke is directly liable for copyright infringement.  Mr. Cooke personally engaged in the conduct alleged in this complaint, including by downloading, accessing, copying, and using Perfect Golf, Course Forge, and the API structures, without authorization.  After SimulatorGolfTour LLC was formed on November 11, 2020, Mr. Cooke continued to directly

engage in the infringing activities alleged in this complaint, and he personally directed SimulatorGolfTour LLC's conduct.  Mr. Cooke is the founder and owner of SimulatorGolfTour LLC, and he manages and operates the company on a day-to-day basis.  Mr. Cooke has the right and ability to supervise SimulatorGolfTour LLC's infringing activity, he personally engaged in the infringing activity, and he has a financial interest in that activity.

## SECOND CAUSE OF ACTION

### (Indirect Copyright Infringement – Davor Bogavac)

98.     TrackMan repeats and realleges paragraphs 1 through 97.

99.     Mr. Bogavac is contributorily liable for GSP's direct copyright infringement.  At all times, Mr. Bogavac knew of GSP's infringing activity, and he induced, caused, and materially contributed to GSP's infringing conduct.  Mr. Bogavac is the moving, active, and conscious force behind GSP's infringement.  Mr. Bogavac personally engaged in and directed the infringing conduct alleged in this complaint.

100.     Mr. Bogavac is contributorily liable for SimulatorGolfTour LLC's and Mr. Cooke's direct copyright infringement.  Mr. Bogavac knew of their plans to copy TrackMan's protected API data structures for SGT to offer tournament play for GSPro.  Mr. Bogavac materially contributed to the conduct, by encouraging, coordinating, and inducing SimulatorGolfTour LLC's and Mr. Cooke's copying, and by designing GSPro to be interoperable with SGT.

101.     Mr. Bogavac is vicariously liable for GSP's direct copyright infringement.  At all times, Mr. Bogavac had the right and ability to supervise and control GSP's infringing activity. Mr. Bogavac is the founder and CEO of GSP and personally engaged in and directed all of GSP's infringing conduct alleged in this complaint.  Mr. Bogavac has received income, and he

has enjoyed a direct financial benefit, from the infringing activity of GSP, which is of a commercial nature.

102.    Mr. Bogavac is vicariously liable for SimulatorGolfTour LLC's and Mr. Cooke's direct copyright infringement.  As the developer of GSPro which he designed to be interoperable with SGT for tournament play, Mr. Bogavac had the right and ability to supervise and control SimulatorGolfTour LLC's and Mr. Cooke's use of API data structures.  Mr. Bogavac designed GSPro to allow SGT to use TrackMan's protected data structures.  Mr. Bogavac has received income, and he has enjoyed a direct financial benefit, from the infringing activity of SimulatorGolfTour LLC and Mr. Cooke.  Among other things, SGT refers users who wish to play online golf tournaments to GSPro, and such users' purchases of GSPro directly results in compensation to Mr. Bogavac.

## THIRD CAUSE OF ACTION

### (Indirect Copyright Infringement – Chad Cooke)

103.    TrackMan repeats and realleges paragraphs 1 through 102.

104.    Mr. Cooke is contributorily liable for SimulatorGolfTour LLC's direct copyright infringement.  At all times, Mr. Cooke knew of SimulatorGolfTour LLC's infringing activity, and he induced, caused, and materially contributed to SimulatorGolfTour LLC's infringing conduct.  Mr. Cooke is the moving, active, and conscious force behind SimulatorGolfTour LLC's infringement.  Mr. Cooke personally engaged in and directed the infringing conduct alleged in this complaint.

105.    Mr. Cooke is contributorily liable for GSP's and Mr. Bogavac's direct copyright infringement.  Mr. Cooke knew of their plans to copy TrackMan's copyright-protected works.

Mr. Cooke materially contributed to the conduct, by encouraging, coordinating, and inducing GSP's and Mr. Bogavac's copying, and by designing SGT to be interoperable with GSPro.

106.    Mr. Cooke is vicariously liable for SimulatorGolfTour LLC's direct copyright infringement.  At all times, Mr. Cooke had the right and ability to supervise and control SimulatorGolfTour LLC's infringing activity.  Mr. Cooke is the owner, single member, and manager of SimulatorGolfTour LLC and personally engaged in and directed all of SimulatorGolfTour LLC's infringing conduct alleged in this complaint.  Mr. Cooke has received income, and he has enjoyed a direct financial benefit, from the infringing activity of SimulatorGolfTour LLC, which is of a commercial nature.

107.    Mr. Cooke is vicariously liable for GSP's and Mr. Bogavac's direct copyright infringement.  As the developer of SGT which he designed to be interoperable with GSPro for tournament play, Mr. Cooke had the right and ability to supervise and control GSP's and Mr. Bogavac's infringing activities.  Mr. Cooke has received income, and he has enjoyed a direct financial benefit, from the infringing activity of GSP and Mr. Bogavac.  Among other things, GSP and Mr. Bogavac refer GSPro users who wish to play online golf tournaments to SGT, and such users' purchases of SGT subscriptions directly results in compensation to Mr. Cooke.

## FOURTH CAUSE OF ACTION

### (Breach of Contract – All Defendants)

108.    TrackMan repeats and realleges paragraphs 1 through 107.

109.    The Perfect Parallel EULA is a valid contract and is in full force and effect.

110.    Defendants agreed to be bound by the terms of the Perfect Parallel EULA by accepting its terms, and by installing, copying, and using Perfect Golf, including Course Forge.

The Perfect Parallel EULA is binding on Defendants with respect to Perfect Golf, Course Forge, and the API data structures.

111.    Under the Perfect Parallel EULA, Defendants agreed to only make personal, non-commercial uses of Perfect Golf, Course Forge, and the API data structures. Defendants agreed not to use any part of Perfect Golf, Course Forge, the API data structures, or the courses designed using Course Forge, "in any way, directly or indirectly" – which includes reverse engineering – to generate revenue or in exchange for any consideration or value. Defendants agreed not to decompile, disassemble, reverse engineer, or otherwise attempt to derive the source code, underlying data, or algorithms of Perfect Golf, Course Forge, and the API data structures, or to assist any third party to do so.

112.    Defendants engaged in reverse engineering in violation of the Perfect Parallel EULA.

113.    Defendants studied and analyzed TrackMan's software and the courses created in Course Forge in order to learn the details of the design, construction, and operation of the software and the courses. For example, Mr. Bogavac and GSP examined and studied Course Forge-designed courses, as well as Perfect Golf, to understand how to build a commercial golf simulator, GSPro. As another example, Mr. Cooke and SimulatorGolfTour LLC examined and studied Course Forge-designed courses, as well as Perfect Golf, to understand how to build a commercial tournament platform, SGT. Defendants undertook these activities to allow them to develop and distribute GSPro, SGT, and golf courses for simulator play on SGT using GSPro – all of which Defendants distribute for commercial purposes. Defendants' conduct constituted reverse engineering, in violation of the Perfect Parallel EULA.

114.    Defendants also reverse engineered the sim connector in Perfect Golf.  Perfect Golf contains a sim connector that originally was made as a "gateway" to play Perfect Golf from various launch monitor based simulators.  The sim connector translates output from various launch monitors into streamlined launch strings that can be launched inside Perfect Golf.  For example, the sim connector will send a request to a launch monitor unit asking if it has approval for use with Perfect Golf.  If approved, Perfect Golf will take the launch string over websocket on the launch monitor unit and send the ball off in the game.  On information and belief, Defendants engaged in reverse engineering to bypass the approval request.  In addition, on information and belief, Defendants engaged in reverse engineering to replicate the Perfect Golf sim connector in order to bypass the approval request.  Defendants' conduct was for commercial purposes, and it violates the Perfect Parallel EULA.

115.    Defendants' breaches are material and caused damage to TrackMan.

116.    Defendants are liable to TrackMan for breach of contract under the laws of the State of New York.

117.    TrackMan does not allege contract claims for Defendants' copying activities, which are the subject of TrackMan's copyright infringement claims.  As such, Defendants' non-copying reverse engineering activities are outside the subject matter of copyright and not equivalent to an exclusive right under the Copyright Act.  The Copyright Act does not preempt TrackMan's breach of contract claims for such conduct.

## FIFTH CAUSE OF ACTION

### (False Advertising – SimulatorGolfTour LLC and Chad Cooke)

118.    TrackMan repeats and realleges paragraphs 1 through 117.

119.    On behalf of SimulatorGolfTour LLC and himself, Mr. Cooke made statements commercially advertising and promoting the availability on SGT of iconic, branded golf courses for simulator play, including St. Andrews and PGA Tour courses.

120.    These and other statements were false and misleading.  The statements suggested, falsely, that SGT was authorized to offer genuine, trademarked courses, including St. Andrews and PGA Tour courses.

121.    SGT lacked the rights to offer these branded courses.  In 2023, the trademark owners of the St. Andrews and PGA Tour courses sent cease-and-desist letters to Mr. Cooke and to Mr. Bogavac, demanding the removal of the courses from SGT and GSPro.  Defendants complied with the requests.

122.    The statements by SimulatorGolfTour LLC and Mr. Cooke were deceptive.  As a result, a significant number of SGT and GSPro users relied on, and were deceived by, these false and misleading statements to join and use SGT, and to purchase and use GSPro, for tournament play.  The statements actually deceived or had the tendency to deceive a substantial segment of consumers.

123.    The statements promoting the availability on SGT of genuine, trademarked courses were material.  The statements influenced consumers' purchasing decisions because they concern qualities consumers value when making such decisions.  The availability for simulation play of such courses draws significant numbers of users to simulated tournament platforms and golf simulator software.

32

124.    SimulatorGolfTour LLC and Mr. Cooke made these statements in interstate commerce, including by posting them on the SGT website and in Discord social media chats, which are available to and viewed by members of the public across the United States.

125.    The conduct by SimulatorGolfTour LLC and Mr. Cooke caused injury to TrackMan.  TrackMan has undertaken efforts to obtain licenses to use the names and trademarks of St. Andrews, PGA Tour, and other courses.  Users were diverted to subscribe to and use SGT, and purchase and use GSPro, as a consequence of the false and misleading statements, diverting sales from and causing financial and business harm to TrackMan.  As a direct and proximate result of the wrongful acts of SimulatorGolfTour LLC and Mr. Cooke, TrackMan has suffered, and will continue to suffer, substantial damage to its business reputation, goodwill, and market share; diversion of sales of its services and products, including the sales of launch monitors; and loss of profits.

126.    SimulatorGolfTour LLC's and Mr. Cooke's conduct constitutes false advertising under and violates the Lanham Act, 15 U.S.C. § 1125(a)(1)(b).

### PRAYER FOR RELIEF

Plaintiff TrackMan requests judgment in its favor and against Defendants GSP, Davor Bogavac, SimulatorGolfTour LLC, and Chad Cooke, jointly and severally, including the following relief:

1.    A permanent injunction prohibiting Defendants from accessing, copying, and using Perfect Golf, including Course Forge and the API data structures embodied in the software, and from creating works that are substantially similar to the literal code or to the protected structure, sequence, and organization of TrackMan's software;

2.      A permanent injunction prohibiting Defendants from studying, analyzing, and reverse engineering Perfect Golf, Course Forge, TrackMan's API data structures, and courses created using Course Forge, to develop and produce GSPro and SGT;

3.      An award of TrackMan's actual damages and Defendants' profits attributable to the infringement;

4.      An award of compensatory, consequential, special, and punitive damages;

5.      For false advertising by SimulatorGolfTour LLC and Mr. Cooke, an award of TrackMan's lost profits from sales diverted, disgorgement of profits, and treble damages;

6.      An award of TrackMan's attorney's fees and costs; and

7.      Such other and further relief as this Court deems appropriate.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38, TrackMan demands a trial by jury as to all claims to which it is entitled.

Dated: New York, New York
      November 15, 2023

GOODWIN PROCTER LLP

By: /s/ Stefan Mentzer
    Stefan Mentzer
    Scott T. Weingaertner
    Timothy Keegan
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Phone: + 1 212 813 8800
Fax: + 1 212 355 3333
smentzer@goodwinlaw.com
sweingaertner@goodwinlaw.com
tkeegan@goodwinlaw.com

*Counsel for Plaintiff TrackMan, Inc.*