UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRACKMAN, INC., | Case No.: 1:23-cv-598-NRB |
|       Plaintiff, | |
|   v. | |
| GSP GOLF AB d/b/a GSPRO, DAVOR BOGAVAC, SIMULATORGOLFTOUR LLC, and CHAD COOKE, | |
|       Defendants. | |
| GSP GOLF AB d/b/a GSPRO and DAVOR BOGAVAC, | |
|       Counterclaim Plaintiffs, | |
|   v. | |
| TRACKMAN, INC., | |
|       Counterclaim Defendant. | |

## DEFENDANTS GSP PARTIES' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS CLAIM FOR BREACH OF CONTRACT (COUNT 4)

FRANKFURT KURNIT KLEIN & SELZ, P.C.
Jeremy S. Goldman
2029 Century Park East
Los Angeles, CA 90067
Tel.: (310) 579-9600
jgoldman@fkks.com

Caren Decter
Zoe Rachael Staum
28 Liberty Street, 35th Floor
New York, New York 10005
Tel.: (212) 980-0120
cdecter@fkks.com
zstaum@fkks.com

*Attorneys for Defendants/Counterclaim Plaintiffs*
*GSP Golf AB and Davor Bogavac*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ 2

PRELIMINARY STATEMENT ......................................................................................... 1

SUMMARY OF RELEVANT ALLEGATIONS ................................................................ 3

LEGAL STANDARD ......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

THE COPYRIGHT ACT PREEMPTS TRACKMAN'S CONTRACT CLAIM .......................... 7

    A.    The Copyright Act Impliedly Preempts TrackMan's Contract Claim
Because the Reverse Engineering Prohibition Conflicts With Federal
Copyright Policy .................................................................................................... 9

        1.    The Contract Claim Does Not Further a Substantial State Law
Interest .................................................................................................... 10

        2.    The Reverse Engineering Prohibition Seeks to Protect Rights
Within the Sphere of Copyright .............................................................. 12

        3.    The Reverse Engineering Prohibition Conflicts Directly With
Federal Copyright Law ........................................................................... 14

    B.    The Copyright Act Expressly Preempts the Contract Claim Because the
Reverse Engineering Prohibition is Qualitatively Equivalent to Rights
Under Copyright .................................................................................................... 18

        1.    TrackMan's Software Falls Within the Subject Matter of Copyright ....... 18

        2.    TrackMan's Contract Claim Seeks to Vindicate Rights Equivalent
to the Exclusive Rights of Copyright ...................................................... 19

        3.    The Second Circuit Does Not Follow *Bowers* .......................................... 21

CONCLUSION ................................................................................................................. 23

**Page(s)**

**Cases**

*159 MP Corp. v. Redbridge Bedford, LLC*,
  33 N.Y.3d 353 (2019) ............................................................................................10

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014)......................................................................................20

*Baystate Techs., Inc. v. Bentley Sys., Inc.*,
  946 F. Supp. 1079 (D. Mass. 1996) .........................................................................5

*Berkson v. Gogo LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015) .......................................................................10

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
  489 U.S. 141 (1989)................................................................................................13

*Bowers v. Baystate Techs., Inc.*,
  320 F.3d 1317 (Fed. Cir. 2003)....................................................................21, 22, 23

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
  373 F.3d 296 (2d Cir. 2004)...............................................................................19, 21

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
  982 F.2d 693 (2d Cir. 1992)...............................................................................13, 19

*Crye Precision LLC v. Bennettsville Printing*,
  755 F. App'x 34 (2d Cir. 2018) ...............................................................................11

*Datacarrier S.A. v. WOCCU Servs. Grp., Inc.*,
  2018 WL 1514456 (W.D. Wis. Mar. 27, 2018).........................................................5

*Fahmy v. Duane Reade, Inc.*,
  No. 05 CIV. 9479 (NRB), 2006 WL 2322672 (S.D.N.Y. Aug. 8, 2006) ..................6

*Forest Park Pictures v. Universal Television Network, Inc.*,
  683 F.3d 424 (2d Cir. 2012).....................................................................................13

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)....................................................................................................7

*IBM Corp. v. Micro Focus (US), Inc.*,
  No. 22 Civ. 9910, 2023 WL 3902955 (S.D.N.Y. June 8, 2023).........................7, 20

*In re Jackson*,
    972 F.3d 25 (2d Cir. 2020) .......................................................................... *passim*

*Klos v. Lotnicze*,
    133 F.3d 164 (2d Cir. 1997) ................................................................................. 10

*Maryland v. Louisiana*,
    481 U.S. 725 (1981) ................................................................................................ 7

*Melendez v. Sirius XM Radio, Inc.*,
    50 F.4th 294 (2d Cir. 2022) ................................................................................. 19

*ML Genius Holdings LLC v. Google LLC*,
    No. 20-3113, 2022 WL 710744 (2d Cir. Mar. 10, 2022) ................................ *passim*

*ML Genius Holdings LLC v. Google LLC*,
    No. 22-121, 2023 WL 3646287 (U.S. May 23, 2023) ......................................... 22

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997) ........................................................................... 18, 19

*Navajo Air, LLC v. Crye Precision, LLC*,
    318 F. Supp. 3d 640 (S.D.N.Y. 2018) ................................................................. 11

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y.2d 685 (1995) .......................................................................................... 10

*ProCD, Inc. v. Zeidenberg*,
    86 F.3d 1447 (7th Cir. 1996) ............................................................................... 22

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ......................................................... 11, 15, 17, 20

*Sony Computer Ent., Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ................................................................. 15, 17, 20

*United States v. Bolton*,
    496 F. Supp. 3d 146 (D.D.C. 2020) .................................................................... 10

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
    924 F.3d 32 (2d Cir. 2019) ............................................................................ *passim*

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988) ...................................................................... 16, 22, 23

*Weinstein Co. v. Smokewood Ent. Grp., LLC*,
    664 F. Supp. 2d 332 (S.D.N.Y. 2009) ................................................................... 7

**U.S. Constitution**

U.S. Const. art. VI, cl.2 ................................................................................7

**Statutes**

17 U.S.C. § 102 ...............................................................................13, 18

17 U.S.C. § 103 .........................................................................................18

17 U.S.C. § 106 ................................................................................ *passim*

17 U.S.C. § 301 .........................................................................2, 7, 8, 18

17 U.S.C. § 1201 .......................................................................................14

N.Y. Gen. Bus. Law § 340 .......................................................................11

**Legislative History**

H.R. Rep. 94-1476 ................................................................................7, 8

**Other Authorities**

Douglas L. Rogers, *Give the Smaller Players A Chance: Shaping the Digital Economy Through Antitrust and Copyright Law*, 5 MARQ. INTELL. PROP. L. REV. 13 (2001) ..............................................................................................11

Google Search, "Reverse Engineering definition," *Oxford Languages*, at https://www.google.com/search?q=reverse+engineering+definition (last visited Dec. 11, 2023) ................................................................................20

Guy A. Rub, *A Less-Formalistic Copyright Preemption,* 24 J. INTELL. PROP. L. 327 (2017) ..........................................................................................8, 17

Guy A. Rub, *Moving from Express Preemption to Conflict Preemption in Scrutinizing Contracts over Copyrighted Goods*, 56 AKRON L. REV. 303 (2022) ..........................................................................................10, 14

U.S. Copyright Office, *Copyright Registration of Games*, http://www.copyright.gov/fls/ fl108.pd ..................................................5

## PRELIMINARY STATEMENT

This case involves two competing golf simulation software programs—*i.e.,* software that creates a virtual golf experience by allowing users to play golf in a digital environment while using real clubs and balls. Trackman, Inc. ("TrackMan") claims rights in software called "Perfect Golf." FAC ¶ 31.[1] GSP Golf AB ("GSP") developed a competing software named "GSPro." *Id.* ¶ 42. TrackMan claims that, in developing GSPro, GSP and its founder Davor Bogavac (together, the "GSP Parties") infringed TrackMan's copyright in Perfect Golf and a related course design tool called "Course Forge," and breached a provision in the game's End User License Agreement ("EULA") that prohibits reverse engineering ("RE Provision").[2] *Id.* ¶¶ 89-117. While all of TrackMan's claims are meritless, this motion seeks dismissal of TrackMan's contract claim (Count 4) on the ground that it is preempted by the Copyright Act under both the implied and statutory preemption doctrines.

Implied preemption "precludes the application of state laws to the extent that those laws interfere with or frustrate the functioning of the regime created by the Copyright Act." *In re Jackson*, 972 F.3d 25, 33 (2d Cir. 2020) (Leval, J.). To determine whether the Copyright Act impliedly preempts a state law claim, the Second Circuit directs courts to examine whether the claim: (1) asserts a substantial state interest, distinct from the interests underlying federal copyright law, and (2) conflicts with federal copyright policies. *Id.* at 34-43. TrackMan's contract claim is preempted under this test.

---

[1] "FAC" refers to TrackMan's First Amended Complaint. *See* ECF No. 32.

[2] A copy of the EULA, which the FAC incorporates by reference, is attached as Exhibit A ("Ex. A") to the Declaration of Jeremy S. Goldman, submitted herewith. *See* FAC at 22 n.3 (linking to https://store.steampowered.com/eula/288140_eula_0).

As to the first factor, New York does not have a substantial interest in enforcing the RE Provision.  While "freedom of contract" is a deeply-rooted public policy, the state's interest in enforcing the RE Provision is drastically reduced because the prohibition is contained in a one-sided, non-negotiated adhesion contract.  The state's interest is further reduced, or even eliminated, because prohibiting users from "studying and analyzing" software for the purpose of building new and compatible products constitutes an unlawful restraint on trade in contravention of New York public policy.  Furthermore, the interests that TrackMan seeks to vindicate through the RE Provision—"details of design, construction, and operation" of its software [FAC ¶ 85]—are indistinct from interests covered (*i.e.*, functional elements expressly ***not*** protected) by the Copyright Act.  As to the second factor, enforcing the RE Provision would conflict directly with a strong federal copyright policy that not allows, but ***encourages***, developers to reverse engineer software for the purpose of building new products that compete, and are compatible with, existing products.  Accordingly, TrackMan's contract claim is preempted under the implied preemption doctrine.

TrackMan's contract claim also is expressly preempted under Section 301 of the Copyright Act.  Express preemption applies when (1) the work at issue falls within the subject matter of copyright; and (2) the claim seeks to vindicate rights "equivalent" to the rights afforded under the Copyright Act.  17 U.S.C. § 301.  Here, the first prong is satisfied because TrackMan's software is covered by copyright.  The second prong also is met because the rights that TrackMan seeks to protect through the RE Provision are qualitatively "equivalent" to exclusive rights granted under Section 106 of the Copyright Act.  Though TrackMan attempts to evade express preemption by asserting that the GSP Parties' "reverse engineering" did not include copying, copying remains the essence of TrackMan's claim—*i.e.*, that the GSP Parties studied

and analyzed Perfect Golf and Course Forge in order to reproduce, prepare derivative works based upon, and distribute the "design, construction, and operation" of TrackMan's software. FAC ¶ 85. Because copying, making derivative works based upon, and distributing works all are exclusive rights under Section 106 of the Copyright Act, TrackMan's contract claim based on reverse engineering is expressly preempted.

## SUMMARY OF RELEVANT ALLEGATIONS

### Perfect Parallel Develops and Releases Perfect Golf

TrackMan is a technology company that manufactures and sells launch monitors for golf ball tracking. FAC ¶ 14. In November 2012, TrackMan partnered with software development company Perfect Parallel Inc. ("Perfect Parallel"), which released a golf simulator game named Perfect Golf in 2015. *Id.* ¶ 31. Perfect Golf came with Course Forge—software that "allows users to design golf courses that can be played in Perfect Golf" ("CF Courses"). *Id.* ¶ 34. Perfect Parallel's EULA made clear that users could "use, reproduce, publish, perform, display and distribute" the CF Courses they created "however [they] wish[ed]" as long as it was "for personal use and not for Commercial Use[.]" *See* Ex. A at 2-3. Perfect Golf also included "an API for external tournament sites to be able to fully integrate into Perfect Golf for online real-time scoring and tracking." FAC ¶ 35. These tournament sites allowed users to play each other on courses they designed with Course Forge. *Id.* Finally, Perfect Golf was compatible with various third-party launch monitors, which allowed users to play the CF Courses they designed with real clubs and balls, not just on their computers. *Id.* ¶ 38.

### TrackMan Acquires Perfect Parallel and "Shelves" Perfect Golf

In January 2018, TrackMan's Danish parent company acquired Perfect Parallel. *Id.* ¶ 36. Approximately 18 months later, TrackMan disabled the feature that allowed users to play Perfect Golf using non-TrackMan launch monitors. *Id.* ¶ 38. Thus, after August 2020, users who had

purchased expensive non-TrackMan launch monitors could no longer play the game they had purchased, enjoy the CF Courses they designed, or participate in multiplayer tournaments except on their computers with a mouse and keyboard. *Id.*

**The GSP Parties Develop a New Golf Simulator**

TrackMan's FAC, though 34 pages long, is short on allegations of actionable wrongdoing by Defendants. The first seven pages of allegations read like a marketing brochure for TrackMan's products. *Id.* at 6-10. The next 15 pages purport to describe "Defendants' Unlawful Conduct." *Id.* at 11-24. In fact, they tell the story of a software developer (Mr. Bogavac) who, in the wake of TrackMan's decision to abandon its game and community, developed a new golf simulator (GSPro) that works with non-Trackman (*i.e.*, competing) launch monitors [¶ 56], facilitates tournament play [¶ 43] and, initially, allowed users to load and play the CF Courses they designed [¶¶ 44, 79]. TrackMan claims that, in building GSPro, Mr. Bogavac, and later his company (GSP), violated TrackMan's copyrights and Perfect Parallel's EULA. However, TrackMan alleges few facts in support of these theories of liability.

**TrackMan Asserts Baseless Copyright Claims**

With respect to copyright infringement, the only instance of alleged copying that is even theoretically actionable is the claim that the GSP Parties "copied Course Forge Code directly into GSPro." *Id.* ¶ 52. As TrackMan knows, this is a non-event. The GSP Parties acknowledge that a pre-commercial release of GSPro appended a library of files from Course Forge ("CF Library"). ECF 31 (GSP Parties' Counterclaim) ¶ 38. As detailed in the GSP Parties' Counterclaim, the CF Library was incorporated into GSPro due to an oversight, was not necessary to run the software, and was removed from GSPro promptly after the GSP Parties were notified of its existence. *Id.* The GSP Parties communicated these facts to TrackMan nearly

three years ago.  *Id.*  The brief inclusion of this library, which was freely available to any user who downloaded Course Forge, caused TrackMan no damage or at most was *de minimis*.

TrackMan alleges no other acts that, even if true, would constitute copyright infringement.  TrackMan claims that the GSP Parties "copied Perfect Golf's 'combine' feature," described as a "standardized test that enables golfers to identify strengths and weaknesses in their game."  FAC ¶ 53.  However, TrackMan alleges only that this game mechanic, not any code underlying it or expressive content, was duplicated.  Copyright does not protect game mechanics.[3]  TrackMan also alleges that the GSP Parties copied "API data structures," supposedly developed by Perfect Parallel, to allow "online competitions for GSPro users."  *Id.* ¶ 65.  Again, even if this were true (it is not), copyright does not protect data structures, except in limited, inapposite cases.[4]  These three alleged acts—the inadvertent, non-actionable inclusion of the CF Library, the duplication of a non-protectable game mechanic, and the use of non-protectable API data structures—comprise the totality TrackMan's infringement claim.  *Id.* ¶ 93.

**TrackMan Asserts Baseless Contract Claim**

Lacking a viable copyright claim, TrackMan also claims that the GSP Parties breached Perfect Parallel's EULA.  TrackMan's initial complaint alleged that, in violation of the EULA, the GSP Parties "reproduced the software's data structures," "replicated or reverse-engineered

---

[3] *See* U.S. Copyright Office, *Copyright Registration of Games*, http://www.copyright.gov/fls/fl108.pdf ("Copyright does not protect the idea for a game, its name or title, or the method or methods for playing it.  Nor does copyright protect any idea, system, method, device, or trademark material involved in developing, merchandising, or playing a game.  Once a game has been made public, nothing in the copyright law prevents others from developing another game based on similar principles.").

[4] *See, e.g.*, *Datacarrier S.A. v. WOCCU Servs. Grp., Inc.*, 2018 WL 1514456, at *8 (W.D. Wis. Mar. 27, 2018) (no infringement based on alleged similarity of data structures where "functional considerations" were "paramount in the message formats," which used "only the fields that [were] needed for the kind of transactions performed by the switch software"); *Baystate Techs., Inc. v. Bentley Sys., Inc.*, 946 F. Supp. 1079, 1090 (D. Mass. 1996) (data structures comprising "the words and abbreviations used to describe the files contained within the data structures and the data structures themselves" were not copyrightable).

the software's sim connector," "adapted, modified, and created derivative works based on the software," and "assisted third parties with making unauthorized copies of the software." ECF 1 ¶ 67. After the GSP Parties notified the Court that this contract claim was preempted by the Copyright Act [ECF 28], TrackMan filed an amended complaint. The FAC eliminated every alleged breach except "reverse engineering," based on the following provision in the EULA:

> Notwithstanding the grant to you of a limited license to use the Software as set forth in Section 3, above, you may not: . . . decompile, disassemble, ***reverse engineer***, or otherwise ***attempt to derive the source code, underlying ideas, or algorithms of the Software.*** . . .

*See* Ex. A at 3 (emphasis added).

TrackMan alleges that the GSP Parties violated the RE Provision by "studying and analyzing TrackMan's software and the courses created in Course Forge in order to learn the details of design, construction, and operation — to allow Defendants to develop, produce, and distribute GSPro, SGT, and simulator golf courses." *Id.* ¶ 85. In particular, TrackMan contends that, "[b]y examining and studying Course Forge-created courses—without at first copying them—Defendants learned how to build . . . GSPro and tournament platform SGT that would play these courses." *Id.* ¶ 74. TrackMan further alleges that the GSP Parties "reverse engineered the sim connector in Perfect Golf" in order to accommodate third-party launch monitors. *Id.* ¶ 114. In other words, TrackMan claims the GSP Parties breached the RE Provision by "studying and analyzing" TrackMan's software in order to build a golf simulator that was compatible with CF Courses and third-party hardware. As set forth below, this claim should be dismissed because it is preempted by the implied and statutory preemption doctrines.

## LEGAL STANDARD

"In considering a motion to dismiss, the Court must accept as true all material factual allegations in the complaint and draw all inferences in plaintiff's favor." *Fahmy v. Duane Reade,*

*Inc.*, No. 05 CIV. 9479 (NRB), 2006 WL 2322672, at *3 (S.D.N.Y. Aug. 8, 2006). "However, '[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'" *Id.* (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir.2002) (internal citation omitted). "[T]he Court may consider exhibits to the complaint and documents incorporated into the complaint by reference." *Weinstein Co. v. Smokewood Ent. Grp., LLC*, 664 F. Supp. 2d 332, 338 (S.D.N.Y. 2009) (cleaned up).

"[O]nce a district court determines that a state law claim has been completely preempted and thereby assumes jurisdiction over it, the court must then dismiss the claim for failing to state a cause of action." *IBM Corp. v. Micro Focus (US), Inc.*, No. 22 Civ. 9910, 2023 WL 3902955, at *10 (S.D.N.Y. June 8, 2023) (citing *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 309 (2d Cir. 2004)).

## ARGUMENT

### THE COPYRIGHT ACT PREEMPTS TRACKMAN'S CONTRACT CLAIM

Congress's preemption power derives from the Supremacy Clause of the Constitution: "the Laws of the United States . . . shall be the supreme law of the land." U.S. Const. art. VI, cl.2. Based on this clause, state laws that conflict with federal law are "without effect." *Maryland v. Louisiana*, 481 U.S. 725, 746 (1981). Congress may preempt state law expressly by statute or impliedly through the doctrines of "field" or "conflict" preemption. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).

In 1976, Congress enacted Section 301 of the Copyright Act, which provides:

[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship . . . are governed exclusively by this title. [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

7

*See* 17 U.S.C. § 301(a). Described by its drafters as "one of the bedrock provisions" of the Copyright Act, the preemption clause embodied Congress' intention "to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law." H.R. Rep. 94-1476 at 129. Congress sought "to foreclose any conceivable misinterpretation of its unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection." *Id.* Creating a "single Federal system" was a crucial component of Congress' chief objective: "carrying out the basic constitutional aims of uniformity and the promotion of writing and scholarship." *Id.*

Although most copyright preemption decisions since 1976 have considered preemption only under Section 301, the Second Circuit recently reaffirmed that state law claims that "stand as an obstacle" to federal copyright objectives also may be preempted under the implied preemption doctrine. *See In re Jackson*, 972 F.3d at 34 (holding that state law right of publicity claim was impliedly and expressly preempted under the Copyright Act). As a "prominent copyright scholar" observed in an article cited favorably in *In re Jackson* [*id.* at 35 n.8], "use of conflict preemption should not be reserved for unusual or extreme cases, if at all." Guy A. Rub, *A Less-Formalistic Copyright Preemption,* 24 J. Intell. Prop. L. 327, 345–46 (2017). Rather, as confirmed by *In re Jackson*, implied/conflict preemption should be "considered in practically every copyright preemption case." *Id.* Indeed, "in the context of preemption of contracts, this might be the primary and, in many cases, the only question that should be asked." *Id.*

As shown below, TrackMan's claim for breach of contract is both expressly and impliedly preempted by the Copyright. Following *In re Jackson*'s lead, we start with implied preemption.

**A.  The Copyright Act Impliedly Preempts TrackMan's Contract Claim Because the Reverse Engineering Prohibition Conflicts With Federal Copyright Policy**

"The doctrine of implied preemption will bar a state law claim where, 'under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *In re Jackson*, 972 F.3d at 34 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).  To determine what constitutes a "sufficient obstacle," the Second Circuit balances (1) the substantiality of a state law interest that is distinct from the "sphere" of copyright, with (2) the potential for conflict between the state law and federal copyright policy.  *Id.* at 34-42.

*First*, courts should examine "whether the state law claim furthers substantial state law interests that are distinct from the interests served by the federal law which may preempt the claim." *Id.* at 37.  Thus, "when a person undertakes to exert control over a work within the subject matter of the Copyright Act under a mechanism different from the one instituted by the law of copyright (*i.e.*, a state law claim), implied preemption may bar the claim unless the state-created-right vindicates a substantial state law interest, *i.e.*, an 'interest[ ] outside the sphere of congressional concern in [copyright] laws.'" *Id.* (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 155 (1989)).  The more substantial the state law interest, and the farther the state-created right lies beyond the sphere of copyright law, "the stronger the case to allow that right to exist side-by-side with the copyright interest, notwithstanding its capacity to interfere, even substantially, with the enjoyment of copyright." *Id.* at 37-38.  On the other hand, the "less substantial the state law rights invoked, or the more the invocation of the state right amounts to little more than camouflage for an attempt to exercise control over the exploitation of copyright, the more likely that courts will find the state law claim to be preempted." *Id.* at 38.

**Second**, courts should balance the substantiality of the state law interest against "the potential for conflict between the assertion of a state law claim invoked against the dissemination of works within the subject matter of copyright and the operation of the federal copyright system." *Id.* at 39. The greater the conflict with federal copyright policy, the more likely the state law claim will be preempted. *Id.*

Applying the Second Circuit's conflict preemption test to the RE Provision leads inescapably to the federal preemption of TrackMan's contract claim.

### 1. The Contract Claim Does Not Further a Substantial State Law Interest

Enforcing the RE Provision will not further a substantial state law interest. *In re Jackson*, 972 F.3d at 37. The primary state law interest served by upholding the RE Provision is freedom of contract. Guy A. Rub, *Moving from Express Preemption to Conflict Preemption in Scrutinizing Contracts over Copyrighted Goods*, 56 AKRON L. REV. 303, 320 (2022) ("The main interest that contract law promotes is individualized autonomy and efficient allocation of resources in creating enforceable bilateral arrangements."). While freedom of contract is a "deeply rooted" public policy in this state, the policy "does not mandate that the language of an agreement be enforced in all circumstances." *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 359 (2019). That is especially true where, as here, the provision is contained in a contract of adhesion and restrains competition in violation of New York public policy.

New York has a diminished interest in enforcing contracts of adhesion like the EULA. "Freedom of contract prevails" most strongly "in an arm's length transaction between sophisticated parties." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (1995). Here, however, the EULA is a take-it-or-leave-it contract of adhesion between a corporation and unsophisticated consumers. *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394-401 (E.D.N.Y. 2015) (exploring "Electronic Adhesion Contracts"). Thus, the state's interest in

enforcing the EULA is far weaker. *See Klos v. Lotnicze*, 133 F.3d 164, 168–69 (2d Cir. 1997)

("The concept of adhesion contracts introduces the serpent of uncertainty into the Eden of

contract enforcement. . . . At bottom, it is a notion evolved from public policy that refuses to

enforce a contract provision when it offends basic notions of civility and fair play."); *United*

*States v. Bolton*, 496 F. Supp. 3d 146, 159 (D.D.C. 2020) ("Contracts of adhesion . . .

paradigmatically create public policy difficulties when they bind unsophisticated consumers.").

New York also has a diminished interest in enforcing restrictive covenants like the RE

Provision that restrain trade and impede competition in contravention of New York public

policy. N.Y. Gen. Bus. Law § 340 ("Every contract . . . whereby . . . Competition or the free

exercise of any activity in the conduct of any business, trade or commerce . . . in this state is or

may be restrained . . . is hereby declared to be against public policy, illegal and void."); *Crye*

*Precision LLC v. Bennettsville Printing*, 755 F. App'x 34, 37 (2d Cir. 2018) (clause in IP

licensing agreement prohibiting licensee "from competing in the same field" constitutes unlawful

and unenforceable restraint on trade). While reverse engineering clauses may not expressly

restrict competition, courts and commentators universally recognize that is their impact. *See,*

*e.g.*, *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523–24 (9th Cir. 1992)

(characterizing video game developer's claim based upon competitor's reverse engineering as

"an attempt to monopolize the market by making it impossible for others to compete"); Douglas

L. Rogers, *Give the Smaller Players A Chance: Shaping the Digital Economy Through Antitrust*

*and Copyright Law*, 5 MARQ. INTELL. PROP. L. REV. 13, 93 (2001) ("A prohibition on reverse

engineering stagnates technological developments because competitors are restricted from

developing compatible computer products. Therefore, if a company with monopoly power

resulting from a copyrighted software product prohibits reverse engineering, that prohibition should be considered anticompetitive.").

While New York courts will uphold restrictive covenants in license agreements if they are "reasonable," they will not do so if they "merely insulate a party from competition" or fail to "protect a legitimate business interest," such as "a defensible IP interest[.]" *Navajo Air, LLC v. Crye Precision, LLC*, 318 F. Supp. 3d 640, 651 (S.D.N.Y. 2018), *as amended* (Aug. 2, 2018) (holding that covenant prohibiting licensee from printing a pattern that licensor did not own was "contrary to public policy, in that its enforcement would allow [licensor] to restrict competition without having any legitimate business interest in [the pattern]"). Here, TrackMan does not seek to protect "defensible IP" or any other "legitimate business interest" in its software through the RE Provision. Indeed, in an effort to avoid preemption, TrackMan goes out of its way to contend that the GSP Parties' alleged reverse engineering does ***not*** implicate any protectable copyright interest. FAC ¶¶ 74, 84, 85, 117. TrackMan simply seeks to prevent its users from developing competing and interoperable products.

To be clear—the Court need not rule that the RE Provision is unenforceable under New York law because it is contained in a contract of adhesion and/or constitutes an unlawful restraint of trade. Rather, the point is that whatever interest the state has in upholding the EULA under freedom of contract principles, the state's interest is, at a minimum, significantly weakened by the nature of the contract (adhesive) and provision at issue (anti-competitive).

### 2. The Reverse Engineering Prohibition Seeks to Protect Rights Within the Sphere of Copyright

The Second Circuit directs courts to examine the substantiality of the state's interest not in absolute terms, but in terms of the interest's proximity to copyright law—that is, "whether the state-created-right vindicates . . . an interest outside the sphere of congressional concern in

copyright laws." *In re Jackson*, 972 F.3d at 37 (cleaned up). Thus, for example, right of publicity claims that target "false endorsement" or seek to "vindicate privacy or reputational interests" may not be preempted by copyright law because the interests these claims seek to vindicate bear "little relation to the interests of a copyright holder to exclusive control over works of authorship." *Id*. at 37. Similarly, federal patent law does not preempt state trade secret law because it "operate[s] to protect non-economic interests outside the sphere of congressional concern in the patent laws." *Bonito Boats*, 489 U.S. at 155.

Here, TrackMan's contract claim seeks to vindicate rights that fall squarely within the domain of copyright law. In particular, TrackMan invokes state contract law to assert a quasi-property right in the "details of design, construction, and operation" of its software. FAC ¶ 85; *see also* Ex. A at 3 ("you may not . . . reverse engineer. . . or otherwise attempt to ***derive the source code, underlying ideas, or algorithms of the Software***") (emphasis added). These functional elements, though not protected by copyright, lie at the heart of "congressional concern in copyright laws." *In re Jackson*, 972 F.3d at 37; *see Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429–30 (2d Cir. 2012) ("The scope of copyright for preemption purposes . . . extends beyond the scope of available copyright protection."). Congress deliberately excluded from the scope of copyright protection "any idea, procedure, process, system, method of operation, concept, principle, or discovery…" 17 U.S.C. § 102(b). This includes the "functional elements" of TrackMan's software, including the "design, construction, and operation" elements that TrackMan seeks to protect through its state law claim. *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 714 (2d Cir. 1992) ("[F]unctional elements . . . do not qualify for copyright protection").

TrackMan's "invocation of the state right amounts to little more than camouflage for an attempt to exercise control over the exploitation" of its software. *In re Jackson*, 972 F.3d at 37 (right of publicity claim preempted where "predominant focus" was not concern regarding "reputation, prestige, social or commercial standing, public interest or other values of name and likeness," but rather the "unauthorized use of a copyrighted sound recording that [the claimant] has no legal right to control"); *see Bonito Boats*, 489 U.S. at 158 (state law prohibiting duplication of boat hulls through "molding process" preempted where it did not target unfair competition, but rather "aimed directly at preventing the exploitation of the design and utilitarian conceptions embodied in the product itself").[5]

### 3. The Reverse Engineering Prohibition Conflicts Directly With Federal Copyright Law

The second element of the implied preemption test weighs "the potential for conflict between the assertion of a state law claim invoked against the dissemination of works within the subject matter of copyright and the operation of the federal copyright system." *In re Jackson*, 972 F.3d at 39. This factor weighs strongly in favor of preemption because enforcing the RE Provision would create a direct conflict with fundamental policies and goals of copyright law.

The Copyright Act itself reflects Congress's recognition that reverse engineering frequently serves copyright's goals. Most notably, the anti-circumvention section of the Digital

---

[5] The fact that the RE Provision is contained in a contract of adhesion further erodes the difference between contract law's goals of individual autonomy and commercial efficiency and copyright's goals of incentivizing creativity. Rub, *Moving*, at 305 ("As a technical matter, standard-form agreements are just like any other contracts that become binding through the process of offer and acceptance. However, in practice, those non-negotiable arrangements are so broad and can be binding on so many people that they often look more like a regulatory scheme or a property right. Therefore, when copyrighted-good providers require all their buyers to agree to standard-form agreements that create arrangements that differ from copyright law, one may be concerned that contracts might be able to recreate and reshape copyright law's arrangements.").

Millennium Copyright Act contains a "reverse engineering" exemption that authorizes software users to "circumvent a technological measure that effectively controls access to a particular portion of that program for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs . . . ." 17 U.S.C. § 1201(f).

Consistent with the policies underlying this statute, courts have universally held that the Copyright Act allows developers to reverse engineer copyright-protected software in order to learn its functional components and create compatible and competing products.

For example, in *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992), the Ninth Circuit held it was fair use for a video game developer to reverse engineer the Sega Genesis gaming console in order to create new games that were compatible with the Genesis. 977 F.2d at 1510. The court noted that its decision served important "public policies" underlying the Copyright Act. *Id.* at 1514. In particular, the developer's reverse engineering resulted in "an increase in the number of independently designed video game programs," and "[i]t is precisely this growth in creative expression, based on the dissemination of other creative works and the unprotected ideas contained in those works, that the Copyright Act was intended to promote." *Id.* at 1523; *see also Sony Computer Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000) (fair use allows reverse engineering of Sony Playstation gaming console in order to create new gaming system compatible with Playstation games).

In *Google LLC v. Oracle America, Inc.*, the Supreme Court cited favorably to *Sega* and *Sony* in recognizing that copyright's primary objectives are served by allowing reverse engineering, and even literal copying, in order to enable the creation of new and compatible software products. 141 S. Ct. 1183, 1203 (2021) ("Google's use of the Sun Java API . . . to

create new products" and "a new platform that could be readily used by programmers" is "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself."). Even Justice Thomas, who dissented, apparently accepts that using code "to reverse engineer a system to ensure compatibility" constitutes fair use. *Id.* at 1198, 1219.

These decisions reflect a strong federal copyright policy in favor of allowing precisely the type of "reverse engineering" that TrackMan claims the EULA prohibits.

Although the Second Circuit has not yet spoken directly to whether a contractual prohibition against reverse engineering is preempted by the Copyright Act, the court sent a clear signal in *In re Jackson* that it would view any such state-law-based prohibition as a substantial obstacle to federal copyright policy and thus subject to preemption. Specifically, in its effort to illustrate "when a state law would frustrate the operation of a provision of federal copyright," such that implied preemption would apply, the Second Circuit cited favorably to *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 268–70 (5th Cir. 1988). *See In re Jackson*, 972 F.3d at 34 n.5. In *Vault*, a software company claimed a developer "breached its license agreement by decompiling or disassembling" software in violation of a Louisiana statute that permitted developers to include reverse engineering prohibitions in their form licenses. *Vault*, 847 F.2d at 258. The court concluded that, because the prohibition against reverse engineering "clearly 'touches upon an area' of federal copyright law," it was "preempted by federal law," and therefore "the restriction in Vault's license agreement against decompilation or disassembly is unenforceable." *Id.* at 270 (quoting *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229 (1964)). The Second Circuit's citation to *Vault* to exemplify the proper application of implied preemption strongly suggests that the Second Circuit would follow *Vault* in holding that

contractual prohibitions against reverse engineering—at least those contained in contracts of

adhesion—conflict with federal copyright policy and thus are preempted.

TrackMan, like the software company in *Vault*, seeks to restrict the GSP Parties from

reverse engineering their program. Specifically, TrackMan seeks to hold the GSP Parties liable

for studying and analyzing the non-copyrightable, functional elements of its software—the

"details of design, construction, and operation"—in order to create a new program that

interoperated with CF Courses and third-party launch monitors. FAC ¶ 74, 85, 114. Under

federal copyright law, these activities would not violate TrackMan's copyright and would

constitute fair use. *See Google*, 141 S. Ct. at 1203 (use of API code to permit interoperability is

fair use); *Sega*, 977 F.2d at 1510 (reverse engineering to understand software's functional

components is fair use); *Sony*, 203 F.3d at 596 (same). The Court should not permit TrackMan to

invoke state law to assert exclusive rights in its software—not available under Copyright Act—

that frustrate federal copyright policy in favor of allowing this type of reverse engineering.

Restricting users like the GSP Parties from "deriv[ing] the source code, underlying ideas, or

algorithms" of TrackMan's software [*see* Ex. A at 3] for the purpose of developing compatible

and competing products "would restrain future creation too much and prevent competition in a

way that would undermine copyright law's intent of granting the creator only limited monopoly

power." Rub, *Less-Formalistic*, at 346.

\*      \*      \*

In sum, TrackMan's contract claim seeks to vindicate a state-derived "freedom of

contract" interest that is exceptionally weak since the RE Provision is contained in an adhesive

form license and falls squarely within the sphere of copyright. Allowing TrackMan to invoke

state law to prevent users from "studying and analyzing" its game for the purpose of developing

new and interoperable programs would conflict directly with "the basic constitutional objective

of copyright itself." *Google*, 141 S. Ct. at 1203 ("To the extent that Google used parts of the Sun Java API to create a new platform that could be readily used by programmers, its use was consistent with that creative 'progress' that is the basic constitutional objective of copyright itself.") Thus, the Court should dismiss TrackMan's contract claim under the implied preemption doctrine.

**B.      The Copyright Act Expressly Preempts the Contract Claim Because the Reverse Engineering Prohibition is Qualitatively Equivalent to Rights Under Copyright**

TrackMan's contract claim also is expressly preempted by the Copyright Act. *See* 17 U.S.C. § 301(a). Section 301 of the Copyright Act preempts state law claims that enforce "rights 'equivalent' to exclusive copyright protections when the work to which the state claim was being applied falls within the area of copyright protection." *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 845 (2d Cir. 1997). A state law claim is preempted by the Copyright Act when "(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 48 (2d Cir. 2019). Both criteria are met, so TrackMan's contract claim is expressly preempted.

**1.      TrackMan's Software Falls Within the Subject Matter of Copyright**

The "subject matter" requirement "looks at the work that would be affected by the plaintiff's exercise of a state-created right, and requires (as an essential element of preemption) that the work 'come within the subject matter of copyright as specified by sections 102 and 103.'" *Jackson v. Roberts*, 972 F.3d 25, 42 (2d Cir. 2020) (quoting 17 U.S.C. § 301(a)).

TrackMan claims that the GSP Parties breached the EULA by reverse engineering TrackMan's software. FAC ¶ 113. Software falls within the subject matter of copyright because it is a "literary work" under Section 102(a)(1). *See* 17 U.S.C. § 102(a)(1); *Altai*, 982 F.2d at 702. Indeed, TrackMan concedes the point by alleging that its applications are "original works of authorship fixed in a tangible medium of expression and are protected by copyright." FAC ¶ 90. Thus, the subject matter prong of the preemption analysis is satisfied.

### 2. TrackMan's Contract Claim Seeks to Vindicate Rights Equivalent to the Exclusive Rights of Copyright

The equivalence requirement "looks at the right being asserted" over the work at issue and applies when that right is 'equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.'" *ML Genius Holdings LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at *3 (2d Cir. Mar. 10, 2022), *cert. denied*, No. 22-121, 2023 WL 4163205 (U.S. June 26, 2023) ("*Genius*"); *see also Nat'l Basketball Ass'n*, 105 F.3d at 848. A "state law right is equivalent to one of the exclusive rights of copyright if it may be abridged by an act which, in and of itself, would infringe one of the exclusive rights" bestowed by the Copyright Act. *Universal Instruments*, 924 F.3d at 48. Courts "engage in a holistic evaluation of the nature of the rights to be enforced" to determine "whether the state law action is qualitatively different from a copyright infringement claim." *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 302 (2d Cir. 2022) (cleaned up). "Only if the claim differs qualitatively from a copyright infringement claim will preemption not apply." *Id.* The Second Circuit takes a "restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).

Here, the rights that TrackMan seeks to vindicate through its contract claim are equivalent to exclusive rights bestowed by the Copyright Act. TrackMan accuses the GSP Parties of reverse engineering, which TrackMan defines as learning the "details of design, construction, and operation" of TrackMan's software in order to "develop, produce, and distribute GSPro, SGT, and simulator golf courses." *Id.* ¶ 85. Alleging that the GSP Parties analyzed TrackMan's software to "develop, produce, and distribute" GSPro is equivalent to claiming that they reproduced, prepared a derivative work based upon, and distributed copies of TrackMan's software in violation of 17 U.S.C. § 106(1), (2) & (3). *See IBM*, 2023 WL 3902955, at *10 (contract claim based on "reverse engineering . . . is simply a restatement of . . . claims under the Copyright Act for unlawful copying and distribution" and therefore is preempted).

TrackMan attempts to manufacture an "extra element" by contending that the reverse engineering activities targeted by the contract claim do not include "copying." FAC ¶¶ 74, 84, 85, 117. However, the Second Circuit defines reverse engineering as the process by which a "competitor . . . ***create[s] copies*** of copyrighted software for the purpose of analyzing that software and discovering how it functions. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014) (emphasis added); *see also Sega*, 977 F.2d at 1518 (reverse engineering involves "***intermediate copying*** of computer code as an initial step in the development of a competing product") (emphasis added); *Sony*, 203 F.3d at 602 (same). Dictionary definitions concur. *See* Google Search, "Reverse Engineering definition," *Oxford Languages*, at

https://www.google.com/search?q=reverse+engineering+definition (last visited Dec. 11, 2023) (defining "reverse engineering" as "the ***reproduction*** of another manufacturer's product following detailed examination of its construction or composition") (emphasis added). Indeed, TrackMan concedes that reproduction was a step in the GSP Parties' alleged "learning" process.

*See* FAC ¶ 74 ("By examining and studying Course Forge-created courses – ***without at first***

***copying them*** – Defendants learned how to build golf simulator software GSPro. . . .") (emphasis

added).  Allowing TrackMan to avoid preemption by extracting the copying step from the

reverse engineering process would conflict with the Second Circuit's directive to perform a

"holistic evaluation of the nature of the rights sought to be enforced," *In re Jackson*, 972 F.3d at

44 n.17 (cleaned up), and to "take a restrictive view of what extra elements transform an

otherwise equivalent claim into one that is qualitatively different from a copyright infringement

claim." *Briarpatch*, 373 F.3d at 305.

The fact that the RE Provision is contained in a contract also does not preclude

preemption.  The Second Circuit has made clear that a claim based on breach of a contract that

does not grant a copyright owner "any protection beyond that provided by copyright law itself"

is preempted.  *See* 5 Nimmer on Copyright § 19D.03[C][2][b] (quoted in *Genius*, 2022 WL

710744, at *4, *Universal Instruments*, 924 F.3d at 49, and *Forest Park*, 683 F.3d at 432).  Thus,

in at least two cases, the Second Circuit has held that the Copyright Act preempts a contract

claim when the provision at issue is qualitatively equivalent to rights provided under the

Copyright Act.  *See Genius*, 2022 WL 710744, at *3 (breach claim based on website term

restricting commercial use of lyrics preempted)*; Universal Instruments*, 924 F.3d at 49 (breach

claim based on licensee's violation of contractual prohibition against source code modification

preempted).  That is the case here, where TrackMan's claim for breach of the RE Provision is

"coextensive" with the exclusive rights of reproduction, preparation of derivative works, and

distribution already covered by the Copyright Act.  *Genius*, 2022 WL 710744, at *4.

### 3. The Second Circuit Does Not Follow *Bowers*

TrackMan likely will urge the Court to follow the Federal Circuit's decision in *Bowers v.*

*Baystate Techs., Inc.*, 320 F.3d 1317 (Fed. Cir. 2003), which held that the Copyright Act did not

preempt a claim for breach of contract based on a reverse engineering prohibition contained in a shrinkwrap license. However, *Bowers* is not binding and conflicts with Second Circuit law.

The Federal Circuit's decision relied on its finding that "most courts to examine this issue have found that the Copyright Act does not preempt contractual constraints on copyrighted articles." *Id.* The rulings cited by the court (none from the Second Circuit) stem from a Seventh Circuit decision holding that "the mutual assent and consideration required by a contract claim render that claim qualitatively different from copyright infringement." *Id.* at 1324 (citing *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 39 (7th Cir. 1996)). The Second Circuit, however, has rejected this exact logic, holding that contract claims cannot "escape preemption" merely because they require "mutual assent and valid consideration." *Genius*, 2022 WL 710744, at *4. The Second Circuit reasons that "such a rule would be in tension with our precedent holding that the general scope inquiry is holistic," and "would be difficult to square with our precedent teaching that we should take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Id.* (cleaned up).

The difference in approach taken by the Second Circuit and Federal Circuit on this issue has not gone unnoticed. In a brief submitted to the Supreme Court on a petition for certiorari in the *Genius* case, the Solicitor General of the United States noted "disagreement among the courts of appeals," on the issue of copyright preemption in the context of contract claims, contrasting *ProCD* and *Bowers* with *Universal Instruments* and *Genius* (the case on appeal), among other cases. Brief of the United States as Amicus Curaie, *ML Genius Holdings LLC v. Google LLC*, No. 22-121, 2023 WL 3646287, at *13 (U.S. May 23, 2023).

Tellingly, *Bowers* was not a unanimous decision. Circuit Judge Dik dissented, making the familiar argument that prohibitions on reverse engineering contained in "shrinkwrap

licenses" should be preempted by the Copyright Act in light of the state's diminished interest in enforcing contracts of adhesion and the strong federal copyright policy permitting reverse engineering. *Bowers*, 320 F.3d at 1337. Judge Dik further observed that "*Vault* directly supports preemption of the shrinkwrap limitation" and that, "[f]rom a preemption standpoint," and contrary to the majority's attempt to distinguish *Vault*, "there is no distinction between a state law that explicitly validates a contract that restricts reverse engineering (*Vault*) and general common law that permits such a restriction (as here)." *Id.*

As shown above, the Second Circuit has issued strong signals that it would follow Judge Dik's dissent and not the majority opinion in *Bowers*. These signals include the Second Circuit's policy-driven implied preemption test in *In re Jackson*, favorable citation to *Vault*, and *Universal Instruments* and *Genius* decisions affirming that contract claims are expressly preempted preemption where, as here, they are "coextensive" with exclusive rights covered by the Copyright Act. *Genius*, 2022 WL 710744, at *4. Thus, this Court need not and should not follow *Bowers*.

## CONCLUSION

For these reasons, the GSP Parties respectfully request that the Court dismiss TrackMan's claim for breach of contract with prejudice and order such other and further relief as the Court deems just and proper.

Dated: Los Angeles, California
      December 15, 2023

                    FRANKFURT KURNIT KLEIN & SELZ, P.C.

                    By:   */s/ Jeremy S. Goldman*
                        Jeremy S. Goldman
                    2029 Century Park East
                    Los Angeles, CA 90067
                    Tel.: (310) 579-9600
                    jgoldman@fkks.com

Caren Decter
Zoe Rachael Staum
28 Liberty Street, 35th Floor
New York, New York 10005
Tel.:  (212) 980-0120
cdecter@fkks.com
zstaum@fkks.com

*Attorneys for Defendants/Counterclaim Plaintiffs*
*GSP Golf AG and Davor Bogavac*