UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRACKMAN, INC.,

                    Plaintiff,

          v.

GSP GOLF AB d/b/a GSPRO, DAVOR
BOGAVAC, SIMULATORGOLFTOUR LLC,
and CHAD COOKE,

                    Defendants.

Case No. 1:23-cv-598-NRB

ORAL ARGUMENT
REQUESTED

GSP GOLF AB d/b/a GSPRO and DAVOR
BOGAVAC,

                    Counterclaim Plaintiffs,

          v.

TRACKMAN, INC.,

                    Counterclaim Defendant.

## **<u>TRACKMAN'S OPPOSITION TO THE GSP DEFENDANTS' MOTION TO DISMISS</u>**

Stefan Mentzer
Scott T. Weingaertner
Timothy Keegan
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Phone: + 1 212 813 8800
Fax: + 1 212 355 3333
smentzer@goodwinlaw.com
sweingaertner@goodwinlaw.com
tkeegan@goodwinlaw.com

*Counsel for Plaintiff TrackMan, Inc.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 3

    A.    Perfect Golf ................................................................................................. 3

    B.    The Perfect Parallel EULA ......................................................................... 5

    C.    The GSP Defendants' Conduct ................................................................... 6

    D.    TrackMan's Contract Claim against the GSP Defendants ........................... 7

LEGAL STANDARD ........................................................................................................... 8

ARGUMENT ....................................................................................................................... 8

I.    THE IMPLIED PREEMPTION DOCTRINE DOES NOT BAR TRACKMAN'S
CONTRACT CLAIM ................................................................................................ 8

    A.    The GSP Defendants' Implied Preemption Argument Raises Fact Issues
That Must Be Resolved in TrackMan's Favor ........................................... 8

          1.    Whether the EULA Is an Adhesion Contract Involves
Questions of Fact ........................................................................... 9

          2.    Whether the EULA Restrains Trade in Violation of Public Policy
Involves Questions of Fact ............................................................ 11

          3.    The GSP Defendants Cannot Avoid the Fact-Driven Nature of the
Implied Preemption Inquiry ......................................................... 11

    B.    The Contract Claim Is Not Directed to Acts of Copying, Which Are the
Domain of Copyright Law ......................................................................... 12

    C.    Enforcing the EULA Against Commercial Reverse Engineering Would Not
Conflict with Federal Copyright Law ....................................................... 14

    D.    There Is No Precedent to Bar a Contract Claim on Implied Preemption
Grounds ..................................................................................................... 16

II.    THE STATUTORY PREEMPTION DOCTRINE DOES NOT BAR TRACKMAN'S
CONTRACT CLAIM .............................................................................................. 18

    A.    TrackMan's Contract Claim Does Not Allege Copying ........................... 19

    B.    TrackMan's Contract Claim Does Not Satisfy the Equivalence Prong ...... 20

C.    The GSP Defendants' Attempt to Recharacterize TrackMan's Contract Claim
Is Unpersuasive ................................................................................................ 22

D.    Preemption Would Leave TrackMan with No Remedy for the GSP
Defendants' Reverse Engineering of User-Generated Courses ........................... 23

CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012).................................................................................................11

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014)..................................................................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................................8

*Berkson v. Gogo LLC*,
    97 F. Supp. 3d 359 (E.D.N.Y. 2015) .................................................................................10

*Bowers v. Baystate Techs., Inc.*,
    320 F.3d 1317 (Fed. Cir. 2003)...............................................................................14, 15, 16

*Cargo Partner AG v. Albatrans, Inc.*,
    352 F.3d 41 (2d Cir. 2003)....................................................................................................8

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006)..................................................................................................11

*Forest Park Pictures v. Universal TV Network, Inc.*,
    683 F.3d 424 (2d Cir. 2012)...............................................................................................15

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985)...............................................................................................8

*Hirsch v. CBS Broad. Inc.*,
    No. 17-cv-1860, 2017 WL 3393845 (S.D.N.Y. Aug. 4, 2017)............................................16

*IBM Corp. v. Micro Focus (US), Inc.*,
    No. 22-cv-9910-VB, 2023 WL 3902955 (S.D.N.Y. June 8, 2023) .................................22, 23

*In re Jackson*,
    972 F.3d 25 (2d Cir. 2020)...........................................................................................17, 18

*K.D. Hercules, Inc. v. Laborers Local 78 of Laborers' Int'l Union of N. Am*,
    No. 20-cv-4829, 2021 WL 1614369 (S.D.N.Y. Apr. 26, 2021) .............................................9

*Meridian Project Sys. v. Hardin Constr. Co., L.L.C.*,
    426 F. Supp. 2d 1101 (E.D. Cal. 2006)..........................................................................14, 15

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017).................................................................................................10

*ML Genius Holdings, LLC v. Google LLC*,
  No. 20-3113, 2022 WL 710744 (2d Cir. Mar. 10, 2022)........................................3, 19, 21, 22

*Molino v. Sagamore*,
  963 N.Y.S.2d 355 (2013) .....................................................................................................9

*Montz v. Pilgrim Films & Television, Inc.*,
  649 F.3d 975 (9th Cir. 2011) ..............................................................................................15

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)..................................................................................................8

*Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*,
  991 F.2d 426 (8th Cir. 1993) ..............................................................................................15

*Nat'l Union Life Ins. Co. v. Casmalia Resources Ltd.*,
  No. 89-cv-1045, 1990 WL 102199 (S.D.N.Y. July 11, 1990)..............................................10

*People v. Rattenni*,
  81 N.Y.2d 166 (1993) ........................................................................................................11

*ProCD, Inc. v. Zeidenberg*,
  86 F. 3d 1447 (7th Cir. 1996) .............................................................................................15

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)..................................................................................................8

*Sega Enters. Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) .......................................................................................16, 22

*United Techs. Corp. by Pratt & Whitney v. F.A.A.*,
  102 F.3d 688 (2d Cir. 1996)................................................................................................22

*Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., L.L.C.*,
  596 F.3d 1313 (11th Cir. 2010) ..........................................................................................15

*Vault Corp. v. Quaid Software Ltd.*,
  847 F.2d 255 (5th Cir. 1988) .........................................................................................17, 18

**Statutes**

17 U.S.C. § 106................................................................................................... *passim*

17 U.S.C. § 107........................................................................................................16

17 U.S.C. § 301.................................................................................................2, 20, 21

17 U.S.C. § 501(a) ...................................................................................................18

17 U.S.C. § 1201 ...............................................................................................15, 16

N.Y. Gen. Bus. Law § 340 ....................................................................................11

Sherman Act, 15 U.S.C. § 1 et seq.........................................................................11

**Other Authorities**

Rule 12(b)(6)............................................................................................................8

## INTRODUCTION

TrackMan is a sports technology innovator that is changing how the game of golf is played, taught, and viewed.  TrackMan develops and offers a range of hardware and software products for golf professionals, amateur players, instructors, driving ranges, golf clubs, tournaments, and broadcasters.  Its products include launch monitor devices that track how a golf ball is hit, providing highly accurate measurements of ball collision, launch, flight and landing. TrackMan also offers golf simulator software that lets users play the sport in their homes using clubs, launch monitors, and software.  TrackMan is continually innovating, and it protects its work and investments through a combination of intellectual property and contract law.

TrackMan has brought an action for copyright infringement and breach of contract against GSP Golf AB and its owner Davor Bogavac (the "GSP Defendants").  The GSP Defendants have engaged in a deliberate and systematic effort to build a for-profit enterprise on the backs of TrackMan's innovative golf simulator software, named Perfect Golf, and of the course designers and players who use Perfect Golf.  Mr. Bogavac admitted their approach in a post on Discord:  "***Copy and borrow*** as a starting point and then innovate on top of that." (emphasis added).  With that approach, and in violation of TrackMan's end user license agreement, the GSP Defendants reverse-engineered Perfect Golf and user-designed golf courses, to study, analyze, and learn how to build a product they could commercially market.  In addition, without TrackMan's consent, the GSP Defendants reproduced and adapted TrackMan's copyright-protected software to build their own competing product.  The GSP Defendants commercially launched their golf simulator software, naming it "GSPro."

Their conduct was brazen.  "I am all for innovating but if someone else does something good ***I have no issues to shamelessly 'borrow,'***" Mr. Bogavac posted (emphasis added).  Early in the development process, Mr. Bogavac mused:  "we can thank" TrackMan "and all the course

designers" for "what we are about to embark on.  It all builds on top of what was already done by them."  And later, when TrackMan was on the eve of introducing a new software simulator, Virtual Golf 2, he wrote:  "Hope [TrackMan] came up with some new cool features ***so we can copy and steal them***." (emphasis added).

TrackMan has brought two causes of action against the GSP Defendants.  One is for copyright infringement, based on the unauthorized copying of TrackMan's software to develop their software product, GSPro.  The other is for breach of contract, for the GSP Defendants' reverse engineering, for commercial gain, of TrackMan's software and of user-generated courses, in violation of TrackMan's non-commercial end user license agreement.  With these causes of action, TrackMan seeks to bring an end to the GSP Defendants' unlawful acts.

The GSP Defendants' motion asks this Court to dismiss TrackMan's breach of contract claim.  It does so on two grounds—"implied preemption," a rarely-invoked doctrine that appears nowhere in the Copyright Act, and "statutory preemption," a doctrine codified at 17 U.S.C. § 301.  Neither argument has merit.

The GSP Defendants rely heavily on their novel theory of implied preemption.  But that doctrine rarely is used in copyright cases.  To date, no court has applied implied preemption in a copyright case to bar a contract claim, much less a contract claim for violation of a prohibition on reverse engineering.  There is no reason to do so now.

To arrive at implied preemption, the GSP Defendants rely on a number of arguments that require factual findings that this Court cannot resolve in the movants' favor at the motion to dismiss phase.  That should end the matter.  The facts the GSP Defendants require to support their theory go to the nature and effect of the contract and the manner in which the GSP Defendants assented to it.  This is only one of several fatal defects in the GSP Defendants'

motion.  TrackMan's contract claim is not directed toward copying, which is the essence of copyright claims, and enforcement of the EULA would not conflict with any federal policy.  There is no reason for this Court to make new law and bar TrackMan's contract claim through implied preemption.

The statutory preemption argument fares no better.  It is telling that the GSP Defendants lead off with their novel implied preemption argument, before turning to statutory preemption at the end of the brief.  The statutory argument suffers from a fatal defect:  TrackMan narrowly tailored its contract claim to exclude any conduct that constitutes copying.  Copying is at the core of all copyright infringement claims.  The Second Circuit instructs that for statutory preemption to apply, the state law claim "must" involve copying—that is, an act of reproduction, adaptation, performance, distribution or display.  *ML Genius Holdings, LLC v. Google LLC*, No. 20-3113, 2022 WL 710744, at *3 (2d Cir. Mar. 10, 2022) (citation and quotations omitted).  A contract claim cannot be considered equivalent to a copyright claim where no such copying is pleaded.  Taking this precedent into account, TrackMan narrowed its contract claim in the First Amended Complaint to avoid claiming any acts of copying that overlap with its copyright infringement claims.  As pleaded, TrackMan's copyright infringement claim is for the GSP Defendants' copying, and its contract claim is for their non-copying acts of reverse-engineering undertaken for commercial gain.  There is no overlap, and the claims are not equivalent.

For all these reasons, the Court should deny the GSP Defendants' motion.

## **FACTUAL BACKGROUND**

### A.    **Perfect Golf**

In 2015, TrackMan's affiliate Perfect Parallel, Inc. released Perfect Golf, a golf game that provides an immersive experience centered on high-resolution visuals, accurate ball flight

physics developed using state-of-the-art launch monitors, and hyper-realistic gameplay.[1]  First Amended Complaint ("FAC"), ECF No. 32, ¶ 31.  The complaint includes a screenshot from Perfect Golf:



*Id.* ¶ 32.

Perfect Golf includes "Course Forge" software that allows users to design golf courses that can be played in Perfect Golf.  *Id.* ¶ 34.  Since the release of Perfect Golf, users have created hundreds of courses using Course Forge.  *Id.*

Perfect Parallel also built and previously provided a feature for external tournament sites to be able to fully integrate into Perfect Golf for online real-time scoring and tracking.  *Id.* ¶ 35.  Through third-party tournament sites, Perfect Golf users could play each other on courses designed in Course Forge.  *Id.*

In August 2019, TrackMan's parent company TrackMan A/S, which had acquired Perfect Parallel the year before, announced that it would suspend third-party simulator integration

---

[1] On January 1, 2018, TrackMan's parent TrackMan A/S acquired Perfect Parallel.  FAC, ECF No. 32, ¶ 36.  TrackMan subsequently obtained exclusive United States rights in Perfect Golf.  *Id.* ¶ 37.

licenses on August 31, 2020.  *Id.* ¶ 38.  TrackMan A/S made the announcement in light of its planned release of its Virtual Golf 2 software, which is playable with TrackMan launch monitors and offers tournament play as a feature.  *Id.*  TrackMan decided to suspend third-party simulator integration licenses to keep the company's focus on quality assurance and support for TrackMan's customers.  *Id.*

### B. The Perfect Parallel EULA

Persons who purchase Perfect Golf agree to the terms of the Perfect Parallel End User License Agreement (the "EULA").[2]  EULA, ECF No. 43-1, at 1.  The EULA governs the use of the "Software," which includes Perfect Golf and Course Forge, and of "User-Generated Content," which includes golf courses that users build using Course Forge.  *Id.*

The EULA grants users a "personal, limited, terminable, non-exclusive and non-transferable license to install and use the Software on a single computer for personal, non-commercial use."  *Id.* at 2.  In the EULA's "No Commercial Use" section, the agreement grants users "a limited right, subject to certain restrictions, to use the Software on a single computer for personal use only."  *Id.*

The EULA prohibits reverse engineering in two ways.  First, the EULA provides that a user "may not . . . otherwise use any part or all of the Software or any User-Generated Content in any way, directly or indirectly, to generate revenue for yourself or any third party or in exchange for any consideration or value of any kind . . . ."  *Id.*  Second, the EULA provides that users "may not . . . decompile, disassemble, reverse engineer, or otherwise attempt to derive the source code, underlying ideas, or algorithms of the Software . . . ."  *Id.* at 3.

---

[2] The GSP Defendants have submitted the full text of the EULA to the Court.  *See* EULA, ECF No. 43-1.  TrackMan does not object to including the EULA as part of the pleadings.

C.        **The GSP Defendants' Conduct**

Defendant Davor Bogavac, the founder, co-owner, and CEO of Defendant GSP Golf AB, was an avid user of Perfect Golf.  FAC, ECF No. 32, ¶¶ 3, 39.  When TrackMan A/S announced in August 2019 that it would discontinue Perfect Golf simulator licenses the following year, Mr. Bogavac saw an opportunity to build a business by exploiting the golf simulator ecosystem Perfect Parallel had created.  *Id.* ¶ 40.  To succeed, Mr. Bogavac needed to do three things.  *Id.* ¶ 41.

First, Mr. Bogavac needed to make and distribute golf simulator software to replace Perfect Golf.  *Id.* ¶ 42.  Bogavac ultimately called the golf simulator software "GSPro."  *Id.*

Second, Mr. Bogavac needed an online platform to host tournament play by GSPro users.  *Id.* ¶ 43.  Mr. Bogavac would coordinate closely with other defendants in this action to develop a new tournament platform that would be designed to operate seamlessly with GSPro and the courses users created in Course Forge.  *Id.*

Third, Mr. Bogavac needed courses for GSPro users to play on the new tournament platform.  *Id.* ¶ 44.  Mr. Bogavac had a ready supply—the courses Perfect Golf users had created with Course Forge.  *Id.*  Mr. Bogavac undertook to build GSPro to play courses created using Perfect Parallel's Course Forge.  *Id.*

To achieve these aims, Defendants engaged in acts of copyright infringement in violation of the Copyright Act and acts of reverse engineering in violation of the EULA.  *Id.* ¶¶ 46-59, 80-82, 84-85, 89-102, 108-17.

### D.    TrackMan's Contract Claim against the GSP Defendants

The First Amended Complaint asserts a claim for breach of contract against the GSP Defendants, as well as claims for copyright infringement.[3]  The contract claim specifically alleges that the GSP Defendants violated the EULA's prohibition on reverse engineering— namely, (1) the requirement that a user "may not . . . otherwise use any part or all of the Software or any User-Generated Content in any way, directly or indirectly, to generate revenue for yourself or any third party or in exchange for any consideration or value of any kind" (EULA, ECF No. 43-1, at 2); and (2) the requirement that a user "may not . . . decompile, disassemble, reverse engineer, or otherwise attempt to derive the source code, underlying ideas, or algorithms of the Software . . . ." (*Id.* at 3).

The Defendants engaged in acts of reverse engineering in a number of ways.  The GSP Defendants studied and analyzed TrackMan's software and the courses created in Course Forge in order to learn the details of their design, construction, and operation.  FAC, ECF No. 32, ¶ 113.  Mr. Bogavac and GSP examined and studied Course Forge-designed courses, as well as Perfect Golf, to understand how to build their commercial golf simulator, GSPro.  *Id.*  The GSP Defendants also reverse engineered the "sim connector" in Perfect Golf for commercial purposes.  *Id.* ¶ 114.

TrackMan does not allege a contract claim for the GSP Defendants' acts of copying, which are the subject of TrackMan's separate copyright infringement claims.  *Id.* ¶ 117.  The acts of reverse engineering that TrackMan accuses in its contract claim are not acts of copying or any other violation of copyright law.  *Id.* ¶ 85.  The non-copying acts that comprise TrackMan's

---

[3] The GSP Defendants argue the merits of TrackMan's copyright case (ECF No. 42, at 4-5), even though they have not moved to dismiss any copyright infringement claims.  Those arguments have no bearing on this motion and should be disregarded.  TrackMan strongly disputes the GSP Defendants' merits arguments and is prepared to litigate them in this action.

contract claim are the GSP Defendants' studying and analyzing of TrackMan's software and the courses created in Course Forge in order to learn details of their design, construction, and operation, to allow Defendants to develop, produce, and distribute their commercial product, GSPro. *Id.* ¶ 85.

## LEGAL STANDARD

In deciding a Rule 12(b)(6) motion, a court is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). A court must accept all factual allegations as true and draw all reasonable inferences on open questions of fact in favor of the plaintiff. *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013); *Roth v. Jennings*, 489 F.3d 499, 501 (2d Cir. 2007). A "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). A plaintiff need only provide "enough facts to state a claim to relief that is plausible on its face" and "raise a reasonable expectation that discovery will reveal [the necessary] evidence." *Id.* at 556, 570. Accordingly, "[d]ismissal is not warranted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003) (quotation and alterations omitted).

## ARGUMENT

## I.    THE IMPLIED PREEMPTION DOCTRINE DOES NOT BAR TRACKMAN'S CONTRACT CLAIM

### A.    The GSP Defendants' Implied Preemption Argument Raises Fact Issues That Must Be Resolved in TrackMan's Favor

The GSP Defendants rest their implied preemption argument on questions of fact. The Perfect Parallel EULA, they say, is a "contract of adhesion" that "restrains competition" in

violation of New York State public policy.  ECF No. 42, at 10-12.  But the pleadings do not establish the facts underlying these findings.  The complaint, in truth, shows the contrary.

It well-established what happens when there are open questions of fact at the pleadings stage:  a court should resolve the fact issues in the non-movant's favor.  This holds true where a defendant seeks to dismiss a claim on preemption grounds.  *See K.D. Hercules, Inc. v. Laborers Local 78 of Laborers' Int'l Union of N. Am*, No. 20-cv-4829, 2021 WL 1614369, at *2 (S.D.N.Y. Apr. 26, 2021) ("At the pleading stage, preemption constitutes grounds for dismissal only 'if the statute's barrier to suit is evident from the face of the complaint.'") (quoting *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015)).  The full factual record, TrackMan submits, will confirm that the EULA is not an adhesion contract and does not unlawfully restrain competition, and that the state's interest in upholding the parties' private contract is substantial.

### 1.    Whether the EULA Is an Adhesion Contract Involves Questions of Fact

An "adhesion contract" under New York law "contains terms that are unfair and nonnegotiable and arises from a disparity of bargaining power or oppressive tactics."  *Molino v. Sagamore*, 963 N.Y.S.2d 355, 357 (2013).  A "form agreement . . . is not automatically one of adhesion because such claims are judged by whether the party seeking to enforce the contract has used high pressure tactics or deceptive language in the contract and whether there is inequality of bargaining power between the parties."  *Id.*  The GSP Defendants have made no factual showing to establish that the EULA is an adhesion contract.  All they say, without citing anything in the pleadings, is that the EULA is a "take-it-or-leave-it contract of adhesion between a corporation and unsophisticated consumers."  ECF No. 42, at 10.  There is no support for this sweeping assertion.

The pleadings, in fact, show that the EULA is not an adhesion contract.  The EULA invites users to negotiate commercial terms:  if the user "would like to use the Software or any

9

User-Generated Content for Commercial use, please contact Perfect Parallel at

[sales@perfectparallel.com](mailto:sales@perfectparallel.com)."  EULA, ECF No. 43-1, at 1.  This offer to negotiate is not "take-it-

or-leave-it," as the GSP Defendants characterize it.

      Nor is there any indication that the GSP Defendants are "unsophisticated consumers."

The First Amended Complaint alleges the lengths to which GSP Defendants have gone, not

merely to use Perfect Golf as consumers of the software, but to build a commercially viable

software product offering.  *See* FAC, ECF No. 32, ¶¶ 39-59, 73-77.  The GSP Defendants claim

to have developed a "competing" software offering (ECF No. 42, at 1), which further undercuts

any notion that they are mere "unsophisticated consumers."

      Notably, the EULA is a "clickwrap" agreement that, under the GSP Defendants' own

formulation, is enforceable.  *See* EULA, ECF No. 43-1, at 1 (indicating the user's agreement

"BY YOUR ACT OF CLICKING TO ACCEPT THESE TERMS AND/OR BY INSTALLING,

COPYING OR USING THE SOFTWARE.").  The GSP Defendants cite to *Berkson* (ECF No.

41, at 10), a decision which noted that courts "in general, find [clickwrap agreements]

enforceable," as users who physically manifest assent are on inquiry notice of the terms to which

they are assenting.  *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015).  Courts

consistently uphold clickwrap agreements as enforceable.  *See*, *e.g.*, *Meyer v. Uber Techs., Inc.*,

868 F.3d 66, 76 (2d Cir. 2017).

      The fact questions that underpin the question of whether the EULA is an adhesion

contract cannot be decided on a motion to dismiss and must be resolved in TrackMan's favor.

*See Nat'l Union Life Ins. Co. v. Casmalia Resources Ltd.*, No. 89-cv-1045, 1990 WL 102199, at

*3 n.3 (S.D.N.Y. July 11, 1990) (assessing if a contract is one of adhesion requires

"determination of factual issues inappropriate for resolution in a motion to dismiss").

### 2. Whether the EULA Restrains Trade in Violation of Public Policy Involves Questions of Fact

The GSP Defendants again offer no support in the pleadings for their broad assertion that the EULA is improperly anticompetitive. All they do is say that the EULA "restrains competition in violation of New York public policy" and then cite the New York antitrust statute (N.Y. Gen. Bus. Law § 340) and various cases that purportedly concern restraints on competition. ECF No. 42, at 10-11. But whether conduct is an improper constraint on competition is a highly fact-driven inquiry—one the GSP Defendants have not even begun to undertake.[4] TrackMan disputes these allegations, which must be resolved in TrackMan's favor.

### 3. The GSP Defendants Cannot Avoid the Fact-Driven Nature of the Implied Preemption Inquiry

It does not save the GSP Defendants' motion that, as they claim, "the Court need not rule that the" reverse engineering prohibition "is unenforceable under New York law" in order to find whether the contract claim furthers a substantial state interest. ECF No. 42, at 12. That is beside the point. The issues the GSP Defendants have raised—*i.e.*, whether the EULA is an adhesion contract and whether the EULA unduly restrains trade—require the Court to decide questions of

---

[4] "Courts generally construe the Donnelly Act [N.Y. Gen. Bus. Law § 340 *et seq.*] in accordance with its federal analogue, the Sherman Act, 15 U.S.C. § 1 *et seq.*, upon which it was modeled." *See People v. Rattenni*, 81 N.Y.2d 166, 171 (1993). There are two approaches to determine if an agreement is anticompetitive, both of which involve considerable fact-finding, typically over many years. The first is if an agreement "is among that small class of actions that courts have deemed to have 'such predictable and pernicious anticompetitive effect, and such limited potential for precompetitive benefit,' it will be unreasonable per se." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006) (quotations and citation omitted). This generally requires finding that agreements were actually entered into "between competitors at the same level of the market structure, or [among] combinations of persons at different levels of the market structure, e.g., manufacturers and distributors." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quotations omitted). The second is under the "rule of reason," where "the alleged restraint is unreasonable because its 'anticompetitive effects outweigh its procompetitive effects.'" *E & L Consulting, Ltd.*, 472 F.3d at 29 (quotation omitted). This requires defining the relevant market and assessing the effect of the agreement on that market. *See id.*

fact.  That the GSP Defendants ask this Court to find the state interest is "substantial" based on these predicate issues of fact, and then to balance the substantiality of that interest against the GSP Defendants' formulation of a federal copyright law interest, (ECF No. 42, at 9-10) underscores that the analysis is overwhelmingly fact-driven.  The facts underlying the GSP Defendant's implied preemption argument must be resolved in TrackMan's favor at this stage of the case, requiring denial of the motion.

### B.     The Contract Claim Is Not Directed to Acts of Copying, Which Are the Domain of Copyright Law

Contrary to what the GSP Defendants argue, TrackMan's contract claim does not seek to "vindicate rights that fall squarely within the domain of copyright law."  ECF No. 42, at 13.  TrackMan's contract claim is not a copying claim.  At the core of the copyright law is the copyright holder's exclusive right to do or to authorize "copying"—reproduction, adaptation, distribution, public display, and public performance.  *See* 17 U.S.C. § 106 (setting forth the exclusive rights of copyright holders).  TrackMan does not claim that the GSP Defendants' copying activities are contract violations.  It is only their non-copying acts of reverse engineering that violate the EULA.  The complaint alleges that "[b]y examining and studying Course Forge-created courses—***without at first copying them***—Defendants learned how to build golf simulator software GSPro and tournament platform SGT that would play these courses."  FAC, ECF No. 32, ¶ 74 (emphasis added).  The complaint alleges that "Defendants engaged in activities, ***which do not constitute copying or any other violation of copyright law***, in violation of the Perfect Parallel EULA."  *Id.* ¶ 85 (emphasis added).  "Defendants' unlawful conduct included reverse engineering—namely, studying and analyzing TrackMan's software and the courses created in Course Forge in order to learn details of design, construction, and operation—to allow Defendants to develop, produce, and distribute GSPro . . . ."  *Id.*  The complaint is clear what the

12

contract claim does not allege: "***TrackMan does not allege contract claims for Defendants' copying activities***, which are the subject of TrackMan's copyright infringement claims." *Id.* ¶ 117 (emphasis added). There is no overlap between the contract and copyright claims.

TrackMan's contract claim is directed to something different than copyright. The EULA distinguishes between non-commercial uses and commercial uses. That distinction is crucial. The GSP Defendants have improperly exploited the non-commercial EULA to obtain the benefits of a commercial license from TrackMan.

A person who buys Perfect Golf can enjoy the features of the Perfect Parallel software and user-created courses solely for non-commercial purposes. EULA, ECF No. 43-1, at 1. The EULA states at the top that it is for "[n]on-commercial, personal use only." *Id.* The EULA states that "[p]rovided that you comply with all of the terms of this Agreement, we grant you a personal, limited, terminable, non-exclusive and non-transferable license to install and use the Software on a single computer for personal, non-commercial use." *Id.* at 2. The price of the non-commercial license is a flat-dollar payment of $34.99. *See* FAC, ECF No. 32, ¶ 33 n.1 (link to price of Perfect Golf, at https://store.steampowered.com/app/288140/Perfect_Golf).

If a person wishes to make commercial uses of Perfect Golf, that is altogether different. The EULA defines "Commercial Use" to include "otherwise [using] any part or all of the Software or any User-Generated Content in any way, directly or indirectly, to generate revenue for yourself or any third party or in exchange for any consideration or value of any kind . . . ." EULA, ECF No. 43-1 at 2. The EULA invites any person who wishes to make such uses to seek a commercial license: if a user "would like to use the Software or any User-Generated Content for Commercial use, please contact Perfect Parallel at sales@perfectparallel.com." EULA, ECF

No. 43-1, at 1.  Unlike the non-commercial license, a commercial license is not offered for a fixed price of $34.99 and would have to be negotiated.

The GSP Defendants did not obtain a commercial license to allow them to reverse-engineer the Perfect Parallel software and user-generated courses.  FAC, ECF No. 32, ¶¶ 74, 84-85, 111-114.  Instead, they took a non-commercial license to obtain access to the software and courses, and then, under a false pretense of merely personal use, exploited their access to reverse-engineer the software and courses for profit.  *Id.* ¶¶ 74, 84-85, 111-114.  That is the gravamen of TrackMan's contract claim.  The GSP Defendants have taken for their own benefit the features of a commercial license, while only entering into and paying for a non-commercial one.  The GSP Defendants deprived TrackMan's opportunity to negotiate, and to be compensated for, a license permitting commercial reverse-engineering.

## C.    Enforcing the EULA Against Commercial Reverse Engineering Would Not Conflict with Federal Copyright Law

The GSP Defendants have not shown there is a "strong" federal copyright policy favoring their type of reverse engineering.  *See* ECF No. 42, at 14-16.

The case law does not establish such a policy.  To the contrary, courts in statutory preemption cases have ruled that the Copyright Act does not preempt contract claims for violation of a license agreement's prohibition on reverse engineering.  In *Bowers*, the Federal Circuit ruled that the statutory preemption provision of the Copyright Act did not preempt a competitor's shrink-wrap license agreements that prohibited reverse engineering.  *See Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1323-26 (Fed. Cir. 2003) (noting that "most courts to examine this issue [of whether the Copyright Act preempts a state law claim that restrains copying] have found that the Copyright Act does not preempt contractual constraints on copyrighted articles"); *see also Meridian Project Sys. v. Hardin Constr. Co., L.L.C.*, 426 F.

Supp. 2d 1101, 1109 (E.D. Cal. 2006) ("Reverse engineering is not within the scope of the exclusive rights of copyright.  Section 2(b) of the EULA provides that the licensee agrees not to reverse engineer the Software.  To the extent that Meridian's EULA prohibits reverse engineering by defendant Hardin, plaintiff's breach of contract claim is also not preempted because the contract protects a qualitatively different right than those protected by the Copyright Act.") (citations omitted).  While the GSP Defendants seek to distinguish *Bowers* on grounds that it is not binding on this Circuit (*see* ECF No. 42, at 22), *Bowers* (and *Meridian Project Systems*) undeniably bears on what the GSP Defendants claim national copyright policy is in relation to reverse engineering.  And more generally, the majority of circuits have ruled that, as a general matter, the Copyright Act's statutory preemption provision does not bar contract claims.  *See ProCD, Inc. v. Zeidenberg*, 86 F. 3d 1447, 1454 (7th Cir. 1996) ("courts usually read preemption clauses to leave private contracts unaffected"); *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 980-81 (9th Cir. 2011); *Utopia Provider Sys., Inc. v. Pro-Med Clinical Sys., L.L.C.*, 596 F.3d 1313, 1326-27 (11th Cir. 2010); *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 433-34 (8th Cir. 1993); *see also Forest Park Pictures v. Universal TV Network, Inc.*, 683 F.3d 424, 431-32 (2d Cir. 2012) (finding no preemption and noting that "[a] number of our sister circuits have . . . concluded that at least some contract claims involving the subject matter of copyright do not contest rights that are the equivalent of rights under the Copyright Act, and thus are not preempted.").

The statute and the cases the GSP Defendants cite do not establish a "strong" federal policy either.  Section 1201(f) which the GSP Defendants cite (*see* ECF No. 42, at 14-15) is a statutory exception to the Digital Millennium Copyright Act's prohibitions on circumvention of copyright protection systems.  *See* 17 U.S.C. § 1201(a)(1)(A), (a)(2), (b).  The provision does not

concern reverse-engineering prohibitions found in private contracts. And § 1201(f) itself is limited: the provision exempts from DMCA liability certain reverse-engineering activities, but only to the extent such activities do "not constitute infringement" under the Copyright Act. 17 U.S.C. § 1201(f)(1), (2), (3). Section 1201(f) does not address whether reverse engineering is lawful under federal copyright law.

The fair use cases the GSP Defendants cite—*Sega v. Accolade*, *Sony v. Connectix*, and *Google v. Oracle* (ECF No. 42, at 15-16)—are not persuasive. Fair use is a fact-driven inquiry, requiring courts to consider and weigh four factors on the basis of a developed fact record. *See* 17 U.S.C. § 107; *Hirsch v. CBS Broad. Inc.*, No. 17-cv-1860, 2017 WL 3393845, at *7 (S.D.N.Y. Aug. 4, 2017) (denying motion to dismiss based on fair use). Each case the GSP Defendants cite was decided on its own circumstances, after application of the statutory factors. None of the cases considered whether the copyright law preempts a contractual reverse-engineering prohibition. And declining to preempt a contractual prohibition on reverse engineering does not interfere with the jurisprudence on whether reverse engineering constitutes fair use; those decisions continue to remain in effect. *See Bowers*, 320 F.3d at 1325 (in finding no preemption, "this court has left untouched the conclusions reached in *Atari Games v. Nintendo* regarding reverse engineering as a statutory fair use exception to copyright infringement").

### D.    There Is No Precedent to Bar a Contract Claim on Implied Preemption Grounds

The GSP Defendants ultimately ask this Court to make new law. The motion has identified no copyright case—and there is none—where a court has ruled that the implied preemption doctrine requires dismissal of a contract law claim.

The GSP Defendants' implied preemption argument relies heavily on the Second Circuit's opinion in *In re Jackson*.  That case, as the GSP Defendants acknowledge, considered whether the copyright law preempted a claim arising under a state right-of-publicity statute for using the plaintiff's name.  *See In re Jackson*, 972 F.3d 25 (2d Cir. 2020).  The case is easily distinguishable.  *In re Jackson* did not consider a private contract between the parties, and the plaintiff's claim there was for unauthorized copying, unlike TrackMan's non-copying acts of reverse engineering.  And *In re Jackson* considered a district court decision that was decided on summary judgment, on a full fact record, unlike here where the GSP Defendants ask the Court to make factual findings at the pleadings stage.

The GSP Defendants' citation to *Vault* (*see* ECF No. 42, at 16) is not persuasive either.[5] That decision concerned whether the Louisiana License Act—a state statute, not a private contract—was preempted.  *See Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 268-70 (5th Cir. 1988).  The court ruled that a provision of the state law, which permits a software producer to prohibit the "adaptation" of its licensed computer program by decompilation or disassembly, conflicts with § 117 of the Copyright Act, which allows the owner of a computer program to make an adaptation of that program under specific circumstances.  *See id.* at 270.  This particular provision of the Copyright Act triggered preemption of the state statute, unlike here where the GSP Defendants ask the Court to find preemption of a private contract after weighing various state and federal policies.  Notably, *Vault* involved a claim of copying—specifically, "adaptation," which is equivalent to the federal copyright right to prepare derivative works.  *See*

---

[5] The GSP Defendants incorrectly conclude that *In re Jackson*'s citation to *Vault* "strongly suggests" that the Second Circuit would follow *Vault*.  ECF No. 42, at 16-17.  The Second Circuit did not endorse *Vault*.  It cited to *Vault* in a footnote and in reference to explaining what the implied preemption doctrine is.  *See In re Jackson*, 972 F.3d at 34 n.5.

*id.*; 17 U.S.C. § 106(2).  TrackMan's contract claim is only for non-copying conduct.  Finally, *Vault* was decided after a three-day bench trial on an extensive fact record.  *See id.* at 258.  As noted, implied preemption cases require fact determinations that cannot decided in GSP Defendants' favor at the pleadings stage.

It is not surprising that the GSP Defendants can cite no copyright cases where implied preemption barred a contractual prohibition on reverse engineering.  As *In re Jackson* notes, "the mere fact that a state law claim would restrict or prevent certain uses of a copyrighted work does not necessarily answer the question of whether that state law claim should be preempted . . . ." *In re Jackson*, 972 F. 3d at 36.  If that were the case, every state claim would be preempted.  The GSP Defendants have shown no reason to expand the implied preemption doctrine to encompass the circumstances presented in this case, and the Court should decline their invitation to do so.

## II.    THE STATUTORY PREEMPTION DOCTRINE DOES NOT BAR TRACKMAN'S CONTRACT CLAIM

TrackMan's contract claim is not statutorily preempted under the Copyright Act for one simple reason:  the claim does not accuse the GSP Defendants of copying.  Where a claim does not allege copying, it is not equivalent to a claim for copyright infringement, and the "equivalence" prong is not met.

The essence of copyright is the right to control "copying."  The law gives copyright holders the exclusive right to copy:  "the owner of copyright under this title has the exclusive rights to do and to authorize" the reproduction, preparation of derivative works, distribution, public display, and public performance of copyrighted works.  17 U.S.C. § 106.  Unauthorized copying is an element of an infringement claim.  *See* 17 U.S.C. § 501(a) ("Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright").

TrackMan's contract claim does not claim copying.  It claims that the GSP Defendants violated the terms of TrackMan's non-commercial EULA, improperly exploiting that agreement to engage in ***non-copying*** acts of reverse engineering for their own commercial gain.  As pleaded, TrackMan's contract claim does not overlap with the copyright infringement claims.  TrackMan alleges entirely different conduct—conduct that is not an act of reproduction, adaptation, distribution, public display, or public performance under § 106.  That is fatal to the GSP Defendants' preemption argument.  As the Second Circuit recently articulated, "[f]or preemption to apply, the state law claim ***must*** involve acts of reproduction, adaptation, performance, distribution or display."  *ML Genius*, 2022 WL 710744, at *3 (citation and quotations omitted) (emphasis added).  Given the distinct nature of TrackMan's contract claim, there is no basis to preempt the claim on statutory preemption grounds.

### A.    TrackMan's Contract Claim Does Not Allege Copying

TrackMan has narrowly pleaded its contract cause of action to allege only non-copying conduct.  The claim focuses specifically on the GSP Defendants' commercial reverse-engineering acts of studying and analyzing TrackMan's software and user-generated courses to learn how to build a commercial product.  The complaint alleges:

- "Defendants engaged in activities, ***which do not constitute copying or any other violation of copyright law***, in violation of the Perfect Parallel EULA."  FAC, ECF No. 32, ¶ 85 (emphasis added).

- "Defendants' unlawful conduct included reverse engineering—namely, ***studying and analyzing TrackMan's software and the courses created in Course Forge*** in order to learn details of design, construction, and operation—to allow Defendants to develop, produce, and distribute GSPro, SGT, and simulator golf courses."  *Id.* (emphasis added).

- "Defendants ***studied and analyzed*** TrackMan's software and the courses created in Course Forge in order to learn the details of the design, construction, and operation of the software and the courses.  For example, Mr. Bogavac and GSP ***examined and studied*** Course Forge-designed courses, as well as Perfect Golf, to understand how to build a commercial golf simulator, GSPro.  As another example, Mr. Cooke and

SimulatorGolfTour LLC **examined and studied** Course Forge-designed courses, as well as Perfect Golf, to understand how to build a commercial tournament platform, SGT.  Defendants undertook these activities allow them to develop and distribute GSPro, SGT, and golf courses for simulator play on SGT using GSPro – all of which Defendants distribute for commercial purposes.  Defendants' conduct constituted reverse engineering, in violation of the Perfect Parallel EULA." *Id.* ¶ 113 (emphasis added).

- "By examining and studying Course Forge-created courses—**without at first copying them**—Defendants learned how to build golf simulator software GSPro and tournament platform SGT that would play these courses." *Id.* ¶ 74 (emphasis added).

- "***TrackMan does not allege contract claims for Defendants' copying activities***, which are the subject of TrackMan's copyright infringement claims." *Id.* ¶ 117 (emphasis added).

These allegations are not, as the GSP Defendants argue, "equivalent to claiming that [the GSP Defendants] reproduced, prepared a derivative work based upon, and distributed copies." ECF No. 42, at 20.  The complaint expressly carves out copying activities from the contract claim.  Only the unauthorized acts of "studying" and "analyzing" TrackMan's software and user-generated courses are accused.  Those are not acts of copying, which the Copyright Act defines as reproduction, adaptation, or distribution, public display, and public performance. *See* 17 U.S.C. § 106.

### B.    TrackMan's Contract Claim Does Not Satisfy the Equivalence Prong

TrackMan's contract claim as pleaded does not satisfy the "equivalence" (also called "general scope") prong of 17 U.S.C. § 301(a).  Thus, there is no statutory preemption.[6]

The Copyright Act preempts "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter

---

[6] The contract claim also does not satisfy the "subject matter" prong of § 301.  The absence of any copying allegations provide the same basis for finding that the contract claim falls outside of the subject matter of copyright.

of copyright . . . ."  17 U.S.C. § 301(a).  "[N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State."  *Id.*  Furthermore, "[n]othing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to . . . activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 . . . ."  17 U.S.C. § 301(b)(3).

The Second Circuit recently considered whether, for statutory preemption purposes, a claim for breach of an internet platform's terms of service was equivalent to the exclusive rights set forth in the Copyright Act.  The court ruled that ML Genius's terms of service, which prohibited users like Google from copying third-party owned song lyrics on ML Genius's site, were equivalent and thus preempted under § 301.  *See ML Genius*, 2022 WL 710744, at *4.  The logic of *ML Genius* does not lead to preemption of TrackMan's contract claim, however.  *ML Genius* did not consider a contractual bar on non-copying acts of reverse engineering.  The contract claim in *ML Genius* was directed to copying—the unauthorized reproduction by Google of copyright-protected lyrics.  *See id.* at *4 ("Genius's complaint alleges that Defendants "breache[d] Genius's Terms of Service regarding the copying and reproduction of Genius [c]ontent.").  In contrast, TrackMan's contract claim is directed to the non-copying acts of studying and analyzing copyrighted works.  FAC, ECF No. 32, ¶¶ 74, 85, 113, 117.

Consequently, the contract claim does not meet the "equivalence" requirement of § 301 as articulated by *ML Genius*.  The equivalence requirement "is satisfied ***only when*** the state-created right may be abridged ***by an act that would, by itself, infringe one of the exclusive rights*** provided by federal copyright law."  *See ML Genius*, 2022 WL 710744, at *3 (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004)) (emphasis

added).  "For preemption to apply, 'the state law claim **must involve** acts of reproduction, adaptation, performance, distribution or display.'"  *Id.* (quoting *Briarpatch Ltd.*, 373 F.3d at 305) (emphasis added).  Acts of "studying" and "analyzing" are not acts that infringe the Copyright Act's exclusive rights.

### C.    The GSP Defendants' Attempt to Recharacterize TrackMan's Contract Claim Is Unpersuasive

To obtain a preemption ruling, the GSP Defendants try to redefine what "reverse engineering" means.  They argue that a Second Circuit decision and a dictionary entry define reverse engineering to include making copies, and thus TrackMan should as well.[7]  *See* ECF No. 42, at 20.  But TrackMan's complaint does not plead those definitions of "reverse engineering."  It expressly carves out acts of copying from the contract claim, such that the contract claim will only prevail where TrackMan proves non-copying acts of "studying" and "analyzing."  As pleaded, acts of copying will not be contractual breaches of the EULA.  TrackMan's pleading is entirely consistent with courts define "reverse engineering."  *See, e.g.*, *United Techs. Corp. by Pratt & Whitney v. F.A.A.*, 102 F.3d 688, 690 n.1 (2d Cir. 1996) ("Reverse engineering is the process by which an engineer takes an already existing product and works backward to re-create its design and/or manufacturing process.").

The GSP Defendants' citation to *IBM* (*see* ECF No. 42, at 20) is unpersuasive.  There, the plaintiff IBM intermingled its allegations of copying and reverse-engineering conduct to claim copyright and contract violations.  As the district court explained, IBM claimed that the defendant "Micro Focus allegedly copied and reverse engineered" through the defendant's "web

---

[7] To be clear, the cases the GSP Defendants cite involved actual copying as part of the alleged reverse engineering, unlike here, where acts of copying specifically are excluded.  *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992).

services implementation" with a "WSBIND file for mapping data that ***copies*** IBM's WSBIND file," and that "the numerous similarities in the file indicate that other portions of Micro Focus Enterprise Suite were ***copied*** from IBM as well." *IBM Corp. v. Micro Focus (US), Inc.*, No. 22-cv-9910-VB, 2023 WL 3902955, at *2 (S.D.N.Y. June 8, 2023) (emphasis added). TrackMan's pleadings separate the (infringing) acts of copying from the (reverse engineering) acts that are not copying. There is no overlap between the contract claim, which is narrowly drawn to allege purely non-copying conduct, and the copyright infringement claim, which is directed toward the GSP Defendants' violations of TrackMan's exclusive rights under § 106.

### D. Preemption Would Leave TrackMan with No Remedy for the GSP Defendants' Reverse Engineering of User-Generated Courses

The GSP Defendants largely ignore that TrackMan's contract claim is directed to their alleged reverse engineering of user-generated golf courses, not just of TrackMan's software. *See*, *e.g.*, ECF No. 42, at 19 (characterizing TrackMan's contract claim as for "reverse engineering TrackMan's software," without mentioning user-created courses). This aspect of TrackMan's contract claim is significant, as the reverse engineering of courses created by Perfect Golf users was crucial to the GSP Defendants' development of GSPro. FAC, ECF No. 32, ¶¶ 39-40, 44, 73-79. If the contract claim is preempted, TrackMan will be left without a remedy for this conduct.

One of Perfect Golf's features is to provide tools for users to build their own golf courses. Perfect Golf includes "Course Forge" software which allows users to design golf courses that can be played in Perfect Golf. *Id.* ¶ 34. Users have created hundreds of courses using Course Forge. *Id.* Through third-party tournament sites, Perfect Golf users can play each other on courses designed in Course Forge. *Id.* ¶ 35.

The EULA treats these user-created courses as "User Generated Content." The EULA provides that users "may use, reproduce, publish, perform, display and distribute any User-Generated Content you create," provided however that such use is "solely for personal use and not for Commercial Use." EULA, ECF No. 43-1, at 2-3. The EULA prohibits use of "any User-Generated Content in any way, directly or indirectly, to generate revenue for yourself or any third party or in exchange for any consideration or value of any kind (without limitation, "Commercial Use")." *Id.* at 1. TrackMan claims the GSP Defendants' commercial reverse-engineering of user-generated courses violates this provision. FAC, ECF No. 32, ¶¶ 73-79, 84-85.

This claim is important. The complaint alleges Defendant Bogavac, the principal of Defendant GSP, knew that he could build a business if he could offer a product that allowed tournament play of golf courses created in Course Forge. FAC, ECF No. 32, ¶ 40. The ability to play a large number of high-quality courses is essential to the commercial success of GSPro. *Id.* ¶ 73. Mr. Bogavac needed courses to ensure his product would be commercially successful. *Id.* ¶ 44. Accordingly, Mr. Bogavac undertook to build GSPro to play Course Forge-created courses. *Id.* Shortly after TrackMan announced it would discontinue simulator passes for Perfect Golf, Mr. Bogavac began to assess how to make a standalone game that would replace Perfect Golf and allow users to play games designed in Course Forge. *Id.* ¶ 46. "[H]acking the damn thing" was "morally justifiable," he declared in a post on messaging platform Discord. *Id.* In another post just as he was beginning development, Mr. Bogavac wrote that "we can thank" TrackMan, Perfect Parallel, "and all the course designers" for "what we are about to embark on. It all builds on top of what was already done by them." *Id.* ¶ 49.

The GSP Defendants began to reverse-engineer courses. By examining and studying Course Forge-created courses—without at first copying them—the GSP Defendants learned how to build their golf simulator software GSPro. *Id.* ¶ 74. These activities, which do not constitute copying or any other violation of copyright law, involved studying and analyzing the courses created in Course Forge in order to learn details of their design, construction, and operation. *Id.* ¶¶ 74, 85, 113. Having engaged in such non-copying acts of reverse engineering, the GSP Defendants developed and distributed early versions of software that allowed users to play courses created in Course Forge "as is." *Id.* ¶ 74. Defendants did so for commercial gain, to build their businesses. *Id*. ¶¶ 74, 113.

TrackMan does not own the copyright in the courses users created with Course Forge. The users who created them do. TrackMan cannot, and it does not, claim the GSP Defendants infringed the copyrights in user-generated courses. TrackMan's sole remedy is a breach of contract claim. If that claim is preempted, TrackMan will have no remedy for the GSP Defendants' commercial use of the courses. Under these circumstances, TrackMan's contract claim for the reverse-engineering of user-generated courses can hardly be considered "equivalent" to a copyright claim that TrackMan is unable to bring.

## **CONCLUSION**

TrackMan respectfully requests that the Court deny the GSP Defendants' motion.


Dated: New York, New York        GOODWIN PROCTER LLP
January 19, 2024


                                 By: /s/ Stefan Mentzer
                                     Stefan Mentzer
                                     Scott T. Weingaertner
                                     Timothy Keegan
                                 The New York Times Building
                                 620 Eighth Avenue

25

New York, New York 10018
Phone: + 1 212 813 8800
Fax: + 1 212 355 3333
smentzer@goodwinlaw.com
sweingaertner@goodwinlaw.com
tkeegan@goodwinlaw.com

*Counsel for Plaintiff TrackMan, Inc.*