UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
TRACKMAN, INC.,

         Plaintiff,

      - against -

GSP GOLF AB, doing business as GSPro,
DAVOR BOGAVAC, SIMULATORGOLFTOUR LLC,
and CHAD COOKE,

         Defendants.
-----------------------------------X

**MEMORANDUM AND ORDER**

23 Civ. 598 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Trackman, Inc. ("plaintiff") is the maker of the golf simulator game Perfect Golf. Among other things, Perfect Golf offers users the ability to virtually play some of the most famous golf courses in the world, including St. Andrews, Pebble Beach, and PGA National. Beginning in the late summer or early fall of 2019, defendants Davor Bogavac ("Bogavac"), his company GSP Golf AB ("GSP" and together with Bogavac, the "GSP Defendants"), Chad Cooke ("Cooke"), and his company SimulatorGolfTour LLC ("SGT" and together with Cooke, the "SGT Defendants") began taking steps toward creating their own golf simulator game that would compete with Perfect Golf.[1] As part of these efforts, defendants allegedly copied key components of plaintiff's copyrighted software and, without permission,

---

[1] When referring to the GSP Defendants and SGT Defendants collectively, we use the term "defendants."

incorporated them into their own product. Moreover, after digitally converting many of the famed golf courses from plaintiff's platform for use on defendants' competing platform, Cooke falsely suggested, in promotions and advertisements, that defendants were authorized to use these trademarked courses.

Plaintiff subsequently sued defendants, asserting five causes of action, namely: (1) direct copyright infringement; (2) secondary copyright infringement against both Bogavac and Cooke; (3) breach of contract; and (4) false advertising against Cooke and his company SGT. Thereafter, the GSP Defendants filed a motion to dismiss plaintiff's breach of contract claim, while the SGT Defendants filed a motion to dismiss all of plaintiff's claims. Those two motions to dismiss are the subject of this Memorandum and Order. For the following reasons, we grant the GSP Defendants' motion, thereby dismissing plaintiff's contract claim, but deny the SGT Defendants' motion, except as to the contract claim. Therefore, plaintiff's copyright infringement claims (both direct and secondary), as well as its false advertising claim, survive the motions to dismiss.

**BACKGROUND**

**A.    Factual Background[2]**

**1. The Parties**

Plaintiff is a golf technology company that manufactures launch monitors and develops simulator technology. FAC ¶¶ 1, 13-14. Using a combination of radars and cameras, plaintiff's launch monitors track the full trajectory of a golf shot. Id. ¶ 15. Although the launch monitors are portable and can thus be used outdoors on real golf courses, id. ¶ 17, they are also incorporated into plaintiff's simulator technology, which allows users to play golf indoors using real clubs and balls in front of an "impact screen" that displays the simulation and keeps golf balls from ricocheting back at the player after they are hit, id. ¶ 20. Plaintiff's golf simulator is powered by Virtual Golf 2, a computer program that is the product of a multi-year development project, which began with Perfect Golf, i.e., the software at the center of this dispute. Id. ¶¶ 21, 29-30.

Bogavac is the founder, co-owner, and chief executive officer of GSP, which, like plaintiff, is a provider of golf simulator

---

[2] The following facts, taken from the First Amended Complaint ("FAC"), ECF No. 32, are assumed to be true for the purposes of this motion. See Kalnit v. Eichler, 264 F.3d 131, 135 (2d Cir. 2001).

software.    Id. ¶¶ 2-3.    SGT provides an online golf simulator platform, Simulator Golf Tour, and is owned by Cooke.[3]    Id. ¶¶ 4-5.

## 2. Perfect Golf

In 2015, plaintiff's affiliate Perfect Parallel, Inc. released the golf simulator software Perfect Golf, which offers users "an immersive experience centered on high-resolution visuals, accurate ball flight physics developed using state-of-the-art launch monitors, and hyper-realistic gameplay." Id. ¶ 31. Perfect Golf includes Course Forge, a software that "allows user to design golf courses that can be played in Perfect Golf." Id. ¶ 34. Since Perfect Golf's release in 2015, "users have created hundreds of courses using Course Forge." Id. In addition to Course Forge, Perfect Golf also includes "an API[4] for external tournament sites to be able to fully integrate into Perfect Golf

---

[3] The parties sometimes refer to Cooke as "Cook," but we will refer to him as "Cooke" consistent with how his name appears on the case caption and throughout the First Amended Complaint.
[4] An API or application programming interface is defined as "a set of routines, protocols, and tools designed to allow the development of applications that can utilize or operate in conjunction with a given item of software, set of data, website, etc." API, Oxford English Dictionary, https://www.oed.com/dictionary/api_n-a?tab=meaning_and_use#40470976100 (last visited Sept. 24, 2024). In practical terms, APIs are "mechanisms that enable two software components to communicate with each other using a set of definitions and protocols." What is an API (Application Programming Interface)?, Amazon Web Services, https://aws.amazon.com/what-is/api/ (last visited Sept. 24, 2024).

for online real-time scoring and tracking." Id. ¶ 35.  Through third-party tournament sites, Perfect Golf users can play each other on courses designed in Course Forge.  Id.

### 3. The Perfect Parallel EULA

Individuals who purchase Perfect Golf agree to the terms of the Perfect Parallel End User License Agreement (the "EULA"). Id. ¶ 84; see also ECF No. 43-1 (EULA).[5]  The EULA grants a "personal, limited, terminable, non-exclusive and non-transferable license to install and use" Perfect Golf, including Course Forge and the underlying API data structures, "on a single computer for personal non-commercial use."[6]  EULA at 2.  The EULA prohibits the use of any part of Perfect Golf, Course Forge, and the API data structures, "in any way, directly or indirectly," for the purpose of generating revenue or in exchange for any consideration or value of any kind.  Id.  This prohibition expressly extends to any "User-Generated Content," which includes courses created using Course Forge.  Id.  Finally, as particularly relevant here, the EULA

---

[5] The GSP Defendants submitted the full text of the EULA with their motion to dismiss.  See ECF No. 43-1.  As plaintiff acknowledges, ECF No. 47 at 5 n.2, the EULA is integral to the complaint and therefore may be considered on the motion to dismiss, see DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

[6] Similarly, in the EULA's "No Commercial Use" section, the agreement grants users a "limited right, subject to certain restrictions, to use the Software on a single computer for personal use only."  EULA at 2.

prohibits users from decompiling, disassembling, reverse engineering, or otherwise attempting to derive the source code, underlying ideas, or algorithms of Perfect Golf and Course Forge. Id. at 3.

### 4. The Perfect Parallel Acquisition

In January 2018, plaintiff acquired Perfect Parallel, including Perfect Golf and all Perfect Parallel's software assets and intellectual property rights. FAC ¶ 36. Historically, Perfect Golf had been compatible with various third-party launch monitors, not just those manufactured by plaintiff, but in August 2019, plaintiff announced it would be suspending this feature. Id. ¶ 38. Thus, once that policy went into effect in August 2020, Perfect Golf users were no longer able to fully play the game unless they purchased and used plaintiff's launch monitors. Id.

### 5. Defendants' Alleged Conduct

Bogavac was an "avid" user of Perfect Golf and "regularly" used Course Forge to design virtual golf courses which he played using Perfect Golf. Id. ¶ 39. After plaintiff announced in August 2019 that it would soon discontinue Perfect Golf's compatibility with third-party launch monitors, "Bogavac saw an opportunity." Id. ¶ 40. Specifically, Bogavac sought make a golf simulator game

-6-

that would replace Perfect Golf and allow users to play games designed in Course Forge but across a number of launch monitors, not just those developed by plaintiff.  Id.  To that end, as plaintiff alleges, Bogavac "needed to do three things."  Id. ¶ 41.

First, Bogavac needed to develop golf simulator software to replace Perfect Golf, which he would later call "GSPro."  Id. ¶ 42. To develop GSPro, Bogavac and his associates allegedly "downloaded, accessed, and used Perfect Golf, including Course Forge."  Id. ¶ 51.  As part of his development efforts, Bogavac "copied, adapted, and incorporated [plaintiff's] copyright-protected software into GSPro," without permission from plaintiff or Perfect Parallel.  Id.  For example, Bogavac (and his company GSP) "copied Course Forge code directly into GSPro" and "copied Perfect Golf's 'combine' feature," which "enables golfers to identify strengths and weaknesses in their game."  Id. ¶¶ 52-53. In 2020, Bogavac released versions of GSPro, which allowed "users to integrate and use GSPro with other launch monitors" that "compete with [plaintiff's] launch monitors."  Id. ¶ 56.

Second, in addition to developing GSPro, Bogavac "needed an online platform to host tournament play by GSPro users."  Id. ¶ 43. To accomplish this, Bogavac closely collaborated with Chad Cooke. Id. ¶ 60.  Together, they developed a golf tournament platform

Simulator Golf Tour ("SGT"), which is designed to be played alongside GSPro.[7]  Id. ¶¶ 60, 63.  However, like GSPro, "SGT copies and borrows from [plaintiff's] copyright-protected software."  Id. ¶ 64.  For example, without permission, defendants "downloaded, accessed, copied, and used" Perfect Golf's API data structures for simulating golf competitions.  Id. ¶ 65.

Third, Bogavac needed golf courses for GSPro users to play on the SGT platform.  Id. ¶ 44.  As plaintiff alleges, by "examining and studying" courses that were created on plaintiff's course design platform, Course Forge, defendants "learned how to build [competing software GSPro and SGT] that would play these courses."  Id. ¶ 74.  Thereafter, defendants allegedly undertook a "massive coordinated campaign . . . to convert Course Forge-designed courses for play in GSPro."  Id. ¶ 75.  By the time a new version of GSPro was released in January 2021, "more than two dozen converted courses were available."  Id. ¶ 76.  Plaintiff alleges that "even today, users are playing converted courses on GSPro and SGT."  Id. ¶ 79.

---

[7] SGT is a "commercial enterprise, and it has been from the start."  FAC ¶ 61. Currently, members pay $80 for one year of access to SGT.  Id.

**6. The SGT Defendants' Alleged Misstatements**

Plaintiff also alleges that the SGT Defendants have made numerous misleading statements regarding SGT's course offerings. See id. ¶ 67. Specifically, Cooke repeatedly promoted on social media and elsewhere that SGT's course selection included "iconic, branded courses like St. Andrews in Scotland and various PGA Tour Tournament Players Club courses throughout the United States." Id. Despite these representations, the SGT Defendants "did not have any licenses, including licenses of trademark rights, required to offer these and other branded courses to the public." Id. ¶ 69. By contrast, plaintiff had "diligently sought and obtained permission[], including trademark licenses, from the owners of branded golf courses," including St. Andrews and various PGA Tour courses. Id. ¶ 70. Eventually, in 2023, the trademark owners of the St. Andrews and PGA Tour courses sent cease-and-desist letters to defendants, after which defendants "removed, disabled access to, or renamed the St. Andrews and PGA Tour courses." Id. ¶ 71. By that point, however, "the damage had been done," as many customers had already elected to purchase GSPro and SGT rather than plaintiff's competing software. Id. ¶ 72.

**B.  Procedural History**

**1. The Initial Complaint**

On January 24, 2023, plaintiff sued only the GSP Defendants (Bogavac and his company GSP).  ECF No. 1.  Due to delays in effectuating service, ECF No. 16, the GSP Defendants did not file an answer and assert counterclaims until July 7, 2023, ECF No. 21. The GSP Defendants subsequently filed a pre-motion letter addressing their anticipated motion for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  ECF No. 28.  After plaintiff opposed that letter, the Court held a pre-motion conference on October 4, 2023.  See ECF Nos. 29, 31. Thereafter, the Court so-ordered the parties' agreed-upon schedule allowing plaintiff to file an amended complaint and the GSP Defendants to file a motion to dismiss the amended complaint.  ECF No. 31.

**2. The Amended Complaint**

On November 15, 2023, plaintiff filed its First Amended Complaint, which asserts five claims, this time against both the GSP Defendants and the SGT Defendants (Cooke and his company SGT). See FAC.  First, plaintiff asserts a direct copyright infringement claim against all defendants based on the allegation that after

-10-

they "downloaded, installed, accessed, and used [plaintiff's] Perfect Golf, Course Forge, and tournament API, which are protected by copyright," defendants "copied, prepared derivative works based on, and distributed literal and structural aspects of [plaintiff's] copyright-protected software." Id. ¶ 81.

Second, plaintiff asserts indirect copyright infringement claims against both Bogavac and Cooke because they "knew of and materially contributed to the direct infringements" of one another, their respective companies (GSP and SGT), and their associates. Id. ¶¶ 82-83.

Third, plaintiff asserts a breach of contract claim against all defendants. See id. ¶ 84. On this claim, plaintiff alleges that defendants "engaged in activities" that "do not constitute copying or any other violation of copyright law" but do violate the terms of the Perfect Parallel EULA. Id. ¶ 85. Specifically, defendants' violating conduct included "reverse engineering -- namely, studying and analyzing [plaintiff's] software and the courses created in Course Forge . . . to allow [d]efendants to develop, produce, and distribute GSPro, SGT, and simulator golf courses." Id.

Finally, plaintiff asserts a false advertising claim under the Lanham Act against the SGT Defendants in light of the "false

and misleading" statements they made about the availability of several "iconic, trademark golf courses" on their platform.  Id. ¶ 86.

### 3. The Motions to Dismiss

Each set of defendants -- the GSP Defendants and SGT Defendants -- filed a motion to dismiss the First Amended Complaint.  On December 15, 2023, the GSP Defendants filed their motion, which seeks to dismiss only plaintiff's breach of contract claim on the basis that it is expressly and impliedly preempted by the Copyright Act.[8]  See ECF No. 42 ("GSP Mot.").  On January 19, 2024, plaintiff filed its response in opposition to the GSP Defendants' motion to dismiss, ECF No. 47 ("GSP Opp."), and the GSP Defendants filed their reply on February 9, 2024, ECF No. 48 ("GSP Reply").

On March 8, 2024, the SGT Defendants filed their motion to dismiss, in which they seek to dismiss all claims asserted against them, namely, the direct copyright infringement claim, the indirect copyright infringement claim against Cooke, the breach of contract claim, and the false advertising claim.  See ECF No. 55

---

[8] As noted above, the GSP Defendants attached the EULA as an exhibit, ECF No. 43-1, which we can and will consider on this motion to dismiss.

("SGT Mot."). On April 12, 2024, plaintiff filed its response in opposition to the SGT Defendants' motion, ECF No. 57 ("SGT Opp."), and the SGT Defendants filed their reply on May 7, 2024, ECF No. 59 ("SGT Reply").[9]

## LEGAL STANDARD

Defendants collectively seek to dismiss plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. Acticon AG v. China N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012). In evaluating the sufficiency of a complaint, a district court may consider documents that are attached to the complaint, incorporated by reference in the

---

[9] The parties also filed letters notifying the Court of supplemental authority on May 13, 2024, ECF No. 60, and September 5, 2024, ECF No. 61.

complaint, or otherwise integral to the complaint.  <u>DiFolco v.</u>
<u>MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010).

<u>**DISCUSSION**</u>

As noted above, the SGT Defendants move to dismiss <u>all</u> the claims asserted against them, whereas the GSP Defendants move <u>only</u> to dismiss plaintiff's breach of contract claim.  Because the SGT Defendants' motion implicates all of plaintiff's claims, we analyze each claim in turn and address the GSP Defendants' partial motion to dismiss in the context of the contract claim.

**A.    Direct Copyright Infringement**

First, the SGT Defendants move to dismiss plaintiff's direct copyright claim on three distinct grounds, namely: (1) the API data structures at the center of this dispute are not copyrightable; (2) defendants have dispositive license and estoppel defenses; and (3) the statute of limitations bars the claim.  SGT Mot. at 7-15.  As further set forth below, each of these bases for dismissal is plagued by the same fundamental deficiency: they are not ripe for determination on a motion to dismiss.  Therefore, we deny the SGT Defendants' motion to dismiss plaintiff's direct copyright claim against them.

-14-

## 1. API Structures

We begin with the SGT Defendants' first argument that the API structures at the heart of plaintiff's copyright claim are not copyrightable.[10]  As an initial matter, the API data structures at issue include the shared naming conventions that allows a simulated golf tournament site like SGT (the "server") both to communicate with software like GSPro (the "client") and to process data, like how many shots it takes for a player to complete a hole in the golf simulation.  SGT Mot. at 9 (citing FAC ¶¶ 35, 56, 65).  The SGT Defendants argue that these API data structures, or naming conventions, are not copyrightable because they (1) lack originality; and (2) are "nothing more than a process, system, or method" expressly excluded from protection under the Copyright Act.  Id. at 10.  For the following reasons, we reject the SGT Defendants' arguments regarding the API structures.

"The sine qua non of copyright is originality.  To qualify for copyright protection, a work must be original to the author.  Originality, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied

_____

[10] It bears noting that plaintiff's copyright claim appears not to be limited to the copying of the API data structures, and therefore, even if we were to agree with the SGT Defendants on this issue, it would not completely resolve plaintiff's direct copyright claim.  See SGT Opp. at 4 (citing FAC ¶ 93).

from other works), and that it possesses at least some minimal degree of creativity." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991) (citation omitted). Critically, "the requisite level of creativity is extremely low; even a slight amount will suffice." Id. Indeed, as the Supreme Court has explained, "[t]he vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." Id. (quotations omitted).

Here, plaintiff has pleaded sufficient facts to satisfy the "modest" requirements of originality. Weissmann v. Freeman, 868 F.2d 1313, 1321 (2d Cir. 1989). As alleged, plaintiff's subsidiary Perfect Parallel spent "years" developing Perfect Golf, a golf game that provides, among other things, "an immersive experience centered on high-resolution visuals" and "hyper-realistic gameplay." FAC ¶ 31. Perfect Parallel also "built . . . an API for external tournament sites to be able to fully integrate into Perfect Golf for online real-time scoring and tracking." Id. ¶ 35. Such allegations, at this stage, are more than sufficient to demonstrate that Perfect Parallel both independently developed the subject API structures and made numerous creative decisions in

doing so.[11]  See <u>Nicholls v. Tufenkian Imp./Exp. Ventures, Inc.</u>, No. 04 Civ. 2110 (WHP), 2004 WL 1399187, at *2 (S.D.N.Y. June 23, 2004) (finding allegations that plaintiff "created an original design" in "approximately 1997 or 1998" sufficient to establish originality and withstand a motion to dismiss).

Tellingly, the SGT Defendants overlook these well-pleaded allegations and instead ask us to determine that plaintiff's API structures, which the SGT Defendants append to their motion, lack originality on their face.  <u>See</u> SGT Mot. at 10 (citing Declaration of Chad Cooke ("Cooke Decl."), Ex. 3).  Even if we could consider the API structures attached to their motion, the SGT Defendants' "merits-based argument . . . is premature."  <u>King-Devick Test Inc. v. NYU Langone Hosps.</u>, 17 Civ. 9307 (JPO), 2019 WL 78986, at *4 (S.D.N.Y. Jan. 2, 2019).  "[C]ourts in this Circuit have concluded that questions of originality are generally 'inappropriate for determination on a motion to dismiss.'"  <u>Sohm v. Mcgraw-Hill Glob. Educ. Holdings, LLC</u>, 16 Civ. 4255 (WHP), 2016 WL 5061116, at *2 (S.D.N.Y. Sept. 16, 2016) (quoting <u>FragranceNet.com v.</u>

---

[11] Although Perfect Golf is a registered copyright, it was only registered in September 2022, seven years after its publication in January 2015.  <u>See</u> Perfect Golf, Registration No. TX0009168826 (Sept. 14, 2022).  While production of a certificate of registration constitutes prima facie evidence of the validity of the copyright, it only does so when the registration was made before or within five years after first publication of the work.  <u>See</u> <u>Urbont v. Sony Music Ent.</u>, 831 F.3d 80, 88-89 (2d Cir. 2016).

FragranceX.com, Inc., 679 F. Supp. 2d 312, 320-21 (E.D.N.Y. 2010)).
Indeed, on such a motion, it is axiomatic that the question is not
whether plaintiff can definitively prove originality, as the SGT
Defendants suggest it is, but "whether [plaintiff] ha[s] made
sufficiently plausible allegations to justify the creation of an
evidentiary record on the question of originality in the first
place." King-Devick Test Inc., 2019 WL 78986, at *4. For the
reasons discussed above, we have no trouble answering this question
in the affirmative -- plaintiff has cleared the preliminary hurdle
of plausibly alleging originality such that an evidentiary record
on the issue should be developed. While the SGT Defendants'
merits-based contention may ultimately prove correct with the
benefit of discovery and expert opinions, the Court cannot say at
this early stage that plaintiff's API structures lack
originality.[12]

---

[12] In support of their argument, the SGT Defendants rely heavily on Ragan v.
Berkshire Hathaway Automotive, Inc., 91 F.4th 1267 (8th Cir. 2024), where the
Eighth Circuit affirmed the dismissal of a copyright infringement claim on the
basis that the document at issue lacked originality. Id. at 1271. That case,
however, is readily distinguishable. In Ragan, the Eighth Circuit's originality
determination relied on the fact that the subject document -- a single-page car
dealership customer intake form "containing fewer than 100 words seeking basic
information" -- was merely "a form designed to record, not convey, information."
Id. Here, by contrast, the API's entire purpose is to communicate, or convey,
information so that "external tournament sites [can] fully integrate into
Perfect Golf for real-time scoring and tracking." FAC ¶ 35. Thus, the Court
rejects the SGT Defendants' attempts to analogize plaintiff's potentially
complex tournament API to a simple customer intake form used by car dealerships.

Next, the SGT Defendants argue that plaintiff's copyright infringement claim fails because plaintiff's API data structures are a "process" or "method of operation" expressly excluded from copyright protection under the Copyright Act.  SGT Mot. at 11-13 (quoting 17 U.S.C. § 102(b)).  It is of course true that copyright protection does not "extend to any . . . process [or] method of operation."  17 U.S.C. § 102(b).  However, like the question of originality, whether plaintiff's API structures are a protectable process or method of operation cannot be determined on a motion to dismiss.  In what is likely the leading case on this issue, Oracle America, Inc. v. Google Inc., 750 F.3d 1339, (Fed. Cir. 2014), the U.S. Court of Appeals for the Federal Circuit explained that the question of whether non-literal elements of a computer program, including the "sequence, structure, and organization" of API structures, are protected under the Copyright Act "depends on . . . the particular facts of each case."  Id. at 1356.  With the benefit of a full trial record, the Federal Circuit concluded that Oracle's API packages were indeed entitled to copyright protection because, among other reasons, they could not be considered mere "processes" or "methods of operation."  See id. at 1348, 1368.[13]  The numerous cases cited by the SGT Defendants

---

[13] The U.S. Supreme Court initially denied the petition for certiorari that was filed after the Federal Circuit's decision addressing the copyrightability of

similarly demonstrate that this issue is not ripe for resolution on a motion to dismiss.  See SGT Mot. at 12 (citing cases).  In each of them, the court only decided the question of whether the relevant API constituted a process or method of operation after the completion of discovery, either on a motion for summary judgment or after trial.[14]  Therefore, the Court rejects the SGT Defendants' invitation to conclude, at this stage, that plaintiff's API is a process or method of operation precluded from protection under the Copyright Act.[15]

---

API data structures.  See Google, Inc. v. Oracle Am., Inc., 576 U.S. 1071 (2015).  However, after the Federal Circuit's second decision in the case, which addressed only the issue of fair use, Oracle Am. v. Google LLC, 886 F.3d 1179 (Fed. Cir. 2018), the Supreme Court granted certiorari on two questions: (1) whether certain API is copyrightable or instead constitutes a "process," "system," and "method of operation" that is expressly exempt from protection under the Copyright Act; and (2) whether Google's use of the API in that case was a fair use.  See Google LLC v. Oracle Am., Inc., 593 U.S. 1, 19-20 (2021).  But due to the "rapidly changing technological, economic, and business-related circumstances," the Supreme Court opted not to address the copyrightability question and instead resolved the case on fair use grounds.  Id. at 20.  As a result, the Federal Circuit's original opinion in Oracle, which we rely upon here, remains good law and is particularly instructive on this evolving issue.

[14] See, e.g., Baystate Techs., Inc. v. Bentley Sys., Inc., 946 F. Supp. 1079 (D. Mass. 1996) (trial); Lotus Dev. Corp. v. Borland Int'l, Inc., 49 F.3d 807 (1995) (multiple trials), aff'd, 516 U.S. 233 (1996); ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc., 402 F.3d 700 (6th Cir. 2005) (summary judgment); SAS Inst., Inc. v. World Programming Ltd., 64 F.4th 1319 (Fed. Cir. 2023) (summary judgment); Comput. Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693 (2d Cir. 1992) (trial).

[15] As the Supreme Court's decision in Oracle demonstrates, whether the type of API data structures at the heart of plaintiff's copyright claims are entitled to copyright protection has yet to be definitively resolved.  Therefore, we address plaintiff's claim as the law stands presently, but as discussed more fully below, we recognize that the legal landscape could change during the pendency of this litigation.

**2. Claimed Defenses**

The SGT Defendants also contend that plaintiff's copyright infringement claim should be dismissed because they have established license and estoppel defenses. See Mot. at 13-14. An affirmative defense may be raised on a motion to dismiss under Rule 12(b)(6), without resort to summary judgment, but only "if the defense appears on the face of the complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998). Here, the SGT Defendants stake their affirmative defense argument not on allegations contained in the operative complaint but instead on statements proffered in a declaration attached to their own motion to dismiss. See SGT Mot. at 13-14 (citing Cooke Decl.). On this basis alone, the Court refuses to consider the SGT Defendants' claimed defenses at this stage. See Spinelli v. Nat'l Football League, 903 F.3d 185, 199 (2d Cir. 2018) ("Because the existence of a license is an affirmative defense, it is a permissible basis for dismissal only where the facts necessary to establish the defense are evident on the face of the complaint." (quotations and citation omitted)); Morningstar Films, LLC v. Nasso, 554 F. Supp. 3d 525, 540-41 (E.D.N.Y. 2021) (stating that the "[estoppel] inquiry is 'peculiarly fact-specific' and, therefore, generally inappropriate for resolution on a motion to dismiss" (quoting

Broad. Music, Inc. v. Hearst/ABC Viacom Ent. Servs., 746 F. Supp. 320, 329-30 (S.D.N.Y. 1990)).

The Court likewise rejects the SGT Defendants' request to convert their motion into one for summary judgment. See SGT Mot. at 14. While a district court has discretion to convert a motion to dismiss into one for summary judgment, the "essential inquiry" in exercising such discretion is whether the parties "should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or [whether they were] taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleading." In re G & A Books, Inc., 770 F.2d 288, 295 (2d Cir. 1985). "Where both parties submit extrinsic evidence in support of their positions, a district court may fairly convert a motion to dismiss into one for summary judgment under Fed. R. Civ. P. 56." Carruthers v. Flaum, 388 F. Supp. 2d 360, 379 (S.D.N.Y. 2005). Here, however, the SGT Defendants are the only party to have submitted and relied upon extrinsic evidence; plaintiff has not had a comparable opportunity to address facts outside the pleadings. Moreover, as plaintiff explains, and as the SGT Defendants effectively concede, there remain "[s]ignificant disputed issues" regarding what licensing rights, if any, plaintiff granted to defendants. SGT Opp. at 12. These

factual issues can and should be fleshed out during discovery, not resolved by the Court without the benefit of a full evidentiary record.    Accordingly, the Court will not convert the SGT Defendants' motion into one for summary judgment and defers any consideration of their affirmative defenses until after the completion of discovery.

### 3. Statute of Limitations

Finally, the SGT Defendants assert that plaintiff's copyright claim is barred by the statute of limitations.    See SGT Mot. at 14-15.    The Copyright Act provides a three-year statute of limitations beginning when an infringement claim accrues.    See 17 U.S.C. § 507(b).    To determine when such a claim arises, the Second Circuit applies a discovery rule.    See Michael Grecco Prods., Inc. v. RADesign, Inc., 112 F.4th 144, 148 (2d Cir. 2024).    Under that rule, "an infringement claim does not accrue until the copyright holder discovers, or with due diligence should have discovered, the infringement."    Id. at 150 (quotations and emphasis omitted). As with other affirmative defenses, a statute of limitations defense may be decided on a Rule 12(b)(6) motion "only if it is clear on the face of the complaint" that the statute of limitations has indeed run.    Id.

In this case, it is unclear from the operative complaint
whether plaintiff's copyright infringement claim against the SGT
Defendants is untimely.  To the contrary, the allegations, when
viewed in the light most favorable to plaintiff, strongly suggest
that plaintiff's claim is indeed timely.  For context, the SGT
Defendants were added to this case on November 15, 2023.
Accordingly, to dismiss on timeliness grounds, it must be evident
that plaintiff discovered, or should have discovered, the SGT
Defendants' infringement before November 15, 2020.  Plaintiff
alleges that, although Bogavac (the owner of GSP) "set out to
produce his golf simulator software . . . [i]n the late summer and
early fall of 2019," plaintiff "was not aware of these development
efforts at that time."  FAC ¶ 50.  Plaintiff further alleges that,
"[a]t the same time," Bogavac began "coordinating" with the SGT
Defendants to "develop a similar golf tournament platform."  Id.
¶ 60.

The SGT Defendants argue that, because the "late summer and
early fall of 2019" is more than three years before they were added
to this case on November 15, 2023, plaintiff's infringement claim
against them is untimely on the face of the complaint.  SGT Mot.
at 15.  However, the late summer and early fall of 2019 was only
when defendants began taking steps to develop their allegedly

infringing product, suggesting that the thrust of the infringing conduct did not take place until much later.  Indeed, according to plaintiff, Cooke did not even register his company SGT until a full year later, on November 11, 2020, at which point he "continued to directly engage in the infringing activities alleged in this complaint."  FAC ¶ 97 (emphasis added).  These allegations thus support the reasonable inference that plaintiff did not and could not discover the SGT Defendants' infringing conduct until after November 15, 2020, placing plaintiff's infringement claim squarely within the three-year statute of limitations.  Therefore, it is hardly clear on the face of the complaint that plaintiff's claim against the SGT Defendants is untimely.  See Parisienne v. Scripps Media, Inc., 19 Civ. 8612 (ER), 2021 WL 3668084, at *2 (S.D.N.Y. Aug. 17, 2021) ("[W]here there is even some doubt as to whether dismissal is warranted, a court should not grant a Rule 12(b)(6) motion on statute of limitations grounds." (quotations omitted)).

For these reasons, the Court denies the SGT Defendants' motion to dismiss as to the direct infringement claim against them.

## B.    Secondary Copyright Infringement

The SGT Defendants also move to dismiss plaintiff's claim of secondary copyright infringement against Cooke on the basis that

(1) absent direct infringement, there is no secondary infringement; and (2) plaintiff fails to state a secondary infringement claim specifically against Cooke.  See Mot. at 15-17.  Since we have already concluded that plaintiff has stated a direct infringement claim, we need only address the SGT Defendants' second argument for dismissal.  However, that argument independently fails because plaintiff sufficiently pleads a secondary infringement claim against Cooke.

"To establish secondary infringement claims under a theory of contributory or vicarious infringement, a plaintiff must adequately allege direct infringement by a party other than the defendant."  Hartmann v. Amazon.com, Inc., 20 Civ. 4928 (PAE), 2021 WL 3683510, at *6 (S.D.N.Y. Aug. 19, 2021).  Once it is established that a third party committed direct copyright infringement, a defendant may be held liable for contributory (or secondary) infringement if he (1) possessed "knowledge of the infringing activity," and (2) "materially contribute[d] to the infringing conduct of another."  Arista Recs. LLC v. Lime Grp. LLC, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011) (quoting Matthew Bender & Co., Inc. v. West Pub. Co., 158 F.3d 693, 706 (2d Cir. 1998)).  The knowledge required is constructive, meaning that persons who "know or have reason to know of the direct

-26-

infringement" may be liable.  Arista Recs. LLC v. Doe 3, 604 F.3d
110, 118 (2d Cir. 2010) (quotations and emphasis omitted).
Material contribution requires that the defendant "encouraged or
assisted others' infringement, or provided machinery or goods that
facilitated infringement." Lime Grp., 784 F. Supp. 2d at 432.  To
qualify as material contribution, the defendant's support must be
"substantial." Arista Recs. LLC v. Usenet.com, Inc., 633 F. Supp.
2d 124, 155 (S.D.N.Y. 2009).

    In this case, plaintiff plainly alleges sufficient facts to
demonstrate that Cooke is secondarily liable for his company's
direct infringement.  As an initial matter, plaintiff alleges that
Cooke "is the owner, single member, and manager of [SGT]." FAC
¶ 5. Although the SGT Defendants correctly observe that "ownership
alone" may be insufficient to establish secondary liability, SGT
Mot. at 16-17 (citing Coach, Inc. v. Cont'l Gift, 2012 WL 13162344,
at *5 (E.D.N.Y. Aug. 24, 2024)), plaintiff alleges far more
involvement from Cooke than mere ownership.  For example, the
complaint states that Cooke "personally directed [SGT's] conduct,"
FAC ¶ 97, including by "carefully orchestrat[ing] and
coordinat[ing]" infringement efforts with other defendants,
id. ¶ 45. Additionally, plaintiff asserts that Cooke himself
"downloaded, installed, accessed, and used" plaintiff's Perfect

Golf, Course Forge, and tournament API in order to copy and distribute this copyright-protected software.  Id. ¶ 81.  As a result of these efforts, moreover, Cooke "received income" and "enjoyed a direct financial benefit."  Id. ¶ 102.  Collectively, these allegations are sufficient to state a claim for secondary liability against Cooke, and thus we deny the SGT Defendants' motion to dismiss as to the secondary infringement claim.[16]

## C.  **Breach of Contract**

As discussed above, plaintiff asserts that defendants breached the Perfect Parallel EULA (the licensing agreement) by engaging in reverse engineering of Perfect Golf and courses created in Course Forge.  See id. ¶¶ 108-17.  Unlike the other claims, both sets of defendants -- the GSP Defendants and the SGT Defendants -- move to dismiss plaintiff's breach of contract claim.  The GSP Defendants' position, which the SGT Defendants also adopt, is that the Copyright Act expressly and impliedly preempts plaintiff's contract claim.  See GSP Mot. at 7-23; SGT Mot. at 18-19.  Express, or statutory, preemption "preempts state law claims

---

[16] Plaintiff also states a claim for secondary liability against Cooke for materially and knowingly assisting the GSP Defendants in their direct copyright infringement.  For example, the complaint asserts, "as the developer of SGT[,] which [Cooke] designed to be interoperable with GSPro for tournament play, [Cooke] had the right and ability to supervise and control GSP's and Mr. Bogavac's infringing activities."  FAC ¶ 107.

to the extent that they assert rights equivalent to those protected by the Copyright Act, in works of authorship within the subject matter of federal copyright." In re Jackson, 972 F.3d 25, 33-34 (2d Cir. 2020) (citing 17 U.S.C. § 301). Implied preemption, on the other hand, "precludes the application of state laws to the extent that those laws interfere with or frustrate the functioning of the regime created by the Copyright Act." Id. at 33. For the following reasons, we hold that plaintiff's claim is expressly preempted by the Copyright Act, and, as a result, we need not reach the issue of implied preemption or the alternative grounds on which the SGT Defendants move to dismiss plaintiff's contract claim.

## 1. Express Preemption

Before we can address defendants' express preemption argument, a brief review of the EULA is necessary. As discussed above, any person who purchases Perfect Golf (including Course Forge and the API data structures) must agree and is subject to the EULA. See FAC ¶ 84. Plaintiff's breach of contract claim is based on a single provision of the EULA (the "Reverse Engineering Provision" or "RE Provision"), which provides:

> Notwithstanding the grant to you of a limited license to use the Software set as set forth in Section 3, above,[17] you may not: . . . decompile, disassemble, <u>reverse engineer</u>, or otherwise <u>attempt to derive the source code, underlying ideas, or algorithms of the Software</u>.

EULA at 3 (emphases added).  Plaintiff alleges that defendants violated this provision by "studying and analyzing [plaintiff's] software and the courses created in Course Forge in order to learn details of design, construction, and operation -- to allow [d]efendants to develop, produce, and distribute GSPro, SGT, and simulator golf courses."  FAC ¶ 85.  Elsewhere, plaintiff contends that "[b]y examining and studying Course Forge-created courses -- without at first copying them -- [d]efendants learned how to build . . . GSPro and tournament platform SGT that would play these courses."[18]  <u>Id.</u> ¶ 74.  Put simply, plaintiff claims that defendants breached the RE Provision by "studying and analyzing" plaintiff's software as part of its efforts to develop its own competing golf simulator software that would be compatible with Course Forge courses and third-party hardware.

---

[17] The EULA grants a limited, non-exclusive license to install Perfect Golf for "personal, non-commercial use."  FAC ¶ 84(a); EULA at 2.

[18] Plaintiff also alleges that defendants "reverse engineered the sim connector in Perfect Golf" to accommodate third-party launch monitors.  FAC ¶ 114.

Defendants argue that plaintiff's breach of contract claim is expressly preempted by the Copyright Act.  The Copyright Act's express preemption provision, Section 301, provides in full:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).  The Second Circuit "has interpreted the statute as directing a two-part analysis for determining whether a state law claim is preempted under § 301." Jackson, 972 F.3d at 42.  While we analyze both prongs of the test, as we must, our focus -- and the crux of the parties' dispute -- centers on the second prong of the two-part analysis.

### a. Subject Matter Requirement

The first prong of the express preemption inquiry, which has been labeled the "subject matter" requirement, "looks at the work that would be affected by the plaintiff's exercise of a state-created right, and requires (as an essential element of preemption) that the work 'come within the subject matter of copyright as specified by sections 102 and 103.'"  Id. (quoting 17 U.S.C.

§ 301(a)).  Thus, if the disputed work "is a 'literary work' . . . or [falls into] any other category of 'work of authorship' within the 'subject matter of copyright' (even if the subject of the claim is for some reason ineligible for copyright protection) the plaintiff's claim is subject to the possibility of statutory preemption."  Id. (quoting 17 U.S.C. § 102(a)).  In analyzing this prong, we are instructed to focus on "the gravamen of the claim and the allegations supporting it."  Id. at 47.

Here, plaintiff's claim is that defendants breached the EULA by reverse engineering plaintiff's software.[19]  See FAC ¶ 113.  Thus, since the underlying work at issue is software, it falls squarely within the subject matter of copyright because software has been deemed a "literary work" under Section 102(a)(1).  See Comput. Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 702 (2d Cir. 1992) ("While computer programs are not specifically listed as part of the above statutory definition, the legislative history leaves no doubt that Congress intended them to be considered literary works."); IBM Corp. v. Micro Focus (US), Inc., 676 F. Supp. 3d 263, 277 (S.D.N.Y. 2023) ("[S]oftware is protected as a

---

[19] As a general matter, reverse engineering is the process by which a "competitor . . . create[s] copies of copyrighted software for the purpose of analyzing that software and discovering how it functions."  Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 95 (2d Cir. 2014).

literary work under the Copyright Act."). Plaintiff itself acknowledges that its computer programs are "original works of authorship fixed in a tangible medium of expression and are protected by copyright," FAC ¶ 90, and it does not seriously dispute that its software falls inside the realm of copyright for preemption purposes, GSP Opp. at 20 n.6. Therefore, plaintiff's contract claim satisfies the subject matter requirement, and thus we move on to the more complex and vigorously disputed second prong of the two-part test.

### b. Equivalence Requirement

The second prong of the express preemption inquiry, referred to as the "equivalence" or "general scope" requirement, "looks at the right being asserted (over a work that comes within the 'subject matter of copyright') and requires (for preemption to apply) that the right be 'equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." Jackson, 972 F.3d at 43 (quoting 17 U.S.C. § 301(a) (emphasis in Jackson). Section 106 of the Copyright Act defines the "exclusive rights" granted by the federal copyright law, "which consist of the rights 'to do and to authorize' the reproduction, distribution, performance, and display of a work, and the creation of derivative works based on a work." Id. (quoting 17 U.S.C. § 106). "The

general scope [or equivalency] requirement is satisfied only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004). Accordingly, for preemption to apply, "the state law claim must involve acts of reproduction, adaptation, performance, distribution, or display." Id.

"Even if a claim otherwise satisfies the general scope requirement, a claim is not preempted if it 'include[s] any extra elements that make it qualitatively different from a copyright infringement claim.'" ML Genius Holdings LLC v. Google LLC, No. 20-3113, 2022 WL 710744, at *3 (2d Cir. Mar. 10, 2022) (quoting Briarpatch, 373 F.3d at 305), cert denied, 143 S. Ct. 2658 (2023). "To determine whether a claim is qualitatively different, we look at what the plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." Briarpatch, 373 F.3d at 306 (quotations and alterations omitted). Critically, the Second Circuit has admonished that the "extra element" inquiry is not "mechanical" but instead "requires a holistic evaluation of the nature of the rights sought to be enforced, and a determination whether the state law action is qualitatively different from a copyright infringement claim."

-34-

Jackson, 972 F.3d at 44 n.17 (quotations and emphasis omitted).

Therefore, under this test, state law claims "survive preemption

when [they] include a sufficiently significant 'extra element'

that 'qualitatively distinguishes [such claims] from claims for

copyright infringement." Id. at 44-45 (quoting Altai, 982 F.2d at

717).

As we wade into this analysis, we note that we are far from

the first court to grapple with whether the Copyright Act expressly

preempts a breach of contract claim.  To the contrary, it is widely

recognized that this question "has proven especially challenging"

for courts in this district.  Piuggi v. Good for You Prods. LLC,

--- F. Supp. 3d ---, No. 23 Civ. 3665 (VM), 2024 WL 3274638, at

*14 (S.D.N.Y. July 2, 2024) (citing cases).  In particular, there

has been widespread "disagreement among the district courts in

this Circuit about how [the] '[extra] elements' test applies to a

breach of contract claim, with courts reaching divergent

conclusions" regarding this issue.  Dow Jones & Co., Inc. v. Juwai

Ltd., No. 21 Civ. 7284 (PKC), 2023 WL 2561588, at *7 (S.D.N.Y.

Mar. 17, 2023); see also Canal+ Image UK Ltd. v. Lutvak, 773 F.

Supp. 2d 419, 442 n.5 (S.D.N.Y. 2011) (noting that "Courts of

Appeals are also divided on this issue").  Some courts have held

that "the extra element that saves a contract claim from preemption

is the promise itself." Canal+, 773 F. Supp. 2d at 442 (citing cases).  Under this view, breach of contract claims are, in effect, categorically exempt from express preemption because there is a "promise inherent in every contract." BroadVision Inc. v. Gen. Elec. Co., No. 08 Civ. 1489 (WHP), 2008 WL 468114, at *4 (S.D.N.Y. Oct. 15, 2008).  Meanwhile, other courts have taken a more fact-specific approach to the extra-elements test, holding "that a breach of contract claim is preempted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively to the plaintiff (such as unauthorized reproduction, performance, distribution, or display)." Canal+, 773 F. Supp.2d at 443 (quotations omitted) (citing cases).

Courts following the first approach -- that the contractual promise is itself the requisite extra element -- have (perhaps unsurprisingly) concluded that similar contractual prohibitions on reverse engineering are not preempted by the Copyright Act.  For example, in Bowers v. Baystate Technologies, Inc., 320 F.3d 1317 (Fed. Cir. 2003), the plaintiff asserted breach of contract claims against the defendant for allegedly violating a "broad[]" prohibition on reverse engineering embodied in the plaintiff's shrink-wrap license agreements.  Id. at 1326.  The U.S. Court of Appeals for the Federal Circuit rejected the defendant's express

preemption argument and held the plaintiff's contract claims escaped such preemption.  See id.  Following the reasoning of "most courts to examine this issue," the Federal Circuit explained that "mutual assent and consideration required by a contract claim" (i.e., the promise itself) "render that claim qualitatively different from copyright infringement."  Id. at 1324-25 (citing, e.g., ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir. 1996)). This approach, if we were to follow it, invariably leads to the conclusion that plaintiff's contract claim is not expressly preempted by the Copyright Act -- like any two parties to a contract, the parties here necessarily exchanged "mutual assent and consideration," which, under the Bowers line of cases, is sufficient to avoid express preemption.

However, as defendants correctly observe, the Second Circuit recently rejected the "promise-is-sufficient" approach reflected in Bowers.  See GSP Mot. at 21-22.  In ML Genius Holdings, the plaintiff published song lyrics with permission from the relevant copyright holders.  2022 WL 710744, at *1, n.3.  The defendants then allegedly copied those song lyrics and licensed them to Google, which was among the named defendants, in direct violation of the plaintiff's terms of service agreement.  Id. at *4.  The plaintiff subsequently brought breach of contract claims, alleging

that the defendants "breache[d] [plaintiff's] Terms of Service regarding the copying and reproduction of [plaintiff's] [c]ontent." Id. In response to the defendants' express preemption argument, the plaintiff contended, consistent with Bowers, that its breach of contract claims could not be preempted "because those claims require it to plead mutual assent and valid consideration." Id. (quotations omitted). In other words, the plaintiff argued the promise itself was the extra element necessary to save its contract claims from preemption. But the Second Circuit explicitly rejected that argument, reasoning that a contractual promise alone is "not sufficient . . . to avoid preemption" because such a "per se rule that all breach of contract claims are exempt from preemption . . . . would be in tension with [the Court's] precedent holding that the general scope inquiry is 'holistic.'" Id. (quoting Jackson, 972 F.3d at 44 n.17). Applying what seems to be a more fact-sensitive analysis, the Second Circuit held the plaintiff's contract claim was indeed preempted because "the right [the plaintiff] seeks to protect is coextensive with an exclusive right already safeguarded by the [Copyright] Act -- namely, control over reproduction and derivative use of copyrighted material." Id. (quotations and alterations omitted).

While <u>ML Genius</u> is non-precedential and does not address the well-documented disagreement on this issue, we find it prudent to apply the approach most recently adopted by the Second Circuit.[20] See also <u>Dow Jones & Co., Inc.</u>, 2023 WL 2561588, at *7 ("<u>ML Genius</u> is non-precedential, but this Court finds its reasoning and conclusion to be persuasive."). Under that approach, we do not simply accept that the promise inherent in every contract is sufficient to take plaintiff's contract claim outside the realm of copyright law and avoid preemption. Instead, the fundamental question is whether the rights that plaintiff seeks to protect through its breach of contract claim are "coextensive" with the exclusive rights protected by the Copyright Act. On this question, plaintiff asserts that its contract claim aims to protect distinct rights from copyright because it is specifically (and carefully) "directed to the <u>non-copying</u> acts of studying and analyzing copyrighted works." GSP Opp. at 21 (citing FAC ¶¶ 74, 85, 113,

---

[20] We also note that the Second Circuit, even before <u>ML Genius</u>, held that a breach of contract claim was expressly preempted because it "seeks solely to vindicate an exclusive right under the Copyright Act." <u>Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.</u>, 924 F.3d 32, 49 (2d Cir. 2019). Although its analysis is not particularly expansive, <u>Universal Instruments</u> implicitly rejects the <u>Bowers</u> approach simply because it holds that a contract claim can indeed be preempted. In other words, as in <u>ML Genius</u>, the Second Circuit in <u>Universal Instruments</u> did not merely accept the premise set forth in <u>Bowers</u> (and the like) that a promise alone is sufficient to avoid preemption. Therefore, <u>Universal Instruments</u> suggests that the Second Circuit was already beginning to move away from the <u>Bowers</u> approach in the years prior to <u>ML Genius</u>, which lends further support to our decision to apply the more fact-sensitive approach reflected in <u>ML Genius</u>.

117) (emphasis added).  However, in characterizing its pleadings
in this narrow fashion, plaintiff ignores the Second Circuit's
instruction to "holistic[ally]" evaluate the nature of the rights
sought to be enforced by the contract claim when conducting the
equivalency inquiry.  ML Genius, 2022 WL 710744, at *4 (quoting
Jackson, 972 F.3d at 44 n.17).  To that end, a thorough review of
all allegations supporting plaintiff's contract claim is in order.

Plaintiff points to five allegations in its complaint in
support of its argument that its contract claim is qualitatively
different from a copyright infringement claim.  See GSP Opp. at 21
(citing FAC ¶¶ 74, 85, 113, 117).  However, two of these
allegations must be disregarded at the outset because they assert,
in wholly conclusory terms, that plaintiff's contract claim is not
based on defendants' copying activities.  See FAC ¶ 85 ("Defendants
engaged in activities, which do not constitute copying or any other
violation of copyright law, in violation of the Perfect Parallel
EULA."); id. ¶ 117 ("[Plaintiff] does not allege contract claims
for Defendants' copying activities, which are the subject of
[plaintiff's] copyright infringement claims.").  After setting
aside these allegations, see Sacerdote v. N.Y. Univ., 9 F.4th 95,
107 (2d Cir. 2021), we turn our focus to the remaining three
allegations cited by plaintiff: (1) "[d]efendants' unlawful

-40-

conduct included reverse engineering -- namely, studying and analyzing [plaintiff's] software and the courses created in Course Forge . . . to allow [d]efendants to develop, produce, and distribute GSPro, SGT, and simulator golf courses, FAC ¶ 85; (2) "[d]efendants studied and analyzed [plaintiff's] software" and "undertook these activities to allow them to develop and distribute GSPro, SGT, and golf courses," id. ¶ 113; and (3) "[b]y examining and studying Course Forge-created courses -- without at first copying them -- [d]efendants learned how to build golf simulator software GSPro and tournament platform SGT that would play these courses," which they did "for commercial gain, to build their businesses," id. ¶ 74.

Even viewed in the light most favorable to plaintiff, these allegations reveal that plaintiff's contract claim is nothing more than a thinly veiled attempt to cloak what is, at bottom, a claim for copyright infringement. While plaintiff focuses solely on the purported reverse engineering activities of "studying and analyzing," it completely disregards the other parts of the same allegations, which answer the more important and dispositive question about those activities: to what end were defendants engaging in them? As the remainder of plaintiff's allegations tell us, "defendants undertook [those] activities [i.e., studying

and analyzing] . . . to develop, produce, and distribute"
allegedly infringing software, including GSpro and SGT.  Id. ¶ 85.
This explanation is fatal to plaintiff's contract claim.  What it
demonstrates is that defendants' reverse engineering activities
(i.e., studying and analyzing) were part and parcel of their
broader infringing conduct that is at the heart of plaintiff's
copyright claims (i.e., unlawfully developing, producing, and
distributing plaintiff's software).  In other words, alleging that
defendants "studied and analyzed" plaintiff's software as one step
in their overall efforts to "develop, produce, and distribute"
their own infringing software is effectively the same as alleging
that defendants reproduced, prepared a derivative work based upon,
and distributed copies of plaintiff's software in violation of the
Copyright Act.  Moreover, the fact that plaintiff's contract
allegations are almost substantively identical to those underlying
plaintiff's copyright infringement claims, see FAC ¶¶ 90-97,
demonstrates that the rights plaintiff seeks to protect in its
contract claim are indeed "coextensive" with those "already
safeguarded by the [Copyright] Act," ML Genius, 2022 WL 710744, at
*4.

Our conclusion is supported by recent case law following the
Second Circuit's ML Genius decision.  In IBM Corp., the plaintiff

claimed, in relevant part, that the defendant violated the provision in the parties' contract prohibiting "reverse assembling, reverse compiling, translating, or reverse engineering" of the plaintiff's software.  676 F. Supp. 3d at 278 (alterations omitted).  In light of this and similar allegations, the court found that "[t]he gravamen" of the provisions that were allegedly breached "is to prohibit [the defendant] from infringing [the plaintiff's] exclusive rights to copy and distribute its software."  Id.  The court thus concluded that the plaintiff's breach of contract claim "is simply a restatement of [the plaintiff's] claims under the Copyright Act for unlawful copying and distribution."  Id. (quoting New London Assocs., LLC v. Kinetic Soc. LLC, 384 F. Supp. 3d 392, 411 (S.D.N.Y. 2019)).  Because the same is true of plaintiff's contract claim here, that claim is expressly preempted by the Copyright Act and we "must [] dismiss [it] for failing to state a cause of action."  Briarpatch, 373 F.3d at 309.[21]

---

[21] The Court recognizes that there were likely well-founded strategic reasons underlying plaintiff's decision to assert a breach of contract claim alongside its copyright claims.  As discussed above, despite granting certiorari on the question of whether certain API data structures are copyrightable, the Supreme Court expressly left open that question for another day.  See Oracle, 593 U.S. at 19.  Thus, we can understand plaintiff's potential concern that during the pendency of this litigation, the Supreme Court (and/or the Second Circuit) could conceivably foreclose some or all of plaintiff's copyright claims by finding that its API structures are not copyrightable.  If that occurs, plaintiff could be wholly or partly without a remedy for its well-pleaded injury given our dismissal of the breach of contract claim.  For this reason, the Court dismisses

**D.    False Advertising**

Finally, we turn to plaintiff's false advertising claim under the Lanham Act, which is asserted only as to the SGT Defendants. Plaintiff alleges that Cooke (on behalf of himself and SGT) made statements that sought to commercially advertise and promote the availability of iconic branded golf courses for simulator play on the SGT platform.   FAC ¶ 119.   However, according to plaintiff, these statements were false and misleading because they suggested SGT was "authorized to offer genuine, trademarked courses," when, in reality, "SGT lacked the rights to offer these branded courses." Id. ¶¶ 120-21.  As plaintiff alleges, Cooke's conduct constitutes false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).  Id. ¶ 126.

The Lanham Act prohibits misrepresentations "in commercial advertising or promotion" of "the nature, characteristics, qualities, or geographic origin" of goods.   15 U.S.C. § 1125(a)(1)(B).   "To prevail on a false advertising claim, a plaintiff must establish that the message at issue is (1) either literally or impliedly false, (2) material, (3) placed in

_____

that contract claim without prejudice to plaintiff's filing a second amended complaint and/or a motion to reconsider our decision should there be any substantial changes in the law while this litigation is pending.

interstate commerce, and (4) the cause of actual or likely injury to the plaintiff." Souza v. Exotic Island Enters., 68 F.4th 99, 118 (2d Cir. 2023) (quotations omitted). The SGT Defendants argue that plaintiff's false advertising claim should be dismissed because plaintiff fails to plead falsity, materiality, and injury.[22] SGT Mot. at 21-23. For the following reasons, however, we disagree and conclude that plaintiff does indeed state a claim for false advertising under 15 U.S.C. § 1125(a)(1)(B).[23]

## 1. Falsity

A plaintiff bringing a false advertising claim must show falsity. See Apotex Inc. v. Acorda Therapeutics, 823 F.3d 51, 63 (2d Cir. 2016). There are two ways to do so. "First, a plaintiff can demonstrate that the challenged advertisement is literally false, i.e., false on its face." Id. (quotations omitted).

---

[22] There is no dispute that the representations at issue were placed in interstate commerce.

[23] At the outset, while the parties do not address it, the Court finds that plaintiff maintains the requisite standing to assert a false advertising claim under the Lanham Act. See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 n.6 (2014) (stating that standing is an element of a false advertising claim). First, plaintiff's false advertising claim falls into the "zone of interests" that the Lanham Act protects, id. at 137, because plaintiff alleges that it suffered "substantial damage" to its business reputation, goodwill, market share, as well as a loss in profits. FAC ¶ 125. Second, plaintiff has shown that the injury was "proximately caused" by the SGT Defendants' alleged false advertising, Lexmark, 572 U.S. at 139, because it alleges that the misstatements made by the SGT Defendants directly influenced consumers' decisions to purchase GSPro and SGT, rather than plaintiff's competing software, resulting in a substantial loss in profits for plaintiff. See FAC ¶¶ 123, 125.

Second, "a plaintiff can show that an advertisement, while not
literally false, is nevertheless likely to mislead or confuse
consumers." Id. (quotations omitted). Plaintiff claims that
Cooke's representations satisfy both types of falsity, while the
SGT Defendants argue that plaintiff cannot establish either. As
discussed below, we conclude that although plaintiff cannot
establish literal falsity, it does allege sufficient facts to
demonstrate implied falsity (i.e., likelihood of confusion).

### a. Literal Falsity

Plaintiff claims the SGT Defendants' statements that "iconic,
branded golf courses were available for simulator play on SGT" are
false on their face because the SGT Defendants lacked the licenses
necessary to offer those courses on their simulator in a legal
manner. SGT Opp. at 22 (citing FAC ¶¶ 67-71, 86, 120). This
argument is insufficient to establish literal falsity. To be
literally false, plaintiff would have to allege that, contrary to
the SGT Defendants' representations, the "iconic, branded golf
courses" were not actually available for simulator play on SGT.
However, plaintiff's own allegations show the exact opposite: that
those courses were indeed available for play on SGT albeit without
the requisite authorization (i.e., licenses) from those courses.
See FAC ¶¶ 67-69. Indeed, precisely because the SGT Defendants

made these branded courses available for play, the trademark owners of several of the courses sent defendants cease-and-desist letters with which defendants complied. See id. ¶ 71. In other words, the allegation that the branded courses were made available on SGT unlawfully does render false the SGT Defendants' representation that these courses were, in fact, available for play on SGT. Therefore, we conclude that the challenged statements are not literally false.

### b. Implied Falsity

Although plaintiff has not demonstrated that the SGT Defendants' representations were literally false, it may still succeed on a Lanham Act false advertising claim under an implied falsity theory.[24] "Typically, to demonstrate implied falsity, a plaintiff must present evidence of consumer deception or confusion." Merck Eprova AG v. Brookstone Pharm., LLC, 920 F. Supp. 2d 404, 418 (S.D.N.Y. 2013). That is, "a district court must rely on extrinsic evidence [of consumer deception or

---

[24] In setting forth the relevant law for implicit falsity, plaintiff seems to rely on cases addressing false advertising claims under New York state law. See SGT Opp. at 23 (citing cases). However, plaintiff only asserts a false advertising claim under the Lanham Act, FAC ¶ 126, and therefore, the case law that plaintiff cites is largely inapt.

confusion] to support a finding of an implicitly false message."[25]
Time Warner Cable, Inc v. DIRECTV, Inc., 497 F.3d 144, 153 (2d
Cir. 2007).   "Such extrinsic evidence is generally provided by
customer surveys exhibiting customer confusion." Merck Eprova AG,
920 F. Supp. 2d at 418.   At the motion to dismiss stage, however,
"plaintiffs need only state that there was confusion and offer
facts to support that claim." Restellini v. Wildenstein Plattner
Inst., Inc., 20 Civ. 4388 (AT), 2021 WL 4340824, at *7 (S.D.N.Y.
Sept. 22, 2021) (quoting Kuklachev v. Gelfman, 600 F. Supp. 2d
437, 473 (E.D.N.Y. 2009); Lokai Holdings LLC v. Twin Tigers USA
LLC, 306 F. Supp. 3d 629, 639 (S.D.N.Y. 2018)).

Here, plaintiff alleges sufficient facts to support its claim
that the SGT Defendants' representations caused customer
confusion.   As plaintiff alleges, the SGT Defendants repeatedly
touted the availability of iconic, branded courses for play on
SGT, falsely suggesting that SGT had the requisite licenses -- and
indeed endorsement -- from those courses.   See FAC ¶¶ 67-68, 72,
86.   In plaintiff's view, consumers relied on these implicitly
false statements and were drawn to SGT (and GSPro) as a direct

---

[25] However, "if the plaintiffs can demonstrate that defendants 'have
intentionally set out to deceive the public,' then no survey is required."
Kuklachev v. Gelfman, 600 F. Supp. 2d 437, 470 (E.D.N.Y. 2009) (quoting Johnson
& Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp., 960 F.2d
294, 298 (2d Cir. 1992)).

result of them.  See id. ¶ 68.  While plaintiff will have to
develop evidence of customer confusion in discovery to
substantiate its claim, these allegations are enough, at this
stage, to establish that consumers purchased SGT (and GSPro) based
upon their false belief that the iconic courses offered on SGT
were genuine and authorized by the courses themselves.

Additionally, "where a plaintiff adequately demonstrates that
a defendant has intentionally set out to deceive the public, and
the defendant's deliberate conduct in this regard is of an
egregious nature, a presumption arises that consumers are, in fact,
being deceived."  Johnson & Johnson * Merck Consumer Pharm. Co. v.
Smithkline Beecham Corp., 960 F.2d 294, 298-99 (2d Cir. 1992)
(quotations omitted).  Here, although plaintiff does not expressly
rely on this theory of confusion, there are enough facts to suggest
that such theory may be viable.  For example, plaintiff alleges
that the SGT Defendants (1) knew that they did not have the
requisite authorization to make available the trademarked courses;
(2) made a litany of statements on social media and elsewhere
suggesting that they had such authorization; and (3) made these
statements with the intention of influencing "a significant number
of users" to purchase SGT subscriptions and GSPro downloads on the
basis that they could play "at some of the most coveted courses

around the world." FAC ¶¶ 68-72. These allegations allow the Court to presume that customers are being deceived, and thus plaintiff plausibly alleges that the SGT Defendants' representations are misleading.

## 2. Materiality

In addition to establishing falsity, plaintiff must also establish materiality -- that the SGT Defendants "misrepresented an inherent quality or characteristic of the product." <u>Nat'l Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d 841, 855 (2d Cir. 1997) (quotations omitted). "In other words, the allegedly false statement must be likely to influence purchasing decisions." <u>Int'l Code Counsel, Inc. v. UpCodes Inc.</u>, 43 F.4th 46, 63 (2d Cir. 2022) (quotations omitted). Thus, the materiality inquiry "analyzes whether [the consumer] confusion . . . related to an inherent quality of the product, such that they would influence consumers' purchasing decisions." <u>Id.</u> at 64 n.10. The Second Circuit has "declared that plaintiffs should be given the opportunity to develop their evidence to demonstrate materiality" such that materiality "generally cannot be determined on consideration of a motion to dismiss." <u>Id.</u> at 64 (quotations omitted).

Here, plaintiff's allegations that the SGT Defendants' misleading statements likely influenced purchasing decisions are plausible. At the core of plaintiff's apparent commercial success is that it "diligently sought and obtained permissions, including trademark licenses, from the owners of branded golf courses," including St. Andrews and PGA Tour courses. FAC ¶ 69. In the golf simulator market, it is unsurprising that consumers would be convinced to purchase plaintiff's product not only because those courses are available on the platform but also because the courses are official partners of plaintiff. That is, the success of plaintiff's product plausibly depends on what could be characterized as endorsements from these iconic courses, which plaintiff says were hard-earned. See id. ¶ 70. Thus, it is entirely reasonable, as plaintiff alleges, that when the SGT Defendants began to misleadingly suggest that they, too, were officially licensed by and affiliated with St. Andrews and PGA Tour courses, "a significant number of users" were influenced to join SGT and GSPro, rather than plaintiff's platform. Id. ¶ 68. Therefore, plaintiff has adequately demonstrated that the misrepresentations at issue were indeed material. See Travel Leaders Grp., LLC v. Corley, 19 Civ. 1595 (GBD)(JLC), 2019 WL 6647319, at *8 (S.D.N.Y. Dec. 5, 2019) (finding plaintiff

adequately alleged materiality based on "the defendants' erroneous claim of affiliation with . . . a company with which [they have] never been affiliated"), report and recommendation adopted by, 2022 WL 950957 (S.D.N.Y. Mar. 30, 2022); Chanel, Inc. v. RealReal, Inc., 449 F. Supp. 3d 422, 444 (S.D.N.Y. 2020) (finding plaintiff plausibly alleged materiality "based on [defendant's] [false] representation that all the products it offers have been authenticated and are 100% the real thing").

Nevertheless, the SGT Defendants contend that Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003), and its progeny preclude plaintiff's false advertising claim.[26] SGT Mot. at 23-24. Dastar "addresses the interplay between copyright -- which protects authors' rights in their creations -- and unfair competition laws [namely, the Lanham Act] -- which protect consumers from, inter alia, confusion as to the origin of goods." Vaad L'Hafotzas Sichos, Inc. v. Krinsky, 133 F. Supp. 3d 527, 538 (E.D.N.Y. 2015). In that case, a film company copied a documentary series that had passed into the public domain onto videotapes that it then sold under its own name. See Dastar, 539 U.S. at 27-28. Production companies that owned the exclusive rights to the series

---

[26] Although they do not couch their Dastar argument in the context of the materiality analysis, we find it appropriate to do so. See Restellini, 2021 WL 4340824, at *7 (addressing similar Dastar argument in materiality inquiry).

asserted a Lanham Act claim against the film company for false designation of origin. See id. Specifically, the production companies alleged that the lack of attribution to the original series misrepresented the "origin" of the series, in violation of 15 U.S.C. § 1125(a)(1)(A), which makes it unlawful to make misrepresentations that "[are] likely to cause confusion . . . as to the origin . . . of [the defendant's] goods."

The question before the Court was whether "origin of goods," as used in § 1125(a)(1)(A) of the Lanham Act, referred to the producer of the physical goods for sale (i.e., the videotapes owned by the film company) or the creator of the intangible, creative content on the videotapes (i.e., the documentary owned by the production companies). See id. at 31. The Court concluded that the term "origin of goods" referred to the former: "to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." Id. at 37. To hold otherwise, the Court reasoned, the Lanham Act would provide authors of creative works with a perpetual protection that is not offered to them under the Copyright Act. Id. As a result, the production companies could not recover for false designation of origin because the film company had accurately

represented that it was indeed the "origin" of the physical videotapes it sold as its own.[27]  See id. at 38.

As the SGT Defendants observe, some courts "have extended the Supreme Court's ruling [in Dastar] to preclude Lanham Act claims premised upon false representations of licensing status."  SGT Mot. at 24 (quoting Micro/sys, Inc. v. DRS Techs., Inc., 2015 WL 12748631, at *2 (C.D. Cal. Feb. 18, 2015)).  The most notable example of this application is Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137 (9th Cir. 2008), in which sellers of karaoke recordings misrepresented to their customers that their recordings were "100% licensed," i.e., that they held the underlying rights to the songs on the recordings, even though, for at least some songs, the sellers held "no licenses at all."  Id. at 1141.  On this basis, the plaintiff sued the sellers for false advertising under 15 U.S.C. § 1125(a)(1)(B), which, as discussed above, requires a showing that the defendants "misrepresent[ed] the nature, characteristics, qualities, or geographic origin" of their goods.  However, the U.S. Court of Appeals for the Ninth Circuit, citing Dastar, rejected the plaintiff's argument that "the

---

[27] The Court did note that if the film company had misrepresented, in advertising or promotion, that the contents of the video were significantly different from the series that it copied, it would have a false advertising claim under the Lanham Act for misrepresenting the "nature, characteristics, [or] qualities" of its goods.  Dastar, 539 U.S. at 38.

-54-

licensing status of each work is part of the nature,
characteristics, or qualities of the karaoke products."
Sybersound, 517 F.3d at 1144.  Rather, "to avoid overlap between
the Lanham and Copyright Acts, the nature, characteristics, and
qualities of karaoke recordings under the Lanham Act are more
properly construed to mean characteristics of the good itself,
such as the original song and artists of the karaoke recording,
and the quality of its audio and visual effects."  Id.  The Ninth
Circuit reasoned that "[c]onstruing the Lanham Act to cover
misrepresentations about copyright licensing status . . . would
allow [distributors] of copyrightable materials to litigate the
underlying copyright infringement when they have no standing to do
so."  Id.

Courts in this district have adopted similar reasoning.  For
example, in Agence France Presse v. Morel, 769 F. Supp. 2d 295
(S.D.N.Y. 2011), a professional photojournalist asserted a false
advertising claim against news outlets for falsely representing
that they were authorized to use certain of his photographs.  Id.
at 308.  In light of Dastar, however, the district court dismissed
the claim because such misrepresentations did not concern "the
nature, characteristics, qualities, or geographic origin" of the
photographs.  Id.  The court explained that the photojournalist

"holds copyrights for his photographs, and his recourse for unauthorized copying, whether through a false claim of authorship or a false assertion of license, lies in copyright law, not in trademark." Id. at 307-08.

Contrary to the SGT Defendants' argument, this line of cases has no bearing on, and certainly does not foreclose, plaintiff's false advertising claim. The rationale animating Dastar and its progeny is to clearly bifurcate the distinct set of protections offered by the Lanham and Copyright Acts. Said otherwise, Dastar and the like are concerned about impermissibly blurring the lines between trademark and copyright law. Plaintiff's false advertising claim, however, does not implicate any such concerns. To the contrary, plaintiff's claim is based solely on the SGT Defendants' misleading statements regarding the licensing of trademarked courses, not the licensing of expressive copyrighted (or copyrightable) material. Unlike Dastar and its progeny, the misrepresentations at issue have nothing to do with claims of authorship of an expressive work or creation of an invention. Plaintiff does not contend, for example, that the SGT Defendants failed to credit plaintiff with creating the simulated version of courses like St. Andrews. That allegation is properly the subject of plaintiff's copyright claim. Similarly, plaintiff does not

allege that the SGT Defendants failed to credit St. Andrews with designing the actual course underlying the simulated version. Rather, the statements that plaintiff challenges are those falsely suggesting that trademarked courses available for play on SGT were genuine and sanctioned by the courses themselves. That is a paradigmatic Lanham Act claim, not a disguised copyright claim, and therefore <u>Dastar</u> and its progeny do not preclude it. Accordingly, we reject the SGT Defendants' argument and find that their misleading statements were material.

### 3. Injury

Finally, the SGT Defendants assert, albeit briefly, that plaintiff fails to establish that plaintiff suffered any injury as a result of the allegedly false advertising. SGT Mot. at 23. However, this argument is unavailing. Plaintiff claims that the various misrepresentations about SGT's course offerings "resulted in the diversion of sales from [plaintiff]." SGT Opp. at 24 (citing FAC ¶¶ 67-68, 72, 86, 125). For example, plaintiff alleges that "[u]sers who otherwise would have purchased [plainitff's] launch monitors and used [plaintiff's] software for simulator play were diverted to buy SGT memberships and purchase GSPro as a consequence of [the SGT Defendants'] false and misleading statements." FAC ¶ 86. This and comparable allegations in the

operative complaint are sufficient to establish harm because "diversion of sales to a direct competitor [is] the paradigmatic direct injury from false advertising." Lexmark, 572 U.S. at 138. Therefore, we reject the SGT Defendants' cursory argument regarding plaintiff's alleged injury and deny their motion to dismiss as to the false advertising claim.

## CONCLUSION

For the foregoing reasons, the GSP Defendants' motion to dismiss is granted in full and SGT Defendants' motion is granted as to plaintiff's breach of contract claim and denied as to all other claims. Accordingly, plaintiff's breach of contract claim is the only claim that is dismissed, and its other four claims -- a direct copyright infringement claim, two secondary copyright infringement claims, and a false advertising claim -- survive the SGT Defendants' motion. The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 41 and 53.


**SO ORDERED.**

Dated:    September 24, 2024
          New York, New York

                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

-58-